UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,

                Plaintiff,

     v.

STEPHEN A. WYNN,

                Defendant.

Case No. 1: 22-cv-01372-JEB

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT

Reid H. Weingarten (D.C. Bar No. 365893)
Brian M. Heberlig (D.C. Bar No. 455381)
Nicholas P. Silverman (D.C. Bar No.1014377)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rweingarten@steptoe.com
bheberlig@steptoe.com
nsilverman@steptoe.com

Robert D. Luskin (D.C. Bar No. 293621)
Leo R. Tsao (*pro hac vice to be filed*)
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC  20036
Tel: (202) 551-1700
Fax: (202) 551-0410
robertluskin@paulhastings.com
leotsao@paulhastings.com

*Counsel for Defendant Stephen A. Wynn*

Dated: July 18, 2022

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

BACKGROUND .................................................................................................................. 4

LEGAL STANDARD .......................................................................................................... 8

ARGUMENT ....................................................................................................................... 8

I.     FARA Does Not Require Registration After an Agency Relationship Ends...................... 8

     A.    Under *McGoff*, There Is No Continuing Obligation to Register After the Agent Ceases Acting on Behalf of the Foreign Principal ................................................. 9

          1.    *McGoff*'s Analysis of FARA's Text ........................................................ 9

          2.    *McGoff's* Analysis of Legislative Intent .................................................. 11

          3.    *McGoff* Precludes Injunctive Relief After an Agency Relationship Has Concluded ................................................................................................. 11

     B.    *McGoff*'s Holding Is Consistent with FARA's Purpose to Allow Contemporaneous Evaluation of Political Speech and Activities......................... 12

     C.    *McGoff*'s Holding Is Consistent with the Limited Purpose of Injunctive Relief.. 13

II.    Compelling Wynn to Swear that He Was an Agent of Foreign Principals Would Violate His Fifth and First Amendment Rights ............................................................................... 14

     A.    Compelling Wynn to Contradict His Past Testimony and Statements Would Violate the Fifth Amendment .................................................................................. 15

     B.    Compelling Wynn to Speak a Government-Dictated Message Would Violate the First Amendment ................................................................................................... 17

          1.    Compelling Wynn to Speak a Government-Dictated Message Is a Content-Based Restriction Subject to Strict Scrutiny ............................... 18

          2.    FARA's Content-Based Restriction Fails Strict Scrutiny as Applied in This Case........................................................................................................ 19

          3.    Exacting Scrutiny Does Not Apply, But Even If It Did, the Requested Relief Is Unconstitutional ........................................................................ 20

               a.    Exacting Scrutiny Does Not Apply to Statements of Opinion or Ideological Belief ......................................................................... 21

               b.    Exacting Scrutiny Does Not Permit the Government to Compel Statements of Controversial Information that the Speaker Believes to Be False ...................................................................................... 22

               c.    Compelling Wynn to Speak the Requested Government-Dictated Message Fails Even Exacting Scrutiny ........................................... 26

III.   The Complaint Fails to Sufficiently Allege That Wynn Acted as an Agent of a Foreign Principal ........................................................................................................ 29

    A.   The Complaint Fails to Allege That Wynn Had an Agency Relationship With a Foreign Principal ........................................................................................... 29

        1.   A Person Acting on a Mere Request, Absent Orders, Direction, or Control, Is Not an Agent of a Foreign Principal ....................................... 30

        2.   The Government's Arguments for a Broad Interpretation of "Request" Are Without Merit ................................................................................... 33

        3.   FARA's Legislative History Confirms that "Request" Was Not Intended to Materially Expand the Statute's Scope ................................................ 36

    B.   The Complaint Fails to Allege That Wynn Engaged in Political Activities ........ 38

        1.   The Complaint's Factual Allegations Support Only That Wynn Delivered a Message to the President and Administration Officials, and Not That He Engaged in Any Lobbying or Other Efforts to Influence on the PRC's Behalf ...................................................................................... 39

        2.   Merely Conveying a Message From the PRC Without Any Attempt to Influence Administration Officials on the PRC's Behalf Does Not Qualify as a "Political Activity" Under FARA ....................................... 41

**CONCLUSION** ............................................................................................................ **43**

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                   **Page(s)**

*ACLU v. Jennings*,
   366 F. Supp. 1041 (D.D.C. 1973), *vacated as moot sub nom. Staats v. ACLU*,
   422 U.S. 1030 (1975).............................................................................................27

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*,
   570 U.S. 205 (2013)...............................................................................................21

*Am. Lithotripsy Soc. v. Thompson*,
   215 F. Supp. 2d 23 (D.D.C. 2002).........................................................................37

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021)...............................................................................20, 26, 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................8

*Assoc. Builders & Contractors of Se. Tex. v. Rung*,
   No 16-cv-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016)................................24

*Att'y Gen. v. Irish N. Aid Comm.*,
   530 F. Supp. 241 (S.D.N.Y. 1981), *aff'd* 668 F.2d 159 (2d Cir. 1982) (per curiam)........33, 34

*Att'y Gen. v. Irish N. Aid Comm.*,
   668 F.2d 159 (2d Cir. 1982) (per curiam).......................................................33, 34

*BedRoc Ltd. v. United States*,
   541 U.S. 176 (2004)...............................................................................................36

*Block v. Meese*,
   793 F.2d 1303 (D.C. Cir. 1986)........................................................................20, 21

*Brady v. Assoc. Press Telecomm.*,
   No. 16-cv-2693, 2017 WL 111783 (S.D.N.Y. Jan. 11, 2017), *aff'd*, 714 F. App'x 62
   (2d Cir. 2018)........................................................................................................15

*Brody v. Bruner*,
   No. 19-cv-01091, 2021 WL 4264055 (D. Colo. Sept. 20, 2021)...........................41

*Buckley v. Valeo*,
   424 U.S. 1 (1976)...................................................................................................21

*Burns v. Martuscello*,
   890 F.3d 77 (2d Cir. 2018).....................................................................................25

*Calzone v. Summers*,
    942 F.3d 415 (8th Cir. 2019) (en banc) ...........................................................26, 27

*Canyon Ferry Rd. Baptist Church v. Unsworth*,
    556 F.3d 1021 (9th Cir. 2009) ...........................................................................26

*Citizens United v. FEC*,
    558 U.S. 310 (2010)...........................................................................................21

*Cressman v. Thompson*,
    798 F.3d 938 (10th Cir. 2015) ...........................................................................19

*CREW v. Pompeo*,
    19-cv-3324 (JEB), 2020 WL 5748105 (D.D.C. Sept. 25, 2020) ...................8, 29

*Fla. Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995)...........................................................................................23

*Fritz v. Gorton*,
    517 P.2d 911 (Wash. 1974)................................................................................26

*FTC v. Facebook, Inc.*,
    No. 20-cv-3590 (JEB), 2022 WL 103308 (D.D.C. Jan. 11, 2022) .....................4

*Gooding v. United States*,
    416 U.S. 430 (1974)...........................................................................................37

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)...........................................................................................32

*Hoffman v. United States*,
    341 U.S. 479 (1951)...........................................................................................15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995)...........................................................................................18

*Jackler v. Byrne*,
    658 F.3d 225 (2d Cir. 2011)...............................................................................25

*Janus v. Am. Fed'n of State, Cnty., & Mun. Empls.*,
    138 S. Ct. 2448 (2018).......................................................................................18

*Johnson v. Fabian*,
    735 N.W.2d 295 (Minn. 2007)...........................................................................16

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) .............................................................................8

*Kang v. Cooper*,
  No. 95-cv-5508, 1999 WL 412437 (N.D. Ill. June 9, 1999)....................................................17

*McCarthy v. Bronson*,
  500 U.S. 136 (1991)........................................................................................................30

*McCullen v. Coakley*,
  573 U.S. 464 (2014)........................................................................................................20

*McDonnell v. United States*,
  136 S. Ct. 2355 (2016)...............................................................................................31, 32

*Meese v. Keene*,
  481 U.S. 465 (1987)......................................................................................1, 12, 19, 20, 24

*Mia. Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974)...................................................................................................22, 23

*N.J. State Chamber of Comm. v. N.J. Elec. Law Enforcement Comm'n*,
  82 N.J. 57 (N.J. 1980)....................................................................................................26

*Nat'l Ass'n of Mfrs. v. Taylor*,
  582 F.3d 1 (D.C. Cir. 2009)...........................................................................................26

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018)..............................................................................................18, 19

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015)..................................................................................23, 24, 25

*Neilson v. United States*,
  674 F. Supp. 2d 248 (D.D.C. 2009) ...............................................................................15

*Papasan v. Allain*,
  478 U.S. 265 (1986)........................................................................................................29

*Ratzlaf v. United States*,
  510 U.S. 135 (1994)........................................................................................................36

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)........................................................................................................19

*Riley v. Nat'l Fed'n of the Blind*,
  487 U.S. 781 (1988)..............................................................................................17, 19, 23, 28

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997)........................................................................................................36

*Scott v. Dist. Hosp. Partners*,
   60 F. Supp. 3d 156 (D.D.C. 2014) ....................................................................4

*SEC v. C. M. Joiner Leasing Corp.*,
   320 U.S. 344 (1943) .........................................................................................2

*SEC v. Steadman*,
   967 F.2d 636 (D.C. Cir. 1992) .......................................................................13

*Seminole Tribe of Fla. v. Florida*,
   517 U.S. 44 (1996) ...........................................................................................9

*Sullivan v. Evans*,
   No. 13-cv-595, 2013 WL 6383033 (D. Md. Dec. 4, 2013) ..............................15

*United States v. Bahadar*,
   954 F.2d 821 (2d Cir. 1992) ...........................................................................16

*United States v. Broidy*,
   No. 20-cr-210 (D.D.C.) .....................................................................................5

*United States v. Chriswell*,
   401 F.3d 459 (6th Cir. 2005) ..........................................................................42

*United States v. Craig*,
   401 F. Supp. 3d 49 (D.D.C. 2019) ........................................................1, 12, 42

*United States v. Davis*,
   No. 20-cr-68 (D. Hawaii) ..................................................................................5

*United States v. Fortin*,
   685 F.2d 1297 (11th Cir. 1982) (per curiam) ..................................................16

*United States v. Hasan*,
   609 F.3d 1121 (10th Cir. 2010) ......................................................................17

*United States v. Higginbotham*,
   No. 18-cr-343 (D.D.C.) .....................................................................................5

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999) ...........................................................................16

* *United States v. McGoff*,
   831 F.2d 1071 (D.C. Cir. 1987) ................................................................ *passim*

*United States v. Michel*,
   No. 19-cr-148 (D.D.C.) .....................................................................................5

*United States v. Nat'l Comm. for Impeachment,*
  469 F.2d 1135 (2d Cir. 1972) ............................................................ 26

*United States v. Playboy Entm't Grp.,*
  529 U.S. 803 (2000) ........................................................................ 20

*United States v. Sindel,*
  53 F.3d 874 (8th Cir. 1995) ............................................................ 25

*United States v. W. T. Grant Co.,*
  345 U.S. 629 (1953) ........................................................................ 13

*Viereck v. United States,*
  318 U.S. 236 (1943) ............................................................... 1, 12, 19

*W. Va. Bd. of Educ. v. Barnett,*
  319 U.S. 624 (1943) .................................................................. 18, 22

*Wooley v. Maynard,*
  430 U.S. 705 (1977) ...................................................... 18, 21, 22, 23

*Yates v. United States,*
  574 U.S. 528 (2015) .................................................................. 30, 32

*Zauderer v. Off. of Disciplinary Couns.,*
  471 U.S. 626 (1985) ...................................................... 18, 21, 22, 23

**Constitution, Legislation, Rules, and Regulations**

18 U.S.C. § 1001 ................................................................................ 16

18 U.S.C. § 1621 ................................................................................ 16

22 U.S.C. § 611 ........................................................................... *passim*

22 U.S.C. § 612 .......................................................... 1, 9, 10, 11, 14

22 U.S.C. § 618 ............................................................................ 9, 16

28 C.F.R. § 5.200 .............................................................................. 14

28 C.F.R. § 5.201 .............................................................................. 14

Fed. R. Civ. P. 12(b)(6) .................................................................. 1, 8

U.S. CONST., amend. I ............................................................... *passim*

U.S. CONST. amend. V ..................................................... 2, 14, 15, 16

## <u>Other Authorities</u>

Antonin Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012)........32

DOJ FARA Unit, *The Scope of Agency Under FARA* (May 2020), https://www.justice
.gov/nsd-fara/page/file/1279836/download ....................................................................35, 42

Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355 (2018) .............................22

Genevieve Lakier, *Not Such a Fixed Star After All*, 13 F.I.U. L. Rev. 741, 750 (2019) ..............23

H.R. Rep. 1775, 81st Cong., 2d Sess. (1950) ...............................................................11

H.R. Rep. 89-1470, 89th Cong., 2d Sess. (1966), as reprinted in 1966 U.S.C.C.A.N. 2397....37, 38

*Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to
Investigate the Activities of Foreign Governments of the Senate Comm. On the Judiciary*,
96th Cong. (1980) ....................................................................................34, 35

Office of Inspector General, DOJ, *Audit of the National Security Division's Enforcement and
Administration of the Foreign Agents Registration Act* (Sept. 2016),
https://oig.justice.gov/reports/2016/a1624.pdf ...............................................................36

T. Hazen, *The Law of Securities Regulation* (2d ed. 1990) .........................................13

Defendant Stephen A. Wynn respectfully submits this memorandum of law in support of his Motion to Dismiss the Complaint with prejudice under Fed. R. Civ. P. 12(b)(6).

<u>**INTRODUCTION**</u>

Steve Wynn delivered a message to President Trump and Administration officials at the request of a Chinese government official who wanted the United States to return a Chinese national he described as a fugitive.  Wynn had no prior relationship with the foreign official, had no agreement or contract, received no compensation or other benefit, was transparent with Administration officials about the source of the request, and told the foreign official to stop contacting him after he delivered the message.  When later approached by the Department of Justice ("DOJ"), Wynn explained, in correspondence and sworn testimony, that he believed he acted in the interests of the United States by bringing this opportunity to President Trump, not as an agent of the Chinese official or government.  Nonetheless, nearly five years later, the government has sued Wynn seeking an injunction compelling him to register as a foreign agent under the Foreign Agent Registration Act, 22 U.S.C. § 612(a)-(b) ("FARA").

The alleged FARA claim is based on factual allegations at odds with the purpose of the statute.  Congress enacted FARA to "prevent *covert influence* over U.S. policy by foreign principals," *United States v. Craig*, 401 F. Supp. 3d 49, 54 (D.D.C. 2019) (emphasis added), by providing "hearers and readers" of political messages with the information necessary to evaluate those messages and their veracity.  *Meese v. Keene*, 481 U.S. 465, 480 & n.15 (1987) (quoting *Viereck v. United States*, 318 U.S. 236, 251 (1943) (Black, J., dissenting)).  In other words, the "purpose of FARA … is to permit, promptly, evaluation of [political] activities as they are undertaken." *United States v. McGoff*, 831 F.2d 1071, 1082 (D.C. Cir. 1987).  According to the factual allegations in the Complaint, Wynn's conduct was neither "covert" nor involved any attempt at foreign "influence," because Wynn fully disclosed to Administration officials that he

1

was delivering a message from the Chinese government, and in delivering that message, he did not lobby or otherwise attempt to influence any Administration officials on China's behalf.  A basic canon of statutory construction requires courts to "construe the details of an act in conformity with its dominating general purpose."  *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350-51 (1943).  That canon should guide the Court's analysis in this case, where the government has sought to stretch the application of FARA to alleged conduct that does not implicate the statute's purpose.

The Complaint should be dismissed on three independent grounds.  First, under binding D.C. Circuit precedent, the obligation to file a FARA registration statement expires on "the last day that an individual acts as an agent of a foreign principal."  *McGoff*, 831 F.2d at 1096.  Here, even assuming Wynn acted as an agent of a foreign principal—which Wynn disputes—any agency relationship ended no later than October 2017.  Compl. ¶¶ 2, 27.  As a result, any obligation that Wynn had to register has long since passed.

Second, requiring Wynn to register under FARA would violate his Fifth and First Amendment rights under the U.S. Constitution.  The government asks the Court to order Wynn to affirm under oath that he acted as an agent of foreign principals.  Such an order would violate his rights under the Fifth Amendment because it would compel Wynn to directly contradict prior sworn testimony and statements to DOJ, thereby exposing him to the risk of prosecution for perjury or false statements.  Such an order would also violate his rights under the First Amendment, as applied, because it would compel Wynn to engage in government-dictated speech affirming an opinion or ideological belief he does not hold.  Courts have repeatedly applied strict scrutiny to strike down similar government attempts to dictate the content of an individual's speech.  As applied to this case, however, the government cannot satisfy even lesser

2

scrutiny.  All material facts about the 2017 events have already been disclosed, and the government may disseminate its version of those facts without infringing on Wynn's constitutional rights.

Third, the Complaint fails to sufficiently allege that Wynn acted as an agent of a foreign principal.  To be a FARA "agent," an individual must (1) have a sufficient relationship with a foreign principal, and (2) engage in political activities in the foreign principal's interests.  Neither statutory requirement is sufficiently alleged in the Complaint.

The Complaint fails the first prong because a person acting at the mere "request" of a foreign principal, absent any alleged orders, direction or control, is not an agent.  The term "request" must be interpreted in context, in relation to the other surrounding terms in the statute, all of which require the principal to exercise direction, control, or authority over the agent.  Here, the Complaint alleges that Wynn acted pursuant to a mere request from a foreign official, and does not allege that he was ordered to act or directed or controlled by the official in any way.  Indeed, as alleged in the Complaint, Wynn told the foreign official to "stop contacting him" after he delivered the message and suffered no consequences whatsoever.

The Complaint fails the second prong because a person engages in "political activities" only if he believes he would, or intends to, "influence" U.S. government officials with reference to foreign interests or policy.  The Complaint alleges only that a foreign official asked Wynn to deliver a message to the Trump Administration, and that Wynn agreed to do so.  Wynn delivered the message while transparently conveying where the message came from.  The Complaint does not allege that Wynn advocated on behalf of the foreign official in a way that he believed would, or intended to, influence U.S. government officials in making policy decisions in the foreign country's interests.

# BACKGROUND[1]

Wynn spent more than five decades founding, building, and running casinos.  He created the Mirage, Treasure Island, the Bellagio, Wynn Las Vegas, and Wynn Encore on the Las Vegas strip, and also developed casino properties in Macau, a Special Administrative Region of China.  Ex. A, at 3.  In his business dealings in Macau, Wynn dealt extensively with Macau's former Chief Executive, but had far fewer contacts and no significant business dealings with government officials from mainland China.  *Id.*

Wynn and Donald Trump historically were business competitors who were not close friends.  *Id.*  Wynn had no formal role in the 2016 presidential campaign, but he had a cordial relationship with Mr. Trump and they spoke periodically.  *Id.*  After the election, at President Trump's request, Wynn agreed to serve as Finance Chairman of the Republican National Committee, a position he held from January 2017 through January 2018.  Compl. ¶ 17.  In 2017, President Trump and Wynn spoke periodically and dined together on a few occasions in the White House.  Ex. A, at 3.

In May 2017, in a meeting coordinated by Low Taek Jho ("Low"), former Chinese Vice Minister for Public Security Sun Lijun ("Sun") asked Elliot Broidy (former finance chair of the RNC), Prakazrel Michel (hip-hop artist), and Nickie Lum Davis (businessperson), to lobby

---

[1] All statements accompanied by citations to the Complaint are assumed for the purposes of this Motion.  Information unaccompanied by a citation to the Complaint is set forth in Wynn's June 8, 2018 letter to DOJ, *see* Heberlig Decl. Ex. A (Letter from Steptoe & Johnson LLP to the Department of Justice, Jun. 8, 2018), which is incorporated by reference in paragraph 37 of the Complaint.  *See FTC v. Facebook, Inc.,* No. 20-cv-3590 (JEB), 2022 WL 103308, at *3 (D.D.C. Jan. 11, 2022) (noting that in deciding a motion to dismiss, the court may consider both "the facts alleged in the complaint," and "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice"); *Scott v. Dist. Hosp. Partners,* 60 F. Supp. 3d 156, 161 (D.D.C. 2014) (noting that the "attached to or incorporated [in]" standard "includ[es] documents referenced or cited to in a complaint").

President Trump and the Trump Administration to cancel the visa or remove from the United

States a Chinese businessperson who had been charged with corruption by the People's Republic

of China ("PRC") and who was seeking political asylum in the United States.  Compl. ¶ 16.

Broidy, Michel, and Davis each had a financial interest in helping Low facilitate this request

from Sun.  *See, e.g.*, Statement of Offense ¶ 31, *United States v. Broidy*, No. 20-cr-210, Dkt. 7

(D.D.C. Oct. 20, 2020).  Broidy and Davis have since pled guilty to crimes related to their work

for Low, as has Michel's co-conspirator George Higginbotham, and Michel is awaiting trial on

his criminal indictment.  *See id.*; *United States v. Davis*, No. 20-cr-68 (D. Hawaii); *United States

v. Higginbotham*, No. 18-cr-343 (D.D.C.); *United States v. Michel*, No. 19-cr-148 (D.D.C.).

Wynn was not present at or aware of this meeting, and was not aware of any related financial

arrangement.

　　　　In June 2017, Broidy told Wynn that a Chinese national, alleged to be a criminal fugitive,

was hiding in the United States and that Sun and the PRC wanted him arrested.  *See* Compl.

¶¶ 17-18.  Broidy informed Wynn that PRC President Xi Jinping had spoken with President

Trump about the removal of the PRC national, and had promised that in return, China would

"return certain U.S. citizens held hostage by China," "accept a very large number of Chinese

illegal immigrants for deportation back to China," and "offer[] new assistance with regard to

North Korea."  *Id.* ¶ 21.c.  Broidy elicited Wynn's help because he believed Wynn could "get[]

access to Trump Administration officials."  *Id.* ¶ 17.  Broidy did not disclose that he had a

financial interest in assisting the Chinese in this endeavor or disclose the involvement of Davis,

Higginbotham, or Michel.  Although Broidy *told* Wynn that Sun had requested Wynn's help with

the Trump Administration, *id.* ¶ 18, the Complaint does not allege that Sun in fact asked for

Wynn's help or even knew who Wynn was before Broidy identified him.

In June 2017, after Broidy gave Wynn passport photos, an Interpol red notice, and media articles about the PRC national, *id.* ¶ 19, Sun spoke to Wynn by phone and asked for help securing the removal of the PRC national. *Id.* ¶ 20. Wynn "agreed to raise the matter with then-President Trump and Trump Administration officials." *Id.* ¶ 20. As Wynn informed DOJ, "[h]e did not agree to lobby the President or advocate on Sun's or the PRC's behalf." Ex. A, at 4.

On June 27, 2017, during a dinner with President Trump and other Administration officials, Wynn "conveyed to then-President Trump the PRC's desire to have the PRC national removed from the United States." Compl. ¶ 22; *compare* Ex. A, at 4 ("During a social dinner with President Trump in the White House, Wynn delivered Sun's message to President Trump, fully disclosing the whole story and the source of the information. Wynn did not advocate for or against Sun's request. He told President Trump that this seemed like an important issue to the PRC and might be a good opportunity for President Trump to do a favor for Chinese President Xi and develop their relationship."). During July and August 2017, Wynn spoke with Sun by phone about this issue on approximately eight occasions, Compl. ¶ 23.c, and attempted to organize meetings with White House and National Security Council (NSC) officials. *Id.* ¶ 25. During a late July 2017 meeting with the White House Chief of Staff and NSC officials, Wynn "stated that PRC officials had contacted him and advised him that 'they were very interested in having' the PRC national returned to China as soon as possible." *Id.* ¶ 25.c.

The Complaint does not allege that Wynn had any contract or agreement with Sun or the PRC; sought or received any compensation or benefit from Sun or the PRC in exchange for his assistance; was coerced, ordered, directed, or otherwise subject to the control, authority, or power of Sun or the PRC; or was threatened with any consequences by Sun or the PRC if he declined to take any action or did not succeed. According to "public reporting," the Complaint

alleges (a) in August 2016, roughly a year before the relevant events, the Macau government restricted the number of gaming tables and machines that Wynn's casino could operate, and (b) in 2019, more than a year and a half after the relevant events, Wynn was scheduled to renegotiate his licenses to operate casinos in Macau. *Id.* ¶ 29. Although Wynn disputes these claims, the Complaint does not allege that Sun ever mentioned them to Wynn.

In October 2017, Wynn told Sun "that he had made U.S. Government officials aware of the request, that [he] was not able to provide any more assistance, and that Sun should stop contacting him." *Id.* ¶ 27; *id.* ¶ 28 (alleging that Wynn told Sun that U.S. Government officials were now aware of the timing nuances related to the issue); *compare* Ex. A, at 4 ("In the fall of 2017, … Sun continued to contact Wynn by telephone, seeking more information. These calls became repetitive and annoying. In October 2017, Wynn told Sun that he had made U.S. government officials aware of Sun's request, and that Sun should stop contacting Wynn because there was nothing more he could or would do. Wynn has had no further communications with Sun since this time."). The Complaint does not allege that Sun or the PRC took any adverse action against Wynn or his business interests, even though the efforts to remove the PRC national "ultimately were unsuccessful." Compl. ¶ 26.

On May 16, 2018, the DOJ advised Wynn by letter that it believed he was obligated to register under FARA as an agent of Sun and the PRC. *Id.* ¶ 37. On June 8, 2018, Wynn, through counsel, sent the DOJ a letter disputing that he was obligated to register. *See* Ex. A. The parties exchanged additional letters, Compl. ¶ 37, and discussed the matter during in-person meetings. In addition, in August 2020, Wynn provided an interview and sworn testimony during the criminal investigation of Broidy and others, in which he stated that he believed he was acting in the interests of the United States, and not as an agent of Sun or the PRC.

**LEGAL STANDARD**

Under Rule 12(b)(6), a defendant may challenge the sufficiency of a complaint on the ground that it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Although the Court assumes the veracity of "well-pleaded factual allegations," *id.* at 679, "[t]he Court need not accept as true … 'a legal conclusion couched as a factual allegation,' nor an inference unsupported by the facts set forth in the Complaint."  *CREW v. Pompeo*, 19-cv-3324 (JEB), 2020 WL 5748105, at *4 (D.D.C. Sept. 25, 2020) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)).  The Court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

**ARGUMENT**

**I.    FARA Does Not Require Registration After an Agency Relationship Ends**

The D.C. Circuit has squarely held that FARA's registration obligation ends when an individual stops acting as an agent of the foreign principal.  *See United States v. McGoff*, 831 F.2d 1071 (D.C. Cir. 1987).  The Complaint alleges that Wynn's last contact with Sun was in approximately October 2017, when Wynn told Sun to "stop contacting him" in order to "exit the situation."  Compl. ¶ 27.  Elsewhere, the Complaint alleges that Wynn acted as an agent for foreign principals "from at least June 2017 through at least August 2017."  *Id.* ¶ 2.  Thus, even assuming Wynn previously acted as Sun's and the PRC's agent—which Wynn disputes, *see infra* § III—any registration obligation has long since ended.  As a result, the Complaint fails to state a claim for injunctive relief under FARA and must be dismissed.

A.      Under *McGoff*, There Is No Continuing Obligation to Register After the
        Agent Ceases Acting on Behalf of the Foreign Principal

In *McGoff*, the D.C. Circuit considered the prosecution of John McGoff, a U.S. citizen

and newspaper publisher who allegedly acted as an agent for the government of South Africa

from 1974 through 1979.  831 F.2d at 1072.  The parties stipulated that McGoff's activities

concluded in 1979, and that he never registered as a foreign agent.  *Id.* at 1073.  In 1986, McGoff

was charged with willfully failing to register under FARA (22 U.S.C. §§ 612, 618).  *Id.*  Seven

years had elapsed since McGoff stopped acting as a foreign agent and the applicable statute of

limitations was five years.  Thus, the question presented was when the statute of limitations

began running for failure to register under FARA.  Because the statute of limitations began to

run "from the last day of the continuing offense" of failure to register, the court concluded that it

was "necessary" to "identify with specificity" the precise moment at which the failure to register

"is complete."  *Id.* at 1079.  This "necessary" analysis is a binding part of the holding and not

dicta.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).

The D.C. Circuit then held that the obligation to register ends on "the last day that an

individual acts as an agent of a foreign principal," at which point the statute of limitations begins

running.  *McGoff*, 831 F.2d at 1096.  *McGoff* is binding authority that compels the dismissal of

the Complaint.

1. *McGoff*'s Analysis of FARA's Text

To determine when the obligation to register ends, the court began with 22 U.S.C.

§ 612(a):

> The obligation of an agent of a foreign principal to file a registration statement
> shall, after the tenth day of his becoming an agent, continue from day to day, and
> *termination of such status shall not relieve such agent from his obligation to file a*
> *registration statement for the period during which he was an agent of a foreign*
> *principal.*

*Id.* at 1082 (emphasis in original).

The court observed that the italicized portion of the statute directly addresses the duration of an agent's obligation to register: "[I]t appears that the statutory obligation to file expires when the agent ceases activities on behalf of a foreign principal. … [O]nce an individual has ceased his activities, he is no longer an 'agent of a foreign principal' within the meaning of FARA." *Id.* Under § 611(c), an "agent of a foreign principal" is defined as an agent who is *acting*, not an agent who *previously acted*. *See id.* (citing 22 U.S.C. § 611(c)(1) ("[A]ny person *who acts* as an agent…at the order, request, or under the direction or control, of a foreign principal…") (emphasis added)). Similarly, the statute's description of registration statements "focus[es] on *ongoing* relationships between agents and principals" not past, terminated relationships. *Id.* (citing 22 U.S.C. §§ 612(a)(1)-(11), (b)). For example, the registration statement must include "copies of each written agreement … by reason of which the registrant *is* an agent of a foreign principal" and a "comprehensive statement … of the *existing and proposed activity or activities engaged in or to be engaged in* by the registrant …." 22 U.S.C. § 612(a)(4) (emphasis added).

The court disagreed with the government's claim that McGoff's obligation to register continued even after he stopped acting on the foreign principal's behalf, an interpretation that would have effectively eliminated the statute of limitations. *McGoff*, 831 F.2d at 1079, 1093 (the government maintained that FARA "creates an offense that continues until actual registration" and "virtually eliminate[s] the statute of limitations for failure to file"). The court reasoned in part that this interpretation "r[a]n afoul of the well-established principle of interpretation that condemning statutory language to the rubbish heap of surplusage is much to be avoided." *Id.* at 1083. In other words, interpreting Section 612(a) to require registration after the individual stops acting as an agent would render the phrase "for the period during which he was an agent of a

foreign principal" redundant.  "A FARA-required registration statement can in logic, relate to no period other than 'the period during which' the individual acted as an agent."  *Id.*  Instead, it is the "obligation to file" that exists only during the period in which a person acts as an agent of a foreign principal.  *Id.*

### 2.  *McGoff's* Analysis of Legislative Intent

The court also found support for its interpretation of Section 612(a) in legislative history.  The 1950 House Committee Report stated: "'The statute of limitations will begin to run only from the last day on which an unregistered agent has acted as such.'  That, of course, is the day on which the agency relationship terminates."  *Id.* at 1087 (quoting H.R. Rep. No. 1775, 81st Cong., 2d Sess. 1 (1950)).  Moreover, the court continued, the virtual elimination of the statute of limitations—a consequence of interpreting FARA's registration obligation to continue after a person stops acting on behalf of a foreign principal, as noted *supra*—is a "draconian" step that Congress would not have taken without a plain statement of intent, or at least discussion or debate.  *Id.* at 1090.  Because Congress did not indicate any such clear intent, the court declined to adopt such a radical interpretation.  *See generally id.* at 1084-94 (legislative history analysis).

### 3.  *McGoff* Precludes Injunctive Relief After an Agency Relationship Has Concluded

As the dissent in *McGoff* correctly observed, under the majority's holding, "the civil injunctive remedy" sought in this case is "unavailable to compel anyone to file a registration statement once his agency has ended."  *Id.* at 1103 (Bork, J., dissenting); *see also id.* (after "the termination of the agency relationship, … the United States will be unable to use an injunction to compel registration, since the [former] agent is no longer under any obligation to register.").  The majority acknowledged the dissent's argument and assumed that "injunctive remedies would not lie once the individual's agency status has terminated."  *Id.* at 1094 n.32.  Nonetheless, the

11

majority concluded, the government was "far from powerless" because it still had five years

"from the termination of the agency relationship to secure an indictment for the agent's willful

failure to register under the Act." *Id.*

**B.**    ***McGoff*'s Holding Is Consistent with FARA's Purpose to Allow
          Contemporaneous Evaluation of Political Speech and Activities**

*McGoff* is consistent with FARA's purpose.  FARA is intended to prevent covert

influence by facilitating an audience's ability to evaluate an agent's political speech and

activities contemporaneously in their proper context.  "Resting on the fundamental constitutional

principle that our people, adequately informed, may be trusted to distinguish between the true

and the false, the bill is intended to label information of foreign origin so that *hearers* and

*readers* may not be deceived by the belief that the information comes from a disinterested

source." *Keene*, 481 U.S. at 480 n.15 (1987) (quoting *Viereck*, 318 U.S. at 251 (Black J.,

dissenting)) (emphasis added); *id.* at 480 (opining that Congress intended FARA to "better

enable the public to evaluate the import" of political speech targeting the public); *Craig*, 401 F.

Supp. 3d at 54 ("[FARA] ensures that the public is informed of the true source or sponsor behind

the information being disseminated for its consideration.").  FARA aims "to permit, promptly,

evaluation of these activities as they are undertaken. … FARA does not evince an antiquarian

interest on Congress' part; FARA's focus is on the here and now." *McGoff*, 831 F.2d at 1074.

Although Wynn denies that he acted as a foreign agent, it is undisputed that Wynn

contemporaneously disclosed to U.S. government officials that he was conveying a message

from the PRC, allowing the U.S. officials to evaluate his activities in their proper context.  *See*

Compl. ¶ 22 (Wynn "conveyed to then-President Trump the PRC's desire …."); ¶ 25.c (Wynn

"stated that PRC officials had contacted him and advised him that 'they were very interested in

having' the PRC national returned to China").  Accepting *arguendo* the government's position

12

on agency, Wynn's relationship with the foreign principal has ended, and there is no benefit in requiring registration months, or, as in this case, years later.

### C.  *McGoff*'s Holding Is Consistent with the Limited Purpose of Injunctive Relief

*McGoff* is also consistent with the limited purpose of injunctive relief, which is typically available only "to prevent *future* violations."  *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added).  Injunctive relief is "'a drastic remedy' and should not be granted lightly, especially when the conduct has ceased."  *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) (quoting T. Hazen, 1 *The Law of Securities Regulation* § 9.5, at 400 (2d ed. 1990)). While a court's power to grant injunctive relief "survives discontinuance of the illegal conduct … the moving party must satisfy the court that relief is needed."  *W. T. Grant*, 345 U.S. at 633. "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."  *Id.*  "Injunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger …."  *Steadman*, 967 F.2d at 648.

*McGoff*'s holding that FARA requires registration only while a person is acting as an agent of a foreign principal is consistent with these well-established principles.  If an agent of a foreign principal is advocating for a foreign government's position to the U.S. government or publicly spreading foreign propaganda, the government should be able to make that agent register to allow those messages to be considered contemporaneously in their proper context. But here, where Wynn told Sun that the message had been transmitted and to "stop contacting him" nearly half a decade ago, and there is no allegation or threat of ongoing activity or recurrent harm, injunctive relief is unnecessary and unwarranted.

13

## II.     Compelling Wynn to Swear that He Was an Agent of Foreign Principals Would Violate His Fifth and First Amendment Rights

The government asks the Court to declare that 22 U.S.C. § 612(a) imposes on Wynn an "obligation to register … for conduct undertaken on behalf of foreign principals Sun Lijun and the PRC," and issue an injunction requiring Wynn to fulfill that obligation.  Compl. at page 12 (Prayer for Relief).  Granting the government's requested relief would compel Wynn to act as a witness against himself and to state an opinion he does not hold, in violation of his Fifth Amendment privilege against self-incrimination and the First Amendment protection against compelled speech.

Ordering Wynn to register would compel him to make a sworn public declaration, under penalty of perjury, that he acted as an agent of foreign principals Sun and the PRC.  The registration form and exhibits, required to be filed under 28 C.F.R. §§ 5.200, 5.201, include the following statement on each execution page:

> In accordance with 28 U.S.C. § 1746, and subject to the penalties of 18 U.S.C. § 1001 and 22 U.S.C. § 618, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this Registration Statement, that he/she is familiar with the contents thereof, and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

DOJ, Form OMB No. 1124-0001, *Registration Statement* at page 6 (Heberlig Decl. Ex. B, at 8); DOJ, Form OMB No. 1124-0006, *Exhibit A to Registration Statement* at page 3, (Ex. B, at 11); DOJ, Form OMB No. 1124-0004, *Exhibit B to Registration Statement* at page 4 (Ex. B, at 15). Wynn would be forced to swear or affirm that he is an "agent[]" of a "foreign principal"; agree that he has a "foreign principal[] for whom [he] is acting or has agreed to act"; and "furnish … a full statement of all the circumstance by reason of which [he] is acting as an agent of a foreign principal." *Registration Statement* at Instrs., page 3, nn.2, 4-9 (Ex. B, at 2, 5, nn.2, 4-9); *Exhibit B to Registration Statement* at pages 1-3 & nn.2-4 (Ex. B, at 12-14 & nn.2-4).  Wynn's

statements would be posted on the FARA Unit's webpage, available for in-person public consumption, and transmitted to Congress as part of periodic reports. *Id.* Those sworn statements would directly contradict Wynn's prior sworn testimony and representations in his correspondence with DOJ. *See, e.g.*, Ex. A; Compl. ¶ 37 (confirming that Wynn "disput[ed] the Department's analysis" in his June 8, 2018 letter).

The government is free to disagree with Wynn's statements—and it can state that disagreement publicly—but it cannot force Wynn to (1) provide evidence that could be used to prosecute him for perjury or false statements; and (2) state his agreement with a government message he disputes. To do so would violate Wynn's Fifth and First Amendment rights, respectively. Because the Court cannot grant the government's requested relief without violating Wynn's constitutional rights, it should dismiss the Complaint. *See, e.g.*, *Brady v. Assoc. Press Telecomm.*, No. 16-cv-2693, 2017 WL 111783, at *3-4 (S.D.N.Y. Jan. 11, 2017) (dismissing complaint for injunctive relief with prejudice in part because "granting the equitable remedy of a mandatory injunction 'compelling defendants to publish what they prefer to withhold would run afoul of Defendants' First Amendment rights'"), *aff'd*, 714 F. App'x 62 (2d Cir. 2018); *Neilson v. United States*, 674 F. Supp. 2d 248, 253 (D.D.C. 2009) (granting motion to dismiss complaint for injunctive relief because statute barred relief sought); *Sullivan v. Evans*, No. 13-cv-595, 2013 WL 6383033, at *2 (D. Md. Dec. 4, 2013) (same).

### A.    Compelling Wynn to Contradict His Past Testimony and Statements Would Violate the Fifth Amendment

The Fifth Amendment protects an individual's right not to provide a "link in the chain of evidence" that could be used to prosecute him. *See Hoffman v. United States*, 341 U.S. 479, 486 (1951). Courts have repeatedly held that a witness can invoke the Fifth Amendment to avoid giving testimony that would contradict previous statements and thereby expose the witness to

criminal liability or increased punishment.  *See United States v. Lumpkin*, 192 F.3d 280, 286 (2d

Cir. 1999) (affirming right of witness to invoke Fifth Amendment based on fear of perjury where

anticipated testimony ran counter to sworn plea colloquy); *United States v. Bahadar*, 954 F.2d

821, 826 (2d Cir. 1992) ("[The witness]'s invocation of his Fifth Amendment privilege was

proper because, to exculpate Bahadar, [the witness] would have had to contradict his prior

statements to government agents, thereby exposing himself to further criminal liability."); *United*

*States v. Fortin*, 685 F.2d 1297, 1298 (11th Cir. 1982) (per curiam) (holding that witnesses can

invoke Fifth Amendment to avoid testifying when testimony would necessarily contradict

previous sworn statements); *Johnson v. Fabian*, 735 N.W.2d 295, 310-11 (Minn. 2007) (holding

that state could not compel defendant to admit sexual contact with victim because defendant

previously testified he had no such contact, observing "[i]t is well-established in federal courts

that the privilege against self-incrimination can properly be invoked based on fear of a perjury

prosecution arising out of conflict between statements sought to be compelled and prior sworn

testimony").

Here, Wynn has testified and repeatedly told the DOJ in correspondence that he did not

act as a foreign agent and that Sun and the PRC were not his foreign principals.  In its

Complaint, the government maintains the exact opposite—that Wynn acted as an agent for Sun

and the PRC, Compl. ¶¶ 30-36—and asks the Court to compel Wynn to affirm under penalty of

perjury, "subject to penalties under 18 U.S.C. § 1001 and 22 U.S.C. § 618," that it is "true and

accurate to the best of his knowledge and belief" that he acted as an agent of foreign principals

Sun and the PRC.  Wynn's sworn statements would be directly contradictory and would expose

him to potential liability, however unfounded it may be, for perjury or false statements, under 18

U.S.C. § 1621 (perjury); 18 U.S.C. § 1001 (false statements); and 22 U.S.C. § 618(a)(2) (false

statement in a FARA registration statement).  Given the direct contradiction, the government

might not even need to prove which statement was true and which statement was false.  *See, e.g.,*

*United States v. Hasan*, 609 F.3d 1121, 1135-37 (10th Cir. 2010) (affirming grand jury perjury

convictions based on statements that were "irreconcilably contradictory"); *Kang v. Cooper*, No.

95-cv-5508, 1999 WL 412437, at \*11 (N.D. Ill. June 9, 1999) (holding that state prosecution

could prove knowledge of falsity by proving "defendant knew he was making contradictory

statements").  The government can opine that Wynn's prior statements were false, but it cannot

force Wynn to make contradictory statements in support of that opinion.

### B. Compelling Wynn to Speak a Government-Dictated Message Would Violate the First Amendment

The Complaint asks the Court to order Wynn to speak a particular government-dictated

message—that Wynn agreed to act as an agent for foreign principals Sun and the PRC—even

though he does not believe that message is true.  The government's attempt to dictate Wynn's

statement is a content-based regulation subject to strict scrutiny, a test it cannot possibly pass.

The compelled statement is not a disclosure of purely factual, uncontroversial information like

those compelled under regimes applicable to charities, electoral campaigns, and professional

lobbyists, each of which is subject to "exacting First Amendment scrutiny" rather than strict

scrutiny.  *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988).  Regardless of

the level of scrutiny, the requested relief would be unconstitutional as applied.  As applied to

Wynn, the government's interest is not compelling (as required by strict scrutiny) or substantial

(as required exacting scrutiny), and its requested relief is not narrowly tailored to that interest (as

required by both levels of scrutiny).  Granting the government's requested relief would therefore

violate the First Amendment.

17

### 1. Compelling Wynn to Speak a Government-Dictated Message Is a Content-Based Restriction Subject to Strict Scrutiny

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Although the State may at times 'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information,' outside that context it may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (quoting *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985)). "[T]his general rule … applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State, Cnty., & Mun. Empls.*, 138 S. Ct. 2448, 2463 (2018) (noting that compelling individuals "to voice ideas with which they disagree" undermines the First Amendment's purpose). Thus, "a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Id.* (quoting *W. Va. Bd. of Educ. v. Barnett*, 319 U.S. 624, 633 (1943)).

Compelling a speaker to involuntarily affirm a government-dictated message is a content-based restriction on speech. "[M]andating speech that a speaker would not otherwise make necessarily alters the content of the speech" and is therefore "a content-based regulation of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (holding that compelled statement of available abortion services was subject to strict scrutiny because "[b]y requiring petitioners to inform women how they can obtain state-subsidized abortions—at

18

the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly 'alters the content' of petitioners' speech."); *see also Riley*, 487 U.S. at 795 (holding that compelled statement of percentage of charitable donations retained as fees violated First Amendment); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) ("[T]o make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action.").

Content-based restrictions of speech are subject to strict scrutiny. *Becerra*, 138 S. Ct. at 2371-72; *accord Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Because the government's application of FARA constitutes a content-based restriction of speech, the government bears the burden of satisfying strict scrutiny.

### 2. FARA's Content-Based Restriction Fails Strict Scrutiny as Applied in This Case

Strict scrutiny dictates that a law is "presumptively unconstitutional" and requires the government to prove that its requirement furthers a compelling interest and is narrowly tailored to achieve that interest. *Reed*, 576 U.S. at 171. Strict scrutiny is demanding and its standard is rarely met. This case is no exception.

The government has no compelling interest as applied. As summarized above in the introduction and § I.B, FARA's purpose is to prevent covert influence by ensuring the audience of political speech and activities is aware of the message's source. That interest is wholly irrelevant in this as-applied challenge. As applied to Wynn, the government has no interest in assisting "hearers and readers" of Wynn's speech in "evaluating its import." *See Keene*, 481 U.S. at 480 n.15 (1987) (quoting *Viereck*, 318 U.S. at 251 (Black J., dissenting)). Wynn transmitted a message to U.S. government officials with full transparency about where the message came from. Compl. ¶¶ 22, 25.c. No audience member was deceived, and all material

facts have since been disclosed to the public, ensuring that even non-audience members have full disclosure.  There is no remaining interest in compelling Wynn to register and state that he was a foreign agent of Sun and the PRC, much less a compelling interest.

Even if the government's desire for public disclosure constituted a compelling interest, its requested relief is not narrowly tailored to achieving that interest.  To be narrowly tailored under strict scrutiny, the requirement "must be the least restrictive means" of achieving that compelling interest.  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000) ("If a less restrictive alternative would serve the Government's purpose, [it] must use that alternative.").  "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.  Here, the government is free to speak itself and to publicize its opinion that Wynn acted as a foreign agent of the PRC.  *See Keene*, 481 U.S. at 467, 484-85 (affirming government's right to opine that film was political propaganda); *Block v. Meese*, 793 F.2d 1303, 1315 (D.C. Cir. 1986) (same).  Indeed, the government has already done so by issuing a press release that received widespread media coverage.  Because the government can achieve its ends without intruding on Wynn's right to remain silent or disagree, forcing Wynn to state a disputed opinion against his will is not narrowly tailored.

### 3.  Exacting Scrutiny Does Not Apply, But Even If It Did, the Requested Relief Is Unconstitutional

The government may argue that the Court should apply "exacting scrutiny," a standard that requires a substantial relationship between a compelled factual disclosure and a sufficiently important governmental interest, and narrow tailoring.  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021).  Exacting scrutiny has historically been invoked for compelled speech

that threatens the freedom of association, rather than the freedom from compelled speech:

(1) disclaimers required to be included with electoral advertisements, *see Citizens United v. FEC*, 558 U.S. 310, 366 (2010); (2) public reports disclosing basic factual information like donors or members' names, addresses, and contributions, *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976); and (3) the government's ability to make FARA information about non-registrants available for public inspection. *Block*, 793 F.2d at 1315.  It has also, in limited circumstances, been invoked in the freedom of speech context, most commonly when considering compelled disclosure of "purely factual and uncontroversial [commercial] information." *Zauderer*, 471 U.S. at 651.

Exacting scrutiny does not, however, apply to controversial statements of opinion or ideological belief, *e.g.*, that the speaker agrees he acted as a foreign agent on behalf of a foreign principal.  Wynn has already cooperated with the government and answered factual questions. *See, e.g.*, Compl. ¶ 37; Ex. A.  The only "disclosure" left is the affirmation under oath that Wynn acted as a foreign agent on behalf of foreign principals Sun and the PRC.  That disclosure is a statement of opinion and ideological belief with which Wynn emphatically disagrees.  Moreover, even if the statement is one of fact (thereby potentially subject to exacting scrutiny), it would be both controversial and a statement Wynn believes to be false.  The government cannot compel a speaker to make controversial statements or statements he believes to be false.  Finally, even if the exacting scrutiny test were applied, the requested relief fails that test.

### a.    Exacting Scrutiny Does Not Apply to Statements of Opinion or Ideological Belief

"[F]reedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205, 213 (2013) (citation omitted) (holding that government cannot compel funding applicants to state their opposition to prostitution); *Wooley*, 430 U.S. at 715 (prohibiting compulsion to display license plate bearing

state motto "Live Free or Die" because it converted the plaintiff into "an instrument for fostering

public adherence to an ideological point of view he finds unacceptable").  Courts have

recognized the application of exacting scrutiny to "pure compulsions to convey facts … unlike

pure compulsions to convey ideas."  *See* Eugene Volokh, *The Law of Compelled Speech*, 97 Tex.

L. Rev. 355, 380 (2018) (noting that courts have distinguished between compelling a statement

of adherence to an ideological point of view and mandating the reporting of information).

Compelling Wynn to classify Sun and the PRC as his "foreign principal[s]" on whose behalf he

acted as a "foreign agent" is a statement of opinion and ideological belief, not a mere factual

disclosure.

> **b.   Exacting Scrutiny Does Not Permit the Government to Compel Statements of Controversial Information that the Speaker Believes to Be False**

Even if the compelled speech in this case were a factual disclosure, it would be prohibited

because it would be a *controversial* disclosure.  The Supreme Court has affirmed the state's

ability to compel an attorney to disclose "purely factual and uncontroversial information" about

the contingent fees he charged.  *Zauderer*, 471 U.S. at 651.  Such disclosures of purely factual

and uncontroversial information are permissible because "the interests at stake … are not of the

same order as those discussed in *Wooley*, *Tornillo*, and *Barnette*."  *Id.*  The degree to which an

individual is controlled by a foreign principal and is thereby an agent is similar to the

controversial compelled speech deemed unconstitutional in *Wooley*, *Tornillo*, and *Barnette* and

unlike the uncontroversial compelled disclosure of attorney fees in *Zauderer*.  *See Barnette*, 319

U.S. at 631 (unconstitutional to compel students to recite the pledge of allegiance and

emphasizing the protected "right of self-determination in matters that touch individual opinion

and personal attitude"); *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974)

(unconstitutional to compel newspapers who advocate against a candidate to run the candidate's

reply); *Wooley*, 430 U.S. at 715 (unconstitutional to compel Jehovah's Witnesses to display license plate reading "Live Free or Die").

While *Zauderer* discussed the constitutional protection accorded to commercial speakers, the Supreme Court has dictated that non-commercial speakers, like Wynn, are entitled to *equal or more* protection than commercial speakers, not less. *Riley*, 487 U.S. at 796 n.9 (citing *Zauderer* and stating "[p]urely commercial speech is more susceptible to compelled disclosure requirements."); *see, e.g.*, *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) ("Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression.") (quoting *Bd. of Trustees v. Fox*, 492 U.S. 469, 477 (1989)); Genevieve Lakier, *Not Such a Fixed Star After All*, 13 F.I.U. L. Rev. 741, 750 (2019) ("Today, the idea that the government acts in a presumptively unconstitutional manner—outside the commercial speech context at least—both when it compels speakers to take a position on matters of opinion and when it compels speakers to assert true facts is a widely accepted, if not universally embraced, principle of free speech jurisprudence."). If a commercial speaker cannot be compelled to make controversial statements, certainly a non-commercial speaker is entitled to the same or greater protection. Because the terms "foreign agent" and "foreign principal," are controversial, compelling an individual to agree that they apply is prohibited by the First Amendment.

The fact that "foreign principal" and "foreign agent" are subject to statutory definitions does not make them "purely factual and uncontroversial" labels. In *National Association of Manufacturers v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ("*NAM*"), the SEC argued that it could force publicly traded companies to report to the SEC and disclose on their websites that their

products were not "conflict free" because "conflict free" was a "statutorily defined term of art."
*Id.* at 531.  The D.C. Circuit disagreed, holding that the SEC's statutory definition of "conflict free" did not justify forcing private entities to speak that message.  *Id.* at 530.  The D.C. Circuit deemed the SEC's contrary argument akin to unconstitutionally forcing speakers to state that their products were not "sustainable" or "fair trade" "even if the companies vehemently disagreed that their products were 'unsustainable' or 'unfair.'"  *Id.* at 530.  "By compelling an issuer to confess blood on its hands," the statute violated the issuer's right to "convey [its chosen] 'message' through 'silence.'"  *Id.* (quoting *Hurley*, 515 U.S. at 573).  Accordingly, the court held that the SEC regulation violated the First Amendment.

Importantly, the SEC contended in *NAM* that a FARA precedent, the Supreme Court's decision in *Keene*, had determined that a statutory definition cured the controversial nature of a compelled statement.  The D.C. Circuit disagreed, concluding, "*Keene* was not a compelled speech case," but rather dealt with the government's ability to opine that films were "political propaganda"—an opinion that the litigant was free to reject and avoid affirming.  *Id.* at 529 (noting that the litigant had "no disclosure obligations" and was "free to remove" the government's label).  *Keene* "did not suggest, much less hold, that it would be constitutionally permissible for Congress to force filmmakers to label their own films as 'political propaganda' … however the term was defined."  *Id.*  Thus, it remains an open question in the D.C. Circuit whether FARA unconstitutionally compels speech.

Similarly, in *Associated Builders & Contractors of Southeast Texas v. Rung*, a Department of Labor rule obligated government contractors and subcontractors to "report for public disclosure on [the government's website] any 'violations of the federal labor laws,'" defined by rule to include any complaint filed by the NLRB even if the complaint had not been

adjudicated.  No. 16-cv-425, 2016 WL 8188655, at *2-3 (E.D. Tex. Oct. 24, 2016).  The court granted a preliminary injunction, holding that the Department's rule violated the First Amendment by "compel[ling the] contractors to engage in public speech on matters of considerable controversy adversely affecting their public reputations …."  *Id.* at *9 (by requiring the contractors to include even alleged violations that they contested, the rule "compel[led] government contractors to 'publicly condemn' themselves").  Just as in *NAM* and *Associated Builders*, the First Amendment prohibits the government from forcing a private individual to adopt a controversial government message.

Even if the Court deems the compelled statements factual and non-controversial, however, they would still be unconstitutional because Wynn believes the statements are false, *i.e.*, Wynn does not believe that he acted as an agent of Sun or the PRC.  "[A] citizen has a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he believes are false."  *Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011); *see also Burns v. Martuscello*, 890 F.3d 77, 89 (2d Cir. 2018) (holding that the First Amendment prohibits the government from forcing inmates to provide either false or truthful information); *cf. United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (rejecting compelled speech challenge to law that required taxpayer to disclose information about his clients to the Internal Revenue Service because the law did not require the taxpayer "to disseminate publicly a message with which he disagrees.").  The government seeks to force Wynn to publicly affirm information he believes to be untrue and with which he disagrees, an unconstitutional compulsion.

c.      **Compelling Wynn to Speak the Requested Government-Dictated Message Fails Even Exacting Scrutiny**

Compelling Wynn to affirm that he was a foreign agent who acted on behalf of foreign principals Sun and the PRC would fail even exacting scrutiny.  When applied in the freedom of speech context, exacting scrutiny has two prongs: (1) a substantial relationship between the compelled disclosure and a sufficiently important governmental interest, and (2) narrow tailoring.  *Bonta*, 141 S. Ct. at 2383.  Compelling a FARA registration from Wynn—years after Wynn's activities have ceased, the policy choice has been made, and his audience has left office—lacks both a substantial relationship to that interest and narrow tailoring.

Ordering Wynn to register under FARA lacks a substantial relationship to a sufficiently important government interest, as applied in this case.  Regardless of whether FARA may be constitutional in other instances, the government bears the burden of establishing "the constitutionality of the law in light of the particular facts of [Wynn's] case."  *Calzone v. Summers*, 942 F.3d 415, 420 (8th Cir. 2019) (en banc).  Thus, while courts have upheld lobbyist disclosure statutes requiring registration for compensated advocacy, *see, e.g., Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009), they have declared unconstitutional broader statutes requiring individuals or entities to register who were not paid for their services or disclose activity unrelated to lobbying.[2]  In *Calzone*, the en banc Eighth Circuit held that a

---

[2] *See Calzone v. Summers*, 942 F.3d 415, 420 (8th Cir. 2019) (en banc); *Canyon Ferry Rd. Baptist Church v. Unsworth*, 556 F.3d 1021, 1031 (9th Cir. 2009) (holding that state reporting requirements reaching entities that made de minimis in-kind expenditures to support campaigns violated the First Amendment); *N.J. State Chamber of Comm. v. N.J. Elec. Law Enforcement Comm'n*, 82 N.J. 57 (N.J. 1980) (holding that lobbying reporting act was constitutional under First Amendment as long as reporting threshold was raised to reflect interest only in disclosures from those who seek to influence legislation while "receiving and expending significant sums of money to that end");  *Fritz v. Gorton*, 517 P.2d 911, 930 (Wash. 1974) (upholding Washington State's lobbyist regulation, but noting that an explicit carve-out for uncompensated activism demonstrated that the law was drafted "to avoid impingement upon First Amendment guarantees"); *see also United States v. Nat'l Comm. for Impeachment*, 469

lobbying disclosure statute that passed exacting scrutiny on a facial challenge was unconstitutional as applied to a purported "lobbyist" who did not receive or expend any money during the course of his advocacy. 942 F.3d at 420. The court held that the First Amendment prohibited the state from compelling Calzone "to pay a fee and publicly disclose his political activities" because the disclosure obligations bore an insufficient relationship to the government's interest in transparency and preventing corruption. *Id.* at 423-25. The court explained that the interest in knowing who was speaking to legislators was insufficient to justify the burdens of registration, particularly in light of the "respected tradition of anonymity in the advocacy of political causes." *Id.* at 425 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342-43 (1995)). This is because "when money changes hands, the nature of [the state]'s transparency interest changes too…." *Id*.

As with the plaintiff in *Calzone*, Wynn received no compensation and spent no money. He transmitted a message to U.S. government officials with full transparency about where the message came from. Compl. ¶¶ 22, 25.c. Under the circumstances, particularly when considering that all material facts have already been disclosed, compelling Wynn to register and state that he was a foreign agent of Sun and the PRC serves no remaining interest in transparency. Because the government has no interest in compelling such speech, much less an important or compelling interest, granting the government's request for relief would violate the First Amendment as applied to Wynn.

_____

F.2d 1135, 1141 (2d Cir. 1972) (construing law requiring registration of entities that make expenditures for the purpose of influencing an election not to include an organization that does so only once); *ACLU v. Jennings*, 366 F. Supp. 1041, 1057 (D.D.C. 1973) (same), *vacated as moot sub nom. Staats v. ACLU*, 422 U.S. 1030 (1975).

Even if the government could satisfy the substantial relationship prong, however, it cannot satisfy narrow tailoring. "[A] reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." *Bonta*, 141 S. Ct. at 2385. Narrow tailoring requires that the government demonstrate that its regulation was "precisely tailored" to "compelling necessity." *Riley*, 487 U.S. at 800 (describing the "exacting First Amendment scrutiny" applicable to disclosure of factual information). In *Bonta*, the Court considered a statute requiring disclosure of donors in order to prevent and detect charitable fraud and self-dealing. 141 S. Ct. at 2385. The challenged portion of the reporting obligation required charities to list the names, addresses, and contributions of the charity's top donors. *Id.* at 2386. The Court held that while the goal was valid, the state cannot choose a disclosure regime as a matter of convenience; "[i]t must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id.* The Court concluded that a less intrusive alternative (targeted requests seeking only relevant information) was available, and that the state's overbroad compelled disclosure was therefore unconstitutional. *Id.*; *accord Riley*, 487 U.S. at 799-800 & n.11 (holding that statute requiring disclosure of percentage of charitable contributions paid as fees failed strict scrutiny because "more benign and narrowly tailored options are available," but that a statute merely requiring disclosure of "professional status" would be lawful).

Here, the government has no shortage of alternative methods to distribute the information it claims is necessary for Wynn's audience to evaluate his 2017 conduct. Most importantly, as explained above, the government is free to speak for itself, which it has already done. Alternatively, the government could allow individuals to disclose solely the external facts of past events or discussions and leave readers to draw their own conclusions. Either of these

28

alternatives would accomplish the government's goals and decrease the burden on First

Amendment rights.  Because the government can achieve its ends without intruding on Wynn's

right to remain silent or disagree, forcing Wynn to speak a government-dictated message with

which he disagrees is not narrowly tailored.

**III.    The Complaint Fails to Sufficiently Allege That Wynn Acted as an Agent of a Foreign Principal**

The Complaint fails to sufficiently allege that Wynn acted as an agent of a foreign

principal.  To be an agent required to register under FARA, an individual must (a) have a

sufficient relationship with a foreign principal, and (b) engage in "political activities" in the

foreign principal's interests.  Specifically, FARA defines "agent of a foreign principal" in

relevant part as:

> [A]ny person who acts as an *agent*, *representative*, *employee*, or *servant*, or any
> person who acts in any other capacity at the *order*, *request*, or *under the direction*
> or *control*, of a foreign principal … and who directly or through any other person
> … engages within the United States in political activities for or in the interests of
> such foreign principal …

22 U.S.C. § 611(c)(1)(i), (iv) (emphases added).  The Complaint fails to sufficiently allege either

statutory requirement.

**A.     The Complaint Fails to Allege That Wynn Had an Agency Relationship With a Foreign Principal**

The Complaint fails to allege facts sufficient to establish that Wynn had an agency

relationship with a foreign principal.  The Complaint alleges that Wynn acted "at the request of

at least one PRC official, Sun," and "[a]s such, he acted as an agent of a foreign principal under

FARA."  Compl. ¶ 36; *accord id.* ¶¶ 2, 12, 40.  The Court, however, "need not accept as true …

'a legal conclusion couched as a factual allegation,' nor an inference unsupported by the facts set

forth in the Complaint."  *CREW*, 2020 WL 5748105, at *4 (quoting *Trudeau*, 456 F.3d at 193));

*see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (holding that allegation that funding disparities

had deprived petitioners of a "minimally adequate education" was a legal conclusion undeserving of acceptance). The Complaint lacks the facts necessary to state a cognizable "request" under FARA, *i.e.*, that Wynn was ordered to act by Sun or the PRC, or that he was subject to their direction, control, or authority. Because the Complaint fails to allege the basic facts necessary to create an obligation to register, it fails to state a claim and must be dismissed.

### 1.   A Person Acting on a Mere Request, Absent Orders, Direction, or Control, Is Not an Agent of a Foreign Principal

FARA defines "agent of a foreign principal" in relevant part as "any person who acts as an *agent*, *representative*, *employee*, or *servant*, or any person who acts in any other capacity at the *order*, *request*, or *under the direction* or *control*, of a foreign principal …." 22 U.S.C. § 611(c)(1) (emphases added). The term "request" must be interpreted consistently with the other italicized terms, each of which connotes direction, control, or authority of a principal over an agent. The allegation that Wynn acted at the mere "request" of Sun—without any allegation that Sun ordered, directed, or controlled Wynn—is insufficient to make Wynn an agent of a foreign principal.

"In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words," but rather must take into account "the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015).

The Supreme Court has repeatedly cautioned against interpreting a statute expansively based on a literal or dictionary definition of one broad term within in a list of narrower terms.

For instance, in the honest services bribery trial of Virginia Governor Bob McDonnell, the question was whether the governor's arranging meetings with state officials, calling those officials to urge them to meet or to consider conducting studies of a product, and hosting promotional events, constituted "official acts" under applicable bribery law.  *McDonnell v. United States*, 136 S. Ct. 2355, 2367-68 (2016); *see id.* at 2362-66 (describing charged acts). The statute defined "official act" as "any *decision or action* on any *question, matter, cause, suit, proceeding or controversy,* which may at any time be pending, or which may by law be brought before any public official" in his official capacity.  *Id.* at 2367 (quoting 18 U.S.C. § 201(a)(3)) (emphasis added).  The Court observed that "the last four words in that list—'cause,' 'suit,' 'proceeding,' and 'controversy'—connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination," which was missing in the case.  *Id.* at 2368. The government argued, as it may here, that the remaining terms in the list—there, "question" and "matter"; here, "request"—had broader meaning, and because they were listed in the disjunctive, the plain meaning of the statute included *any* decision or action on *any* issue falling within those broad terms.  *See id.* at 2368.

The Supreme Court rejected that simplistic analysis, and instead "look[ed] to the context in which the words appear," employing "the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'"  *Id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).  To avoid "giving … unintended breadth to" Congress's enactment, the Court did not read "question" or "matter" in their broadest or even their plainest meaning.  Instead, it interpreted the words as meaning something similar to the other terms in the statutory list—"a formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories."  *Id.* at

2369; *accord id.* at 2371-72.  The Court found such interpretation a better indicator of

congressional intent, as well as a way to avoid rendering the other statutory terms superfluous (as

they would become if they fell within the broad definition of the outlying term).  *See id.* at 2368-

69; Antonin Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, Canon 31

(2012) (Associated-Words Canon).

      Similarly, in *Yates*, a commercial fisherman suspected of harvesting undersized fish, who

directed a crew member to toss the suspect fish overboard, was charged with destruction of

records in a federal investigation, under a statute that prohibited "destroy[ing,] … conceal[ing],

[or] cover[ing] up … any record, document, or tangible object with intent to impede, obstruct, or

influence" a federal investigation.  *Id.* at 531 (quoting 18 U.S.C. § 1519).  Despite the fact that a

fish is a "tangible object" by dictionary definition, the Supreme Court ruled that it was not a

"tangible object" within the meaning of the statute, which was directed at the destruction of

records, not wildlife.  *See id.* at 540-47 (plurality); *id.* at 549-52 (Alito, J., concurring).  The

Court applied the *noscitur a sociis* canon, *id.*, as well as the related canon of *ejusdem generis*:

"[w]here general words follow specific words in a statutory enumeration, the general words are

[usually] construed to embrace only objects similar in nature to those objects enumerated by the

preceding specific words." *Id.* at 545 (plurality) (citation omitted); *accord id.* at 549-51 (Alito, J.,

concurring) (citation omitted); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 578 (1995)

(where a statute defined "prospectus" as a "prospectus, notice, circular, advertisement, letter, or

communication," the term "communication" did not apply to "every casual communication

between buyer and seller."); Scalia and Garner, *supra*, Canon 32 (*Ejusdem Generis* Canon).

      Here, both canons apply.  The term "request" appears among the associated terms "at the

order" and "under the direction or control," which give it meaning.  22 U.S.C. § 611(c)(1).

Moreover, that list itself modifies the residual catch-all "any person who acts in any other capacity," which follows a list of specific terms ("agent, representative, employee, or servant"). *Id.* Not only does "request" in this context connote something similar to "order," "direction," or "control," but it also defines the kind of person to whom the statute applies—a person who acts similarly to an "agent, representative, employee, or servant."

Thus, "request" is not, by its breadth, an escape valve that allows an end-run around the statute's otherwise clear terms. Instead, it must be interpreted similar to those surrounding terms, as connoting a request from someone who exercises some degree of direction, control, or authority over a person who acts in a capacity similar to an "agent, representative, employee, or servant." The Complaint does not allege that Wynn acted in such a capacity.

### 2. The Government's Arguments for a Broad Interpretation of "Request" Are Without Merit

The government's pre-litigation arguments for a broad interpretation of "request," which it presumably will repeat here, are without merit. In its correspondence to Wynn (Compl. ¶ 37), the government has disputed Wynn's statutory interpretation, relying on an out-of-circuit case and DOJ's own interpretive guidance on FARA released in 2020. Neither source is persuasive or saves the Complaint from dismissal.

The government has previously argued that *Att'y Gen. v. Irish N. Aid Comm.*, 668 F.2d 159 (2d Cir. 1982) (per curiam) (*INAC*) justifies ignoring the statutory context and interpreting "request" to extend to the allegations in the Complaint. In *INAC*, before the district court, the defendant maintained that the FARA agency relationship was "defined only by control," as set forth in the Restatement of Agency. *Att'y Gen. v. Irish N. Aid Comm.*, 530 F. Supp. 241, 256 (S.D.N.Y. 1981). The district court rejected this argument, holding that the use of the

"disjunctive" in "any other capacity at the order, request, or under the direction or control" was "dispositive."  530 F. Supp. at 256.

The Second Circuit affirmed, but it issued an opinion "to express a note of caution concerning the statute's coverage of those who act at the 'request' of a foreign principal."  668 F.2d at 160-61.  The court warned that "this word [request] is not to be understood in its most precatory sense.  Such an interpretation would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate."  *Id.* at 161.  The Second Circuit held that a court should normally look to "the surrounding circumstances," with the precise definition of "request" being "somewhere between a command and a plea."  *Id.*  As an example, the Second Circuit quoted with approval the congressional testimony of former DOJ Assistant Attorney General Phillip B. Heymann:

> For instance, a congressman visits Turkey and during his trip he meets with government officials.  The government officials urge the case for foreign policies favorable to Turkey, and he supports these when he returns to Washington.  If that is considered a 'request' under the statute, the congressman is an unregistered foreign agent, even though he has taken no orders, is under no one's direction or control, and is not anyone's agent.

*Id.* at 161 n.6 (quoting *Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Foreign Governments of the Senate Comm. On the Judiciary*, 96th Cong. 701 (1980) (hereinafter, "Heymann Statement")).  Although not quoted by the Second Circuit, AAG Heymann's testimony continued:

> Because of possible results like this one, we do not read or apply the statute instances of persuasion or the mere urging of a viewpoint.  Instead, we focus on the other language in the statute's definition of agent.  *As we read the statute, in other words, a person is a foreign agent, and must register with the Department, if he engages in the activities specified in the statute and if he does so at the order of a foreign principal, or under the direction or control of a foreign principal.*

Heymann Statement at 701 (emphasis added).  *INAC* did not involve a scenario like Wynn's where a foreign principal made a mere request, with no ability to order Wynn to act or to direct

34

or control Wynn's actions.  In contrast, AAG Heymann's testimony makes clear that a person in Wynn's position, who does not act at the order of a foreign principal, or under his direction or control, is not obligated to register.

Any effort to rely on DOJ's own interpretive guidance would be equally unpersuasive.  In May 2020, DOJ issued a non-binding memorandum entitled "The Scope of Agency Under FARA," DOJ FARA Unit, *The Scope of Agency Under FARA* (May 2020), https://www.justice .gov/nsd-fara/page/file/1279836/download, containing a list of non-exhaustive factors that DOJ may deem relevant to considering whether an agency relationship exists.  Far from cutting in DOJ's favor, however, the key takeaway from the memorandum is that "the term 'request' … must be read to connote some form of authority by the principal over the agent."  *Id.* at 2 (citing *McDonnell*'s *noscitur a sociis* analysis; *accord id.* at 3 ("Accordingly, these circumstances must evince some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request.").

The 2020 memorandum was not the first time DOJ made clear that a mere request is not enough to trigger FARA's registration obligation.  In AAG Heymann's 1982 testimony, he stated:

> We emphasize, we have emphasized and I think must, to make sense of the statute, require something stronger than persuasion, *something stronger than a mere request*, something that suggests the legal concept of agency or in the words of this statute *'direction, control, order,' working for a foreign government*.  This requirement of direction, control—working under the order of a foreign government, something that establishes a substantial and continuing relationship and a sense of direction—that requirement applies, of course, to the civil obligations of the act and to criminal prosecutions.

Heymann Statement, at 685 (emphases added).  Likewise, in a 2016 report by DOJ's Office of Inspector General, multiple DOJ officials confirmed that FARA's agency relationship requires the agent to have acted at the direction or control of the foreign principal.  *See* Office of

Inspector General, DOJ, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, at 9 (Sept. 2016), https://oig.justice.gov/reports/2016/a1624.pdf (quoting the FARA Unit Chief as saying that even if a foreign government is trying to influence U.S. policy, "if it is done in a way that does not create a statutory agency relationship on the part of the agent acting within the United States at the direction or control of the foreign government, then there is no agent of a foreign principal with an obligation under FARA"); *id.* at 11 (quoting other NSD officials as stating that prosecutors must prove "that the agent was directed and controlled by a foreign principal"). These 1982, 2016, and 2020 statements do not carry the force of law, but they are persuasive evidence that FARA agency does not apply to an individual who acts in response to a mere request without the foreign principal exercising direction, control, or authority over the individual.  Because the Complaint contains no such allegation, it must be dismissed.

### 3. FARA's Legislative History Confirms that "Request" Was Not Intended to Materially Expand the Statute's Scope

"[The] first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341.  Where the text and statutory structure is clear, there is "no occasion to resort to legislative history." *BedRoc Ltd. v. United States*, 541 U.S. 176, 186 (2004); *see also Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").  If analysis of the statutory language and its context does not yield a plain meaning, however, courts may look to the statute's legislative history and intent.  *Am. Lithotripsy Soc. v. Thompson*, 215 F. Supp. 2d

23, 32 (D.D.C. 2002).  Here, the statutory text, taken in context, has a plain meaning.  *See supra*.

Even if it did not, however, the legislative history cuts against any attempt to use "request" to

materially expand FARA's scope.

As discussed in the preceding sections, the broadest definition of "request" would take

FARA in a materially different direction from the eight terms it accompanies.  Had Congress

intended this ninth term to cause such a drastic step, it would be obvious from the legislature's

discussion and debate.  *See Gooding v. United States*, 416 U.S. 430, 457-58 (1974) ("While

congressional silence as to a particular provision of a bill during debates which give extensive

consideration to neighboring provisions is not easy to interpret, it would be unusual for such a

significant change as that proposed by petitioner to have entirely escaped notice."); *McGoff*, 831

F.2d at 1090 ("If, as the Government maintains, Congress did intend the draconian measure of

effectively eliminating the statute of limitations, the obvious question arises … why such an

unusual (indeed drastic) step did not engender any discussion or debate.").  Here, FARA's

legislative history counsels against a broad reading of "request."

The word "request" was added to FARA as part of a 1966 amendment.  The House

Judiciary Committee report for that amendment explained that the amendment "redefine[d] the

phrase 'agent of a foreign principal'" to ensure it would reach people who were "subject to the

*direction or control* of a foreign principal."  H.R. Rep. 89-1470, at 4, 89th Cong., 2d Sess., as

reprinted in 1966 U.S.C.C.A.N. 2397, 2400 (emphasis added).  The committee report further

explained that its amendment:

> will have the effect of establishing an agency relationship when a person engages
> in one of the enumerated activities and comes within either of these two
> categories: (1) is an agent, employee, representative, or servant of the foreign
> principal, or (2) *acts at the order of*, or is *under the control of*, a foreign principal.

*Id.* (emphasis added).  Neither the House Judiciary Committee nor the Conference Committee explained why the word "request" was included in the bill.  The broad reach of "request" asserted in the Complaint, however—making someone an "agent" in the absence of any orders, direction or control, or any agent, representative, employment, or servant relationship—would drastically expand the meaning of the statute beyond that described by the Committee report.  The absence of any mention in the legislative history of such an outcome strongly suggests that no such drastic effect was intended.

### B.      The Complaint Fails to Allege That Wynn Engaged in Political Activities

In addition to failing sufficiently to allege that Wynn acted at the "request" of Sun or the PRC, the Complaint also fails to allege that he engaged in "political activities" within the scope of that request.  FARA defines "political activities" as:

> any activity that the person engaging in believes will, or that the person intends to, in any way *influence* any agency or official of the Government of the United States … with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or foreign political party.

22 U.S.C. § 611(o) (emphasis added); *accord* Compl. ¶ 13.  To survive a motion to dismiss, the Complaint must, therefore, allege that Wynn believed that he would, or intended to, "influence" the President or the Administration officials in connection with the PRC's or Sun's request.

In fact, however, the Complaint alleges only that Wynn was asked by Sun to deliver a message from the PRC to the Administration, and that Wynn did so while expressly disclosing that the message was coming from the PRC.  Merely delivering a message on behalf of a foreign government and checking on its status, without any accompanying efforts to influence on behalf of the foreign government, falls outside the scope of FARA.  Because the Complaint fails sufficiently to allege that Wynn engaged in political activities, and it should be dismissed.

1.   **The Complaint's Factual Allegations Support Only That Wynn Delivered a Message to the President and Administration Officials, and Not That He Engaged in Any Lobbying or Other Efforts to Influence on the PRC's Behalf**

The Complaint summarizes Wynn's alleged conduct as follows: "[A]t the request of Sun, and on behalf of the PRC, the Defendant *conveyed* to former President Donald J. Trump and his Administration … the PRC's request to remove from the country a PRC national who had sought political asylum in the United States."  Compl. ¶ 2 (emphasis added).  In other words, as framed by the government, Wynn's activities in this matter were limited to the mere delivery of a message on behalf of the PRC without a corollary attempt or intention to "influence" on behalf of the PRC.  As set forth below, the factual allegations of the Complaint confirm that Wynn's role was as a messenger conveying information and not as a lobbyist intending to influence decision-making on behalf of a foreign principal.  Simply put, the facts as laid out by the government fall unambiguously short of describing conduct encompassed by FARA.

*First*, the Complaint alleges only that the PRC requested Wynn's assistance in bringing the PRC's proposal to the attention of Administration officials, not influencing the Administration's ultimate decision on the proposal.  According to the Complaint, the PRC was proposing a mutually beneficial arrangement for the United States and the PRC, *id.* ¶ 21.c., but Sun wanted help in ensuring that the message was delivered.  The Complaint alleges only that "Sun requested [Wynn's] help in *bringing the issue to the attention of the Trump Administration*."  *Id.* ¶ 18 (emphasis added); *accord id.* ¶ 17 (noting Broidy identified Wynn only for potential assistance in "getting access to Trump Administration officials," not advocating to them).  In other words, Sun's request was limited to conveying the PRC's proposal to the Administration and did not include any other tasks, such as lobbying or attempting to influence the Administration officials.

*Second*, the Complaint alleges that Wynn agreed only to deliver the PRC's proposal, and not to influence the U.S. government's decision regarding the proposal.  As the Complaint alleges, when Sun sought Wynn's assistance, Wynn only "agreed to *raise the matter* with then-President Trump and Trump Administration officials."  *Id.* ¶ 20 (emphasis added).  More importantly, the factual allegations in the Complaint reflect that Wynn's conduct was limited to delivering the PRC's message and later inquiring about its status.  There are no factual allegations in the Complaint, however, that Wynn ever lobbied or otherwise attempted to influence the President or Administration officials on behalf of Sun or the PRC.

For example, with respect to the dinner between Wynn and President Trump, the Complaint alleges that "the Defendant *conveyed* to then-President Trump the PRC's desire to have the PRC national removed from the United States and provided the PRC national's passport photos to then-President Trump's secretary."  *Id.* ¶ 22 (emphasis added).  In describing Wynn's meeting with other officials, the Complaint does not allege that Wynn advocated; instead, it alleges that Wynn conveyed "that PRC officials had contacted him and advised him that 'they were very interested in having' the PRC national returned to China as soon as possible."  *Id.* ¶ 25.c.  The Complaint also alleges other occasions when Wynn raised the issue of the PRC national with President Trump, including one call where Wynn allegedly asked President Trump "about the PRC national's status," *id.* ¶¶ 25.d-25.e, but the government does not allege that during any of those occasions Wynn lobbied or attempted to influence the president on behalf of the PRC.

The absence of these necessary factual allegations sharply contrasts with Wynn's alleged statements summarizing his completion of the requested activities.  For example, in his last conversation with Sun, the Complaint alleges that Wynn informed Sun that "he had made U.S.

Government officials aware of the request," and that beyond that, Wynn was not able to provide any additional assistance so Sun should stop contacting Wynn.  *Id.* ¶ 27.  Similarly, in a text message discussing the end of his involvement in the matter, the Complaint alleges that Wynn stated he had "received assurances 'that all parties in the White House were fully sensitive to the timing of this issue and the relevant USA procedural law involved,'" adding that "[a]t this point, as a private citizen, I believe I have exhausted the advantages of my position."  *Id.* ¶ 28.  In both discussions, Wynn's referenced only that he informed the Administration and made them aware of the PRC's proposal because that is all Wynn was allegedly requested to do.

The government should not be permitted to argue that it is a reasonable inference from the factual allegations that Wynn was engaged in a lobbying effort on the PRC's behalf.  The question whether Wynn attempted to lobby the Administration with respect to the PRC's proposal is central to the Complaint and addresses a specific element of the statute; on an issue so fundamental to the case and to Wynn's alleged legal duties, the Court should require the government to include specific factual allegations to support its claim that he engaged in lobbying.  *See, e.g.*, *Brody v. Bruner*, No. 19-cv-01091, 2021 WL 4264055, at *2 (D. Colo. Sept. 20, 2021) (in a case alleging conspiracy, holding that "[t]he Court will not infer the necessary agreement; rather, the Complaint must allege facts showing such agreement").  Given the detailed factual allegations in the Complaint, it is fair to assume that, if the government was aware of such facts, they would have been included.  In their absence, the Court should not invent or assume their existence.

### 2. Merely Conveying a Message From the PRC Without Any Attempt to Influence Administration Officials on the PRC's Behalf Does Not Qualify as a "Political Activity" Under FARA

For the government to state a claim that Wynn engaged in "political activities" as an agent of Sun and the PRC, the Complaint must contain sufficient factual allegations that Wynn

41

believed either that his actions would, or that he intended to, "in any way influence any agency or official of the Government of the United States" at the request of the PRC.  *See* 22 U.S.C. § 611(o).  As a general matter, courts have found that the definition of "influence" means to "affect the mind or action of" another.  *E.g.*, *United States v. Chriswell*, 401 F.3d 459, 469 (6th Cir. 2005) (internal quotation marks omitted).  In the context of FARA's definition of "political activities," the term "influence" thus requires the government to allege facts supporting that Wynn tried to "affect the mind or actions" of Administration officials on behalf of the PRC.  As explained above, the Complaint fails to do so.  *See* Part III.B.1 *supra*.

To find that FARA applies in the absence of such factual allegations would be inconsistent with the purpose of FARA to prevent covert foreign *influence*.  *See Craig*, 401 F. Supp. 3d at 54 ("The purpose of [FARA] is to prevent covert influence over U.S. policy by foreign principals."); *supra* § I.B (summarizing authorities on the purpose of FARA to facilitate audience's ability to evaluate a message from a foreign source).  FARA thus applies where foreign actors try to impact U.S. public policies while hiding behind secretly controlled agents. But where, as here, the Complaint alleges that Wynn delivered a proposal to Administration officials that he openly disclosed came from the PRC, yet at the same time fails to allege that Wynn lobbied or otherwise tried to influence the Administration on the PRC's behalf, there is no covert foreign influence to combat.  FARA's goal of "enabl[ing] American audiences to consider the source in evaluating the message," *The Scope of Agency Under FARA*, at 1, is nowhere implicated where the potential registrant is a mere messenger, who revealed the source of the message to his audience in real time.

Because the Complaint fails to allege that Wynn engaged in "political activities" within the scope of the PRC's request to deliver its proposal, the Complaint should be dismissed.

## **CONCLUSION**

For the foregoing reasons, Wynn respectfully requests that the Court dismiss the

Complaint with prejudice.

Respectfully submitted,

/s/ _____
Reid H. Weingarten (D.C. Bar No. 365893)
Brian M. Heberlig (D.C. Bar No. 455381)
Nicholas P. Silverman (D.C. Bar No.1014377)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rweingarten@steptoe.com
bheberlig@steptoe.com
nsilverman@steptoe.com


/s/ _____
Robert D. Luskin (D.C. Bar No. 293621)
Leo R. Tsao (*pro hac vice to be filed*)
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC  20036
Tel: (202) 551-1700
Fax: (202) 551-0410
robertluskin@paulhastings.com
leotsao@paulhastings.com

*Counsel for Defendant Stephen A. Wynn*


Dated: July 18, 2022