Reid H. Weingarten
202 429 6238
rweingar@steptoe.com

Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com



June 8, 2018

**By Electronic Mail & FedEx**

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
U.S. Department of Justice, National Security Division
175 N Street, NE
Constitution Square, Building 3 – Room 1.300
Washington, DC 20002

Re:   **Stephen A. Wynn**

Dear Counsel:

We write in response to your May 16, 2018 letter, in which you conclude that our client Stephen A. Wynn has an obligation to register under the Foreign Agents Registration Act ("FARA").  For the reasons explained below, we disagree that Wynn has acted as an agent of a foreign principal, or is obligated to register under FARA.  We appreciate this opportunity to expand on the issues we raised during our initial proffer and to more formally set forth our views.[1]  We are hopeful that this submission will convince you to close this matter.  However, in the event you still believe Wynn is obligated to register under FARA, we respectfully request an opportunity to seek review of this decision with your supervisors within the Department of Justice before any enforcement action.

---

[1] As was the case with our initial proffer, this letter and any related communications are in the nature of an attorney proffer, seeking informal resolution of this matter through negotiation and compromise.  Its contents are not admissible in any subsequent proceeding under Federal Rule of Evidence 408.

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 2



## I.     INTRODUCTION

In 2017, Wynn received an unsolicited request from an individual identified as
"Mr. Soon" (ph), who was described as a senior Chinese security official, to deliver a message to
President Trump.  We have concluded that the individual was Sun Lijun, Vice Minister of
Ministry of Public Security of the People's Republic of China (PRC), which you have
corroborated.  Sun asked Wynn if he could speak to President Trump about China's interest in
the repatriation of Guo Wengui, whom he described as a Chinese "criminal" living in New York
whose visa was up for renewal.  Wynn said he would raise the issue with President Trump if he
got the chance, and subsequently delivered the message, fully disclosing the entire sequence of
events to the President.  Wynn did so because he believed it was in the interests of the United
States to consider the request.  Wynn had no agreement with Sun, received no compensation or
benefits, was not threatened or extorted to act, and did not lobby or try to influence the President.
Wynn never met Sun in person and eventually cut off further communications when Sun's phone
calls became repetitive and annoying.  On these facts, Wynn was not Sun's or the PRC's agent
and had no obligation to register under FARA.

Your contrary determination that Wynn was an agent of Sun and the PRC is based
exclusively on Sun's *request* that Wynn convey a message to President Trump regarding the
PRC's desire to repatriate Guo.  You state that FARA "identifies 'request' as one of three
independent, disjunctive prerequisites that can give rise to an agency relationship with a foreign
principal."  Letter at 4.  This broad interpretation of the term "request" in isolation, as alone
sufficient to create a foreign agency relationship, is counter to the terms of the statute as a whole.
In context, FARA requires a greater degree of direction or control by the principal than an
individual's mere delivery of a requested message, with no consideration, direction, relationship,
or agreement to represent the foreign principal's interests.  The requirement is confirmed by
(1) the authority cited in your May 16 letter, *Attorney General v. Irish Northern Aid Committee*,
668 F.2d 159 (2d Cir. 1982) ("*INAC*"); (2) the terms of the statute, read under established canons
of construction endorsed by the Supreme Court; (3) FARA's legislative history; and
(4) statements by Department of Justice officials responsible for FARA administration and
enforcement.

Further, Wynn did not act "for or in the interests" of Sun or the PRC, nor did he
"represent" their interests to President Trump, as is required to be an agent of a foreign principal
under FARA.  Wynn acted as a messenger, not a representative or advocate.  He was transparent
about the circumstances of the unsolicited request he had received, and he passed along the
information without endorsement or advocacy.  By reporting such information, and adding his
view that a response might be in *the United States' interests* in its relations with the PRC, Wynn
was not representing the PRC, nor acting for or in the PRC's interests.

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 3



Finally, even if, *arguendo*, Wynn was obligated to register at one time, that obligation ceased when Wynn cut off communication with Sun in October 2017 and took no further action on this matter.  FARA's registration obligation expires when the agent stops acting on behalf of the foreign principal.  *United States v. McGoff*, 831 F.3d 1071, 1082 (D.C. Cir. 1987).

For all of these reasons, Mr. Wynn was not an agent of a foreign principal and has no obligation to register under FARA.

## II.     FACTUAL BACKGROUND

### A.     Stephen Wynn's Background

Wynn has been a leader in the casino resort industry since the 1970s, and he was responsible for creating the Mirage, Treasure Island, and the Bellagio in Las Vegas.  In the 2000s, he took Wynn Resorts Limited public and created Wynn Las Vegas and Wynn Encore on the Las Vegas strip.  During the same period, Wynn expanded to Macau, a Special Administrative Region of China that has existed under independent local control since 1999, under the Chinese principle of "one country, two systems."  Wynn created the Wynn Macau Resort, Encore at Wynn Macau, and, most recently, the Wynn Palace on the Cotai strip.  In his business dealings in Macau, Wynn dealt extensively and had a good working relationship with Macau's former Chief Executive Edmund Ho.  Wynn has had far fewer contacts and no significant business dealings with government officials from "Mainland China."

Wynn and Donald Trump historically had been business competitors who were not close friends.  By the time of the 2016 presidential campaign, they had a cordial relationship and spoke sporadically during campaign.  Wynn had no formal role in the campaign.  Following the election, at the request of President Trump and Chief of Staff Reince Priebus, Wynn agreed to serve as Finance Chairman of the Republican National Committee (RNC).  Wynn had been an active Republican donor and fundraiser during earlier election cycles and had gotten to know Priebus when he was the Chairman of the RNC.  In 2017, President Trump and Wynn periodically spoke privately and dined together on a few occasions in the White House.

### B.     Wynn's Communications with Sun and the Trump Administration

In the summer of 2017, Wynn learned that a Chinese government official, Sun,[2] wanted to speak with him about U.S. cooperation regarding a Chinese national, Guo Wengui, who was

_____

[2] The official was described to Wynn as a "Mr. Soon" (ph) who was China's Vice Chair of State Security.  From the description, we identified the official as Sun Lijun, Vice Minister of China's Ministry of Public Security.  Your letter states that you have obtained information corroborating that Sun was the official who contacted Wynn.  Letter at 2 n.5.

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 4

**Steptoe**
STEPTOE & JOHNSON LLP

living in New York.  The initial contact came through an American intermediary unaffiliated with Wynn's business, who also provided Wynn with two photo pages from Guo's passports—one in his name and one using the name "Miles Kwok."  Wynn had never heard of Sun or Guo but agreed to receive the call.

Thereafter, Sun contacted Wynn by telephone.  Through an interpreter, Sun conveyed his view that Guo was a criminal whose visa should not be renewed and whom the United States should return to China.  Sun asked Wynn if he would relay that message to President Trump.  Sun did not offer Wynn any compensation for his assistance or threaten to take adverse action if Wynn declined.  Wynn said he would mention the issue to President Trump if he got the chance.  He did not agree to lobby the President or advocate on Sun's or the PRC's behalf.

During a subsequent visit to the White House, Wynn provided Guo's passport photo pages to President Trump's secretary, Madeleine Westerhout.  During a social dinner with President Trump in the White House, Wynn delivered Sun's message to President Trump, fully disclosing the whole story and the source of the information.  Wynn did not advocate for or against Sun's request.  He told President Trump that this seemed like an important issue to the PRC and might be a good opportunity for President Trump to do a favor for Chinese President Xi and develop their relationship.

Thereafter, Sun followed up with Wynn by telephone on a number of occasions seeking status reports and more information.  Wynn, in turn, did follow up conversations with administration officials about this issue, including Priebus, Chief of Staff General John Kelly, and Deputy National Security Advisor Major General Ricky Wadell.  In these communications, Wynn passed along the information about Guo, disclosing the communications he had with Sun, and did not advocate or lobby on Sun's or the PRC's behalf.

In the fall of 2017, Wynn understands that Sun traveled to the United States and met with senior administration officials about Guo.  When no action was taken, Sun continued to contact Wynn by telephone, seeking more information.  These calls became repetitive and annoying.  In October 2017, Wynn told Sun that he had made U.S. government officials aware of Sun's request, and that Sun should stop contacting Wynn because there was nothing more he could or would do.  Wynn has had no further communications with Sun since this time.

Wynn viewed this entire episode as an opportunity to further U.S. interests.  Wynn believed that President Trump wanted to improve relations with China, and thought Sun's request might provide an opportunity to do so.  Wynn had no contract, understanding, or agreement, written or oral, with Sun or the PRC, nor was any such agreement or understanding ever discussed.  Neither Wynn nor any of his businesses received any compensation or special treatment in exchange for passing along Sun's message.  Moreover, neither Wynn nor his Macau

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 5



casinos have been punished or threatened regarding his refusal to do more than transmit Sun's message.[3]

## III.   DISCUSSION

FARA's definition of "agent of a foreign principal" contains two components:  one focusing on an individual's relationship to a foreign principal, 22 U.S.C. § 611(c)(1), and one focusing on forms of action in the United States on the foreign principal's behalf, *id.* § 611(c)(1)(i)-(iv).  Wynn does not fall under either component:  he did not have the requisite agency relationship with Sun or the PRC, and he did not represent them or act for their interests in his communication with President Trump and other administration officials.

### A.   Wynn Was Not an Agent of Sun or the PRC

The first component of FARA's definition of "agent of a foreign principal" focuses on an agency relationship with the foreign principal.[4]  It defines "agent of a foreign principal" as

> any person who acts as an **agent**, **representative**, **employee**, or **servant**, or any person who acts in any other capacity at the **order**, **request**, or **under the direction** or **control**, of a foreign principal or [a person supervised, directed, controlled, financed, or subsidized by a foreign principal].

22 U.S.C. § 611(c)(1) (emphasis added).

Here, Wynn did not act as an "agent," "representative," "employee," or "servant" of Sun or the PRC, nor did he act at their "order" or "under the[ir] direction or control."  Wynn had no engagement, agreement, understanding, or relationship of any kind with Sun or the PRC, either written or oral, formal or informal.  Wynn received no compensation or benefit from them, had no authority to speak for them or represent them, took no instruction from them, and owed them

---

[3] Your letter notes that "Mr. Wynn's Macau operations depend heavily on good relations with the Chinese government."  Letter at 3 n.8.  This is an overstatement.  Had Wynn been so "incentive[ized] to remain in China's good graces," as you suggest (*id.* at 2 n.3), Wynn would have advocated for Guo's deportation, not simply passed along the message.  Moreover, the fact that Wynn cut off communications with Sun belies any suggestion that he acted out of concern for his business or to curry favor with the Chinese government.

[4] Wynn assumes for purposes of this letter that the PRC's Ministry of Public Security qualifies as a "foreign principal" under FARA, 22 U.S.C. § 611(b)(1), (e), and that Sun was "supervised, directed, [or] controlled" by the MPS within the meaning of 22 U.S.C. § 611(c)(1).

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 6



no obligation of any kind, whether to work for them, speak for them, or to do anything at all. Wynn, as a social acquaintance of the President, was asked in an unsolicited telephone call to convey a message to President Trump, and did so.

Your sole basis for contending that Wynn was an "agent" of Sun and the PRC is that he acted on Sun's "request." You assert that "request" is "one of three independent, disjunctive prerequisites that *can* give rise to an agency relationship with a foreign principal." Letter at 4 (emphasis added). But the presence or motivation of a "request," in the broad colloquial sense, standing alone, is not sufficient to make one an agent of a foreign principal, and does not do so in this case. That term cannot be isolated from its statutory context to bear the weight the government gives it.

### 1.    A "request," without any direction or control, does not make Wynn an agent under *Attorney General v. Irish Northern Aid Committee*

Initially, it is notable that the Second Circuit opinion on which your letter relies was issued precisely "to express a note of caution concerning the statute's coverage of those who act at the 'request' of a foreign principal." *INAC*, 668 F.2d at 160-61. In *INAC*, the Second Circuit warned expressly that "this word ['request'] is not to be understood in its most precatory sense. Such an interpretation would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate." *Id.* at 161. The court noted Congress's statement in its report on this 1966 amendment that the breadth of the language alone could reach action for which registration is "not … warranted":

> Under existing law it is possible because of the broad scope of the definitions contained in section [611(c)(1)] to find an agency relationship (and thus the possibility of registration) of persons who are not, in fact, agents of foreign principals but whose acts may incidentally be of benefit to foreign interests, even though such acts are part of the normal exercise of those persons' own rights of free speech, petition or assembly. This may have been desirable when the Foreign Agents Registration Act was amended in 1942, but does not appear warranted in present circumstances.

*Id.* (quoting H.R. Rep. 89-1470, at 6 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2397, 2401).

Your letter quotes the language that follows this passage in the *INAC* opinion, and suggests that because Sun directed his request to a specific individual (Wynn), and requested a specific action (delivery of a message to President Trump), this request makes Wynn a foreign agent. Letter at 4. But these factors, while relevant guideposts, are not dispositive. "[T]he surrounding circumstances *may* show that those 'requested are in some way authorized to act for or to represent the foreign principal," 662 F.2d at 161 (emphasis added), but that is not necessarily so—it depends on the facts of the case. Again, the Second Circuit expressly

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 7



cautioned that "the specificity with which an individual … was designated would not be solely determinative." *INAC*, 662 F.2d at 161 n.6.  As an example, the Second Circuit quoted the congressional testimony of former Assistant Attorney General Phillip B. Heymann:

> For instance, a congressman visits Turkey and during his trip he meets with government officials.  The government officials urge the case for foreign policies favorable to Turkey, and he supports these when he returns to Washington.  If that is considered a 'request' under the statute, the congressman is an unregistered foreign agent, even though he has taken no orders, is under no one's direction or control, and is not anyone's agent.

*Id.* (quoting *Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. To Investigate the Activities of Foreign Governments of the Senate Comm. On the Judiciary*, 96th Cong. 701 (1980) (hereinafter, "Heymann Statement").[5]

Assistant Attorney General Heymann's example, quoted with approval by the Second Circuit, is similar to this case.  Though Wynn is not a congressman, he is in the position AAG Heymann described:  he was contacted by a foreign government official, who requested a U.S. government action favorable to that foreign government.  Concluding that it might be in the interests of the United States to consider Sun's request, Wynn passed on Sun's message in a transparent manner without advocacy to President Trump and administration officials.  Like the congressman in the Second Circuit's example, Wynn "has taken no orders, is under no one's direction or control, and is not anyone's agent." *Id.*  Moreover, Wynn's decision to pass the message to President Trump because it might benefit U.S. interests is an "independent action that incidentally benefits a foreign government but does not fall within the purview of the Act." *Id.*

## 2. A "request," without any direction or control, does not make Wynn an agent under established statutory interpretation canons as applied by the Supreme Court

The Supreme Court has repeatedly and recently cautioned against interpreting statutes expansively by relying on one broad term contained in a list of narrower statutory terms, without attention to the context in which it is employed.  For instance, in the honest services bribery trial of Virginia Governor Bob McDonnell, the question was whether the governor's arranging

---

[5] In language not quoted in *INAC*, AAG Heymann continued, "If [FARA] were read that way, the congressman would face potential criminal penalties of five years imprisonment and a $10,000 fine.  Because of possible results like this one, we do not read or apply the statute to instances of persuasion or the mere urging of a viewpoint.  Instead, we focus on the other language in the statute's definition of agent."  Heymann Statement, at 701.

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 8

Steptoe
STEPTOE & JOHNSON LLP

meetings with state officials, calling those officials to urge them to meet or to consider conducting studies of a product, and hosting promotional events, constituted "official acts" under applicable bribery law. *McDonnell v. United States*, 136 S. Ct. 2355, 2367-68 (2016); *see id.* at 2362-66 (describing charged acts). The statute defined "official act" as "any *decision or action* on any *question, matter, cause, suit, proceeding or controversy,* which may at any time be pending, or which may by law be brought before any public official" in his official capacity. *Id.* at 2367 (quoting 18 U.S.C. § 201(a)(3)) (emphasis added). The Court observed that "the last four words in that list—'cause,' 'suit,' 'proceeding,' and 'controversy'—connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination," and that there was no such action involved in the case. *Id.* at 2368. The government argued, as here, that the remaining terms in the list—there, "question" and "matter"; here, "request"—had broader meaning, and because they were listed in the disjunctive, the plain meaning of the statute included *any* decision or action on *any* issue falling within those broad terms. *See id.* at 2368.

The Supreme Court rejected that simplistic analysis, and instead "look[ed] to the context in which the words appear," employing "the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'" *Id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). To avoid "giving … unintended breadth to" Congress's enactment, the Court did not read "question" or "matter" in their broadest or even their plainest meaning. Instead, it interpreted them as meaning something similar to the other terms in the statutory list—"a formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories." *Id.* at 2369; *accord id.* at 2371-72. The Court found such interpretation a better indicator of congressional intent, as well as a way to avoid rendering the other statutory terms superfluous (as they would become if they fell within the broad definition of the outlying term). *See id.* at 2368-69[6]; *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 573-74 (1995) (where a statute defined "prospectus" as a 'prospectus, notice, circular, advertisement, letter, or communication," "communication" did not mean any type of communication'; rather, the because the list "refers to documents of wide dissemination," "communication" must therefore also mean "a public communication"); Antonin Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, Canon 31 (2012) (Associated-Words Canon).

Similarly, in *Yates v. United States*, 135 S. Ct. 1074 (2015), a commercial fisherman suspected of harvesting undersized fish, who directed a crew member to toss the suspect fish

---

[6] After all, "[i]f 'question' and 'matter' were as unlimited in scope as the Government argues, the terms 'cause, suit, proceeding or controversy' would serve no role in the statute— every 'cause, suit, proceeding or controversy' would also be a 'question' or 'matter.'" *Id.* at 2369.

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 9



overboard, was charged with destruction of records in a federal investigation, under a statute that prohibited "destroy[ing,] … conceal[ing], [or] cover[ing] up … any record, document, or tangible object with intent to impede, obstruct, or influence" a federal investigation. *Id.* at 1078 (quoting 18 U.S.C. § 1519). Despite the fact that a fish is a "tangible object" by dictionary definition, the Supreme Court ruled that it was not a "tangible object" within the meaning of the statute, which was directed at the destruction of records, not wildlife. *See id.* at 1084-87 (plurality); *id.* at 1089-90 (Alito, J., concurring). The Court applied the *noscitur a sociis* canon, *id.*, as well as the related canon of *ejusdem generis*—"Where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* at 1086 (plurality) (citation omitted); *accord id.* at 1089 (Alito, J., concurring) (citation omitted); *see also* Scalia and Garner, *supra*, Canon 32 (*Ejusdem Generis* Canon).

    Here, both canons apply. The term "request" appears among the associated terms "at the order" and "under the direction or control," which give it meaning. Moreover, that list itself modifies the residual catch-all "any person who acts in any other capacity," which follows a list of specific terms ("agent, representative, employee, or servant"). Not only does "request" in this context connote something similar to "order," "direction," or "control," but it also defines the kind of person to whom the statute applies—a person who acts similarly to an "agent, representative, employee, or servant."

    Thus, "request" is not, by its breadth, an escape valve that allows an end-run around the statute's otherwise clear terms. Instead, it must be interpreted similar to those surrounding terms, as connoting a request from someone who exercises some degree of direction or control over some person who acts in a capacity similar to an "agent, representative, employee, or servant." Wynn acted in none of these capacities or ways.

### 3.    FARA's legislative history focuses on direction or control, not a "request"

    The residual clause on which you rely here—"any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal"—was added to FARA in 1966. P.L. 89-486, 80 Stat. 244 (July 4, 1966). The House Judiciary Committee report for that amendment explained that the amendment

> redefine[d] the phrase 'agent of a foreign principal' to insure that that phase covers persons who are either directly or indirectly[7] *subject to the direction*

---

[7] The report goes on to explain that "indirect control" refers to a situation where the foreign principal uses an intermediary to control the agent. *Id.* The phrase is thus not relevant here.

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 10



> *or control* of a foreign principal…. The committee has approved an
> amendment suggested by the Department of Justice which will have the effect
> of establishing an agency relationship when a person engages in one of the
> enumerated activities and comes within either of these two categories: (1) is an
> agent, employee, representative, or servant of the foreign principal, or (2) acts
> at the order of, or is under the control of, a foreign principal.

H.R. Rep. 89-1470, at 4, *as reprinted in* 1966 U.S.C.C.A.N. 2397, 2400.

Neither the House Judiciary Committee nor the Conference Committee explained why the word "request" was included in the bill. The broad reach of "request" asserted here, however—making someone an "agent" even in the absence of *any* orders, direction or control or *any* agent, representative, employment, or servant relationship—is inconsistent with the Committee's summary and would drastically expand the meaning of the statute beyond that described by the Committee report. "If Congress intended[, by amending FARA,] to take [such a] drastic step, … then it would have engendered more discussion or debate," indeed, at least "a single sentence in the legislative history." *United States v. McGoff*, 831 F.2d 1071, 1090 (D.C. Cir. 1987). The absence of any mention in the legislative history of such a broad effect of this one-word addition—which would undo the requirements as summarized in the Committee report—strongly suggests that no such drastic effect was intended.

### 4.   A "request," without direction or control, does not make Wynn an agent under consistent Department of Justice pronouncements

Finally, the requirement of some degree of direction or control has been recognized in statements over the years by Department of Justice officials responsible for FARA enforcement.

For instance, during a 2016 audit by the U.S. Department of Justice's Office of Inspector General, the FARA Unit Chief told OIG investigators that even if a foreign government is trying to influence U.S. policy, "if it is done in a way that does not create a statutory agency relationship on the part of the agent acting within the United States *at the direction or control of the foreign* government, then there is no agent of a foreign principal with an obligation under FARA." Office of the Inspector General, U.S. Department of Justice, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, at 9 (September 2016) (emphasis added). Similarly, National Security Division officials told OIG investigators that part of the reason there were few criminal FARA cases was that prosecutors must prove "that the agent was *directed and controlled* by a foreign principal." *Id.* at 11 (emphasis added).

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 11



These recent pronouncements reflect longstanding Department of Justice policy.  In 1980, Assistant Attorney General Heymann, testifying to the Senate Judiciary Committee, directly rejected the broad construction of "request" that has been suggested here:

> We emphasize, we have emphasized and I think must, to make sense of the statute, require something stronger than persuasion, *something stronger than a mere request*, something that suggests the legal concept of agency or in the words of this statute '*direction, control, order,*' *working for a foreign government*.  This requirement of direction, control—*working under the order of a foreign government*, something that establishes *a substantial and continuing relationship and a sense of direction*—that requirement applies, of course, to the civil obligations of the act and to criminal prosecutions.

Heymann Statement, *supra*, at 685 (emphasis added).

In testimony recognizing the interpretive canons discussed above, the AAG went on to state:

> If we broadly construed the word 'request' to include all forms of argument or persuasion, it would be totally out of line with the other terms 'agent,' 'order,' and 'direction and control.' … As we read the statute, … a person is a foreign agent, and must register with the Department, if he engages in the activities specified in the statute and if he does so at the order of a foreign principal, or under the direction or control of a foreign principal.  What this language emphasizes is that the relationship between the agent and the foreign principal must be one that substantially obligates the agent to the foreign principal.  Only then is it fair to draw the conclusion that an individual is not acting independently, is not simply stating his or her own views, but is acting as an agent or alter ego of the foreign principal.

*Id.* at 701.

Here, Wynn did not act as an "agent, representative, employee or servant," or "at the order … or under the direction or control," of Sun or the PRC.  The fact that Sun may have made a "request," in its broadest colloquial sense, and that Wynn gratuitously acquiesced in a manner that Wynn believed furthered U.S. interests, does not make Wynn an "agent" of Sun or the PRC for FARA purposes.

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 12



**B.**     **Wynn Did Not Act For Or In the Interests of Sun or China, Or Represent Their Interests**

The second component of the definition of "agent of a foreign principal" focuses on the actions taken on the foreign principal's behalf.  Even an individual who has a sufficient agency relationship with a foreign principal under the first paragraph of § 611(c)(1) falls within FARA's requirements only if he:

> (i) engages within the United States in political activities *for or in the interests of such foreign principal*;

> (ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such principal;

> (iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or

> (iv) within the United States *represents the interests of such foreign principal* before any agency or official of the Government of the United States.

22 U.S.C. § 611(c)(1) (emphasis added).  There is no suggestion that Wynn has acted in any of the public relations, political consulting, fundraising, or disbursement functions listed in subsections (ii) and (iii).  Nor is there any suggestion that Wynn has held himself out as a foreign agent under § 611(c)(2).  Wynn therefore can be subject to FARA only if he engaged in political activities in the United States for or in the interests of Sun or the PRC, or represented their interests before the President and other administration officials.  Here, where Wynn acted in the interests *of the United States*, his actions did not trigger FARA.

Contrary to statements in your May 16 letter, Wynn did not "plead" anyone's "cause" to the President—not his, Sun's or the PRC's.  Letter at 5.  He certainly did not "implore President Trump to facilitate the return of Guo to China for the benefit of its government."  *Id.* at 4.  Wynn merely reported to the President the request Sun made on behalf of the PRC.  Wynn did so not in the interests of China, but in the interests of the United States—to apprise the President of information that the President was free to use or to disregard.  Wynn was transparent about the source of the request.  In so doing, Wynn observed to the President that accommodating a favor to the Chinese, on an issue they apparently viewed as important, might strengthen the United States' relationship with China and President Xi, which Wynn believed to be of interest to the President at the time.  Wynn was not representing the PRC's interests before President Trump, or seeking to lobby or influence him for the PRC's benefit.  The fact that Wynn's actions to help President Trump and the United States might also have incidentally benefited the PRC does not

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 13



make Wynn subject to FARA.  *See INAC*, 668 F.2d at 161 n.6 ("independent action that incidentally benefits a foreign government . . . does not fall within the purview of the Act.").

### C.     Because Mr. Wynn Is Not Presently an Agent of a Foreign Principal, He Has No Present Obligation to Register

Finally, even if, *arguendo*, Wynn was ever an agent of a foreign principal, he is no longer an agent, and has no obligation to register now.

We understand that the Department of Justice takes the position that FARA includes a continuing obligation to register even after an agency relationship terminates.  The D.C. Circuit, however, reached a different conclusion in *United States v. McGoff*, 831 F.2d 1071 (D.C. Cir. 1987), where the court concluded that "the statutory obligation to file expires when the agent ceases activities on behalf of the foreign principal."  *Id.* at 1082; *see also id.* ("After all, once an individual has ceased his activities, he is no longer an 'agent of a foreign principal' within the meaning of FARA.").

Here, Wynn cut off all communication with Sun in October 2017.  Thus, any obligation Wynn had to register at the time he was in contact with Sun—an obligation we dispute—expired when they ceased communication.

## IV.     CONCLUSION

Wynn was never an agent of a foreign principal—he was not employed by Sun or the PRC; he was not their representative or servant; he had no agreement with and received no compensation from them; and he did not act at or under their order, direction, or control.  Wynn merely accommodated a request, and transparently reported to the President a message Sun had asked him to convey, without engaging in any advocacy.  In so doing, Wynn did not become an agent of Sun or the PRC for purposes of FARA and had no obligation to register as one.  At the very least, Wynn has no current obligation to register.

Jay I. Bratt, Esq.
Heather H. Hunt, Esq.
Robert Wallace, Esq.
June 8, 2018
Page 14



        For these reasons, we urge you to reconsider your determination that Wynn must register under FARA and close this matter.  In the event you decline to do so, we respectfully request an opportunity to seek review of this decision with your supervisors within the Department of Justice before any enforcement action.  Thank you for your consideration.

                                Sincerely,

                                _____
                                Reid H. Weingarten
                                Brian M. Heberlig
                                Nicholas P. Silverman

                                *Counsel for Stephen A. Wynn*