**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA, | ) ) ) | |
| | ) | Civil Action No. 1:22-cv-01372 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| STEPHEN A. WYNN, | ) ) | |
| | ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND..................................................................................................................3

    A.    Statutory background..............................................................................................3

    B.    Factual background.................................................................................................4

    C.    Procedural background ...........................................................................................7

STANDARD OF REVIEW .................................................................................................7

ARGUMENT ......................................................................................................................8

    A.    Civil enforcement actions under FARA can be brought after the conclusion of an  agency relationship .........................................................................................................9

        1.    *McGoff* does not foreclose civil enforcement actions after an agency relationship has terminated ...................................................................................10

        2.    FARA's legislative history supports allowing the Government to seek injunctive relief addressing past conduct .........................................................13

        3.    Requiring Defendant to register would uphold the purpose of FARA ............14

    B.    Requiring Defendant to register under FARA would not violate his Fifth Amendment rights ..............................................................................................................17

    C.    Requiring Defendant to register under FARA would not violate Defendant's First Amendment rights ..............................................................................................22

        1.    Courts have repeatedly held that FARA comports with the First Amendment ..............22

        2.    FARA registration requires only the disclosure of factual, non-controversial information and does not require affirmation of a Government-dictated message or a statement of opinion and ideological belief................................25

        3.    FARA's registration requirement survives more exacting scrutiny because the Government has a compelling interest in disclosure and the registration obligation is narrowly tailored to fulfill that interest ...........................................29

    D.    By alleging that Defendant acted at the request of the PRC and Sun when he lobbied government officials, the Complaint sufficiently alleges that Defendant engaged in political activities at the request of a foreign principal ....................................33

        1.    The Complaint sufficiently alleges that Defendant formed an agency relationship with Sun and the PRC by acting at their request.....................................33

        2.    The legislative history and other interpretive documents for FARA do not support Defendant's reading of agency .....................................................37

        3.    Defendant's repeated lobbying of government officials on behalf of the PRC to seek the return of a PRC businessperson constitutes "political activities" under FARA ..............40

4.    In the alternative, the Court should grant the Government leave to amend its Complaint ………..……………………………………………………………………..44

**CONCLUSION**.................................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Albertson v. Subversive Activities Control Bd.*,
    382 U.S. 70 (1965) ........................................................................................ 21, 22

*Anderson v. Holder*,
    647 F.3d 1165 (D.C. Cir. 2011) ............................................................................ 17

*Attorney Gen. v. Irish N. Aid Comm't*,
    668 F.2d 159 (2d Cir. 1982) ................................................................ 34, 35, 36, 37

*Attorney Gen. v. Irish People, Inc.*,
    595 F. Supp. 114 (D.D.C. 1984) ........................................................................... 35

*Attorney Gen. v. Irish People, Inc.*,
    796 F.2d 520 (D.C. Cir. 1986) ...................................................................... 35, 36, 37

*Attorney Gen. v. Irish N. Aid Comm.*,
    346 F. Supp. 1384 (S.D.N.Y. 1972) .............................................................. 25, 30, 31

*Attorney Gen. v. Irish People, Inc.*,
    684 F.2d 928 (D.C. Cir. 1982) .............................................................................. 32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 7, 41

*Brody v. Bruner*,
    No. 19-cv-01091, 2021 WL 4264055 (D. Colo. Sept. 20, 2021) ............................... 41

*California v. Byers*,
    402 U.S. 424 (1971) ...................................................................................... 21, 22

*Cohen v. United States*,
    650 F.3d 717 (D.C. Cir. 2011) .............................................................................. 38

*Davis v. FEC*,
    554 U.S. 724 (2008) ............................................................................................ 29

*Doe v. United States*,
    487 U.S. 201 (1988) ............................................................................................ 20

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .............................................................................................. 7

*FDIC v. First Interstate Bank of Denver, N.A.*,
    937 F. Supp. 1461 (D. Colo. 1996) ................................................................... 38, 41

*FEC v. Christian Coalition*,
    965 F. Supp. 66 (D.D.C. 1997) ........................................................................ 18

*Full Value Advisors, LLC v. SEC*,
    633 F.3d 1101 (D.C. Cir. 2011) ..................................................................... 29

*Hoffman v. United States*,
    341 U.S. 479 (1951) ........................................................................................ 18

*Johanns v. Livestock Marketing Ass'n*,
    544 U.S. 550 (2005) ....................................................................................... 26

*Kasten v. Saint Gobain Performance Plastics Corp.*,
    563 U.S. 1 (2011) ........................................................................................... 11

*Leary v. United States*,
    395 U.S. 6 (1969) .................................................................................... 21, 22

*Marchetti v. United States*,
    390 U.S. 39 (1968) ................................................................................. 21, 22

*McDonnell v. United States*,
    579 U.S. 550 (2016) ............................................................................... 36, 37

*Meese v. Keene*,
    481 U.S. 465 (1987) ............................................................................. *passim*

*Morales v. Daley*,
    116 F. Supp. 2d 801 (S.D. Tex. 2000) .......................................................... 29

*Mount Vernon Mortg. Corp. v. United States*,
    236 F.2d 724 (D.C. Cir. 1956) ....................................................................... 11

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ....................................................................... 27

*Nat'l Ass'n of Mfrs. v. Taylor*,
    582 F.3d 1 (D.C. Cir. 2009) ..................................................................... 29, 30

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ....................................................................................... 40

*Riley v. Nat'l Fed. of the Blind v. N. Carolina*,
    487 U.S. 781 (1988) ....................................................................................... 27

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ......................................................................................... 27

*Setser v. United States*,
    566 U.S. 231 (2012) ....................................................................................... 34

*Sickle v. Torres Advanced Enter. Sols., LLC,*
   884 F.3d 338 (D.C. Cir. 2018) ........................................................... 41

*Sparrow v. United Air Lines, Inc.,*
   216 F.3d 1111 (D.C. Cir. 2000) ............................................................. 7

*Steel Co. v. Citizens for Better Env't,*
   523 U.S. 83 (1998) ............................................................................. 15

*United States v. Arnold,*
   740 F.3d 1032 (5th Cir. 2014).................................................... 28, 29

*United States v. City of Palm Beach Gardens,*
   635 F.2d 337 (5th Cir. 1981)............................................................. 11

*United States v. Craig,*
   401 F. Supp. 3d 49 (D.D.C. 2019) ................................................ 3, 16

*United States v. Harriss,*
   347 U.S. 612 (1954) ........................................................................... 30

*United States v. Hubbell,*
   530 U.S. 27 (2000) ............................................................................. 20

*United States v. McGoff,*
   831 F.2d 1071 (D.C. Cir. 1987) ................................................*passim*

*United States v. Peace Info. Ctr.,*
   97 F. Supp. 255 (D.D.C. 1951) ......................................... 19, 22, 25, 31

*United States v. Rafiekian,*
   991 F.3d 529 (4th Cir. 2021)............................................................. 34

*United States v. Schmidt,*
   816 F.2d 1477 (10th Cir. 1987) ........................................................ 19

*United States v. Sindel,*
   53 F.3d 874 (8th Cir. 1995)......................................................... 28, 29

*United States v. Stirling,*
   571 F.2d 708 (2nd Cir. 1978)............................................................ 21

*United States v. Woods,*
   571 U.S. 31 (2013) ............................................................................. 34

*Viereck v. United States,*
   318 U.S. 236 (1943) ........................................................................... 25

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ........................................................................... 26

*Wood v. Moss*,
  572 U.S. 744 (2014) ............................................................................................. 7

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ........................................................................................... 26

*Yates v. United States*,
  574 U.S. 528, 545 (2015). ............................................................................. 36, 37

**Statutes**

22 U.S.C. § 611 ...................................................................................................... *passim*

22 U.S.C. § 612 ...................................................................................................... *passim*

22 U.S.C. § 616 ...................................................................................................... 16, 22

22 U.S.C. § 618 ...................................................................................................... *passim*

**Other Authorities**

28 C.F.R. § 5.205 ...................................................................................................... 17

Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 380 (2018) ................... 28

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 7

Federal Rule of Civil Procedure 15(a)(2) ...................................................................... 43

H.R. Rep. No. 89-1470 (1966) ...................................................................................... 38

U.S. Department of Justice, FARA Unit (May 2020), *available at*
  https://www.justice.gov/nsd-fara/page/file/1279836/download ...................................... 38, 39

**INTRODUCTION**

For at least several months in 2017, Defendant Stephen A. Wynn ("Defendant") helped the People's Republic of China ("PRC") and Sun Lijun ("Sun"), the then-Vice Minister of Public Security for the PRC, try to effectuate the removal of a PRC businessperson from the United States to the PRC.  Defendant was recruited to join this effort by other U.S. citizens who were aware of Defendant's political connections, and the PRC communicated requests for Defendant's assistance either through those same individuals or directly in conversations between Sun and Defendant.  In response to the PRC's requests, Defendant made multiple attempts to lobby high-level officials in the Administration of then-President Donald J. Trump, including the former President himself.  These efforts involved providing documents to the former President's secretary; meeting on multiple occasions with high-level officials at the National Security Council and the White House, including the Chief of Staff; and speaking directly with the former President about the PRC's request, including once in person at a formal White House dinner and once in a phone call that Defendant made from a yacht off the coast of Italy.  Defendant's actions on behalf of the PRC came at a time when he was preparing to renegotiate the licenses held by his business to operate casinos in Macau.

Once apprised of Defendant's conduct at the request of the PRC, the U.S. Department of Justice notified Defendant that he may be obligated to register under the Foreign Agents Registration Act ("FARA").  In May 2018, following discussions between Department of Justice officials and counsel for Defendant, the Department informed Defendant that it had determined that his conduct qualified him as a foreign agent under FARA and that he was therefore required to register.  Defendant challenged this conclusion and to date, despite further discussions by letter and in-person between Department of Justice officials and Defendant's counsel, Defendant

still has not registered.  Accordingly, in May 2022, the Government initiated the instant lawsuit, seeking an order to compel Defendant to comply with his registration obligation under the statute.

Defendant now seeks dismissal of the Government's suit, raising four challenges to the Complaint.  None of these challenges has any merit.  First, relying on a misreading of D.C. Circuit court precedent, Defendant seeks to cabin the Government's authority to bring civil enforcement suits to only the time before an agency relationship is terminated.  This argument misconstrues the precedent on which Defendant relies, which applied only to criminal prosecutions, and would significantly narrow civil enforcement authority under FARA in a manner that would be fundamentally inconsistent with the legislative history of the statute. Second, Defendant claims that being required to register would violate his Fifth Amendment right against self-incrimination, but he fails to meet his burden to establish that such a right is implicated in this case or to show that the Fifth Amendment is implicated by FARA registration due to a purported conflict with his past statements of belief about the legal consequences of his actions.

Nor does Defendant's third argument—a First Amendment challenge to FARA's registration requirement—serve as a basis for dismissing this case.  FARA registration imposes no restraint on free expression and the registration and labeling requirements under the Act are narrowly tailored to satisfy the statute's critical interest of ensuring that the public is sufficiently informed about agents of foreign principals and their activities in this country.  Fourth and finally, Defendant's challenge to the sufficiency of the Complaint should be rejected.  The Complaint sufficiently alleges that Defendant acted "at the request" of the PRC and Sun in a manner that is consistent with circuit court precedent, FARA's legislative history, and the

Government's own interpretive guidance.  Furthermore, the allegations in the Complaint that Defendant lobbied high-level U.S. government officials at the request of a foreign government are more than sufficient to allege that Defendant engaged in political activities.  For all of these reasons, Defendant's motion should be denied.

## BACKGROUND

### A.    Statutory background

The Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. §§ 611-621 ("FARA" or "the Act"), requires that agents of a foreign principal register with the Attorney General and make certain disclosures in registration filings concerning their agency relationships and activities undertaken within the United States on behalf of their respective foreign principals. 22 U.S.C. § 612(a).  Among the chief purposes of FARA is to "prevent covert influence over U.S. policy by foreign principals."  *United States v. Craig*, 401 F. Supp. 3d 49, 54 (D.D.C. 2019).  "Simply put, the statute ensures that the public is informed of the true source or sponsor behind the information being disseminated for its consideration."  *Id*.

"The scope of persons subject to FARA is broad," *see United States v. McGoff*, 831 F.2d 1071, 1074 (D.C. Cir. 1987), and the standard for determining when an agency relationship exists consists of two parts.  First, a person must "act[] as an agent, representative, employee, or servant" or "in any other capacity at the order, request, or under the direction or control" of a foreign principal or the intermediary of a foreign principal.  22 U.S.C. § 611(c)(1).  Second, the person must undertake certain types of activities within the United States on the foreign principal's behalf, including, most relevant here, political activities.  *Id*. § 611(c)(1)(i).  FARA defines "political activities" to mean activities that the agent either believes will, or actually intends to, "in any way" influence U.S. government officials or a section of the U.S. public

3

regarding U.S. domestic or foreign policies or the political or public interests, policies, or relations of a foreign government or foreign political party.  *Id*. § 611(o).

Persons who qualify as agents of one or more foreign principals under FARA are required to submit a registration statement with the Attorney General within ten days of the start of the relationship.  *Id*. § 612(a).  FARA prescribes that certain information be included in the registration statement, *id*. § 612(a)(1)-(11), and supplements must be filed at six-month intervals, *id*. § 612(b).  Violations of FARA can result in either criminal or civil penalties.  Persons who willfully violate the registration requirements or any other provision of the Act are subject to criminal prosecution, *id*. § 618(a), (e), and the Attorney General is authorized to bring suit seeking appropriate injunctive relief, including "an order requiring compliance with any appropriate provision" of the statute or accompanying regulations, *id*. § 618(f).

**B.     Factual background**

As alleged in the Complaint, Defendant acted as an agent of two foreign principals: Sun, the former Vice Minister for Public Security in the PRC, and the PRC itself.  Compl., ECF No. 1, ¶ 1.  Specifically, at the request of Sun, and on behalf of the PRC, Defendant conveyed to former President Trump and his Administration ("the Administration") the PRC's request to remove from the country a PRC businessperson who had sought political asylum in the United States. *Id*. ¶ 2.  In so doing, from at least June 2017 through at least August 2017, Defendant acted as an agent for foreign principals Sun and the PRC and engaged in political activities on their behalf in the United States.  *Id.*

Defendant is a U.S. citizen, real estate developer, and businessperson who has owned multiple casinos and resorts, including three casino properties located in Macau, which is a special administrative region of the PRC.  *Id.* ¶ 8.  The Defendant also served as the Republican

National Committee ("RNC") finance chair from January 2017 through January 2018.  *Id.* ¶ 17.
In that role, the Defendant met Elliot Broidy, a former finance chair of the RNC.  *Id.* ¶¶ 16-17.

In approximately June 2017, Broidy, on behalf of Sun, elicited Defendant's help with
conveying the PRC's request to cancel the visa or otherwise remove the PRC businessperson
from the United States.  *Id.* ¶¶ 16-17.  Broidy provided Defendant with the PRC
businessperson's passport photos, an Interpol red notice, and links to various news articles about
the PRC businessperson.  *Id.* ¶ 19.  Broidy believed that Defendant's RNC experience, combined
with Defendant's business dealings in the PRC and friendship with the then-President, would be
helpful in getting access to Administration officials.  *Id.* ¶ 17.

Defendant spoke by telephone with Sun at least eight times; these calls varied in length
but lasted approximately thirty minutes on average, from approximately June 2017 through at
least August 2017.  *Id.* ¶ 23.  Sun requested Defendant's assistance with seeking the removal of
the PRC businessperson, having his new visa application denied, and having him placed on the
No Fly List.  *Id.* ¶¶ 20-21.  Defendant mentioned his business interests in Macau to Sun on
multiple phone calls.  *Id.* ¶ 23.

The Defendant agreed to raise the matter with the then-President and Administration
officials.  *Id.* ¶ 20.  During a dinner on or about June 27, 2017 with the former President and
other Administration officials in Washington, D.C., Defendant conveyed the PRC's desire to
have the PRC businessperson removed from the United States and provided the PRC
businessperson's passport photos to the then-President's secretary.  *Id.* ¶ 22.  After the dinner,
Broidy informed Defendant by text that Sun was "extremely pleased and said that President Xi
Jinping appreciates [Defendant's] assistance."  *Id.* ¶ 22.

In addition, between approximately June 2017 and August 2017, Defendant contacted multiple Administration officials about the PRC businessperson, including senior officials on the National Security Council ("NSC") and at the White House. *Id.* ¶ 25. For example, during one late July 2017 meeting with the White House Chief of Staff and two senior NSC officials, Defendant stated that PRC officials had contacted him and advised him that "they were very interested in having" the PRC businessperson returned to China. *Id.* ¶ 25. In or around August 2017, Defendant on multiple occasions visited the White House in person to have what appeared to be unscheduled meetings with the then-President; some of these discussions, including a meeting on August 25, 2017, concerned the PRC businessperson. *Id.* ¶ 25. Further, on August 19, 2017, Broidy and the Defendant called the then-President from Broidy's yacht during a trip off the coast of Italy. *Id.* ¶ 25. During that call, Defendant asked the then-President about the PRC businessperson's status, and the then-President responded that he would look into the matter. *Id.*

Sun continued to contact Defendant through approximately October 2017, at which point Defendant informed Sun that he had made U.S. government officials aware of the request, that Defendant was not able to provide any more assistance, and that Sun should stop contacting him. *Id.* ¶ 27. Defendant wanted to exit the situation gracefully, preserve his business interests in China, and avoid offending anyone. *Id.* The efforts by Defendant and others to have the PRC businessperson removed ultimately were unsuccessful. *Id.* ¶ 26.

Defendant's conduct was motivated by his desire to protect his business interests in the PRC. *Id.* ¶ 28. In an undated text message, Defendant wrote to a person whom Defendant believed to be Sun's assistant:

> [a]t this point, as a private citizen, I believe I have exhausted the advantages of my position. If there is any other aspect of this situation may occur to you going

forward, I would of course be anxious to help. I remain grateful for the privilege of being part of the Macau and PRC business community.

*Id.* According to public reporting, in 2016, shortly before the conduct described above occurred, the Macau government restricted the number of gaming tables and machines that Defendant's casino could operate. *Id.* ¶ 29. Also according to public reporting, Defendant was scheduled to renegotiate his licenses to operate casinos in Macau in 2019, subsequent to the conduct described above. *Id.*

## C.    Procedural background

The Government filed suit in this case on May 17, 2022 seeking two types of relief: (1) a declaratory judgment stating that Defendant has an obligation to register for conduct undertaken on behalf of Sun and the PRC, and (2) a permanent injunction requiring Defendant to file a registration statement and any necessary supplements pursuant to § 612(a). *Id.*, Prayer for Relief. On July 18, 2022, Defendant filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), raising statutory and constitutional challenges to the Complaint. *See generally* Def.'s Mem. of Law in Supp. of Mot. to Dismiss the Complaint ("Def.'s Mot."), ECF No. 11-1. Through this filing, the Government now responds to that motion.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing such a motion, a court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations and internal quotation marks omitted). These pleading rules are "not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). While the facts alleged in the complaint

7

"must be enough to raise a right to relief above the speculative level," a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A complaint must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757-58 (2014) (citation omitted).

## ARGUMENT

None of the four bases for Defendant's motion warrants dismissal of this case. First, the Government is permitted to bring civil enforcement actions after an agency relationship terminates. This reading of the statute is consistent with D.C. Circuit court precedent, and to hold otherwise would severely undercut the Government's civil enforcement power under the Act. Second, FARA registration would not implicate Defendant's rights under the Fifth Amendment. Defendant fails to identify any past statement that would be contradicted by his registering, nor can his belief that he is not required to register serve as a valid basis for a Fifth Amendment objection. Third, Defendant's First Amendment rights are similarly not implicated by FARA registration. Any burden imposed by FARA registration is minor, and any registration is narrowly tailored to further the goal of raising public awareness about the activities of foreign agents in this country. Fourth, the Complaint sufficiently alleges that Defendant acted "at the request" of two foreign principals so as to give rise to an agency relationship for purposes of FARA, and Defendant's conduct—which involved lobbying officials at the highest level of the

U.S. Government on behalf of a foreign power—easily qualifies as political activities.  Having

failed to raise any valid basis for dismissing this lawsuit, Defendant's motion should be denied.

**A.      Civil enforcement actions under FARA can be brought after the conclusion of an agency relationship**

Defendant contends that, under FARA, the obligation of an agent of a foreign principal to

register ceases upon termination of the agency relationship.  According to Defendant, because

any agency relationship that may have existed between him and the PRC ended in October 2017,

the Government cannot now bring suit seeking an injunction compelling him to register.

FARA, however, contains no restraints on when the Government can pursue civil

enforcement actions.  The statute expressly states that "termination of [agency] status shall not

relieve such agent from his obligation to file a registration statement for the period during which

he was an agent of a foreign principal."  22 U.S.C. § 612(a).  This provision was specifically

added to the statute to address the concern that those subject to FARA "were attempting to evade

the Act's requirements by ceasing their activities and claiming as an affirmative defense that

withdrawal from an agency relationship automatically eliminated liability for failure to file."

*McGoff*, 831 F.2d at 1087.  Furthermore, retrospective enforcement actions are consistent with

the long-standing rule that the Government is not time-limited in seeking equitable relief to

enforce its rights.  *See, e.g.*, *United States v. Summerlin*, 310 U.S. 414, 416 (1940); *FEC v.*

*Christian Coal.*, 965 F. Supp. 66, 71 (D.D.C. 1997).

Defendant nevertheless now seeks this Court's blessing to do precisely what Congress

sought to disallow:  evade his statutory obligation to register for the work he undertook on behalf

of Sun and the PRC on the grounds that he is no longer acting as their agent.  For the following

reasons, the Court should reject that argument.

1.  *McGoff* does not foreclose civil enforcement actions after an agency relationship has terminated

Defendant relies almost entirely on the D.C. Circuit's decision in *McGoff* interpreting FARA for purposes of a criminal prosecution, but that case does not compel dismissal of the instant action.  There, the Government charged the defendant for failing to register as an agent of the government of South Africa based on conduct that predated the criminal information by more than seven years.  *McGoff*, 831 F.2d at 1072.  Specifically, the Government alleged that the defendant's failure to register violated 22 U.S.C. § 612(a), which requires persons meeting the definition of "agent of a foreign principal to file registration statements, as well as 22 U.S.C. § 618(e), which makes it a continuing criminal offense to fail to register under FARA.  *Id.* Based on its reading of the statutory language of these two provisions and the legislative history of FARA, the majority concluded that the statute of limitations for a continuing offense under FARA begins to run on the last day a person acts as an agent of a foreign principal.  *Id.* at 1071.

Defendant relies heavily on pieces of dicta in the majority opinion's analysis.  First, the majority commented that "it appears that the statutory obligation to file expires when the agent ceases activities on behalf of the foreign principal," reasoning that "once an individual has ceased his activities, he is no longer an 'agent of a foreign' principal within the meaning of FARA."  *Id.* at 1082.  Second, in furthering construing FARA's statutory text, the majority stated that "FARA does not evince an antiquarian interest on Congress' part; FARA's focus is on the here and now."  *Id.*

Neither of these passing references was outcome-determinative or otherwise central to the holding in *McGoff*.  In fact, the majority offered the passages cited by Defendant as one possible reading of § 612(a) before ultimately concluding that the provision is "ambiguous."  *Id.* at 1083.  In the end, the majority's holding in the case rested not on its interpretation of the text

of § 612(a) but its review of the legislative history for that provision.  *Id*. at 1089 (concluding

that § 612(a) was added "for the specific purpose of causing the statute of limitations to

commence on the day the agency relationship terminated").  These comments were not part of

the majority's holding in the case, given its conclusion that the statutory text is ambiguous, and

Defendant's heavy reliance on them is misplaced.[1]

Further distinguishing *McGoff* from the instant case was the majority's narrow focus on

when the statute of limitations for a continuing offense charge under § 618(e) begins to run.  The

majority's central concern with the Government's interpretation of § 618(e) was that "it would

virtually eliminate the statute of limitations for failure to file under FARA," *id*. at 1093, an

outcome the majority described as being "unusual," "remarkable," "draconian," and a "bold

step" for criminal prosecutions, *id*. at 1090.  Civil enforcement actions, however, are authorized

by a separate statutory provision.  *See* 22 U.S.C. § 618(f).  And whereas it is "unusual" for

criminal prosecutions not to be bound by a statute of limitations—in matters reserved for only

"the most heinous crimes known to our law," *McGoff*, 831 F.2d at 1093—that same constraint

does not exist for civil enforcement actions, *see Mount Vernon Mortg. Corp. v. United States*,

236 F.2d 724, 725 (D.C. Cir. 1956) (holding that statutes of limitations do not apply where the

United States brings suit "to enforce a public right"); *accord United States v. City of Palm Beach*

---

[1] Defendant invokes a passage in the dissent suggesting that the majority's reasoning
precludes the Government from being able to bring suit seeking to compel a person to register
"once his agency has ended."  *Id*. at 1103 (Bork, J., dissenting).  As reasoned by the dissent, "[i]f
the obligation to file ends with the termination of the agency relationship, then . . . the United
States will be unable to use an injunction to compel registration, since the agent is no longer
under any obligation to register."  *Id*.  But the majority did not adopt this reading of the
Government's civil enforcement authority, declining to engage with the dissent on this point.
*See id*. at 1094 n.32.  More importantly, the majority left no doubt that its opinion should *not* be
read to "retroactively excuse[] an agent's duty to file a registration statement immediately upon
termination of the agency relationship."  *Id*. at 1089 n.27.  Defendant's attempt to do precisely
this should be rejected.

*Gardens*, 635 F.2d 337, 339 (5th Cir. 1981) ("[C]ourts have long held that the United States is not bound by any limitations period unless congress explicitly directs otherwise.").  The concern about imposing some stopping point on the Government's ability to bring prosecutions is not present in a civil enforcement proceeding.

Indeed, the distinction between criminal prosecutions and civil enforcement actions further distances *McGoff* from the present case, as the majority opinion made multiple references to how its analysis was influenced by considerations specific to the criminal context.  *See McGoff.* 831 F.2d at 1077 ("*In the criminal context*, courts have traditionally required greater clarity in draftsmanship than in civil contexts . . . ." (emphasis added)); *id*. ("[T]he law of crimes must be clear.  There is less room in a statute's regime for flexibility . . . ."); *id*. at 1084 n.22 ("We owe, of course, no deference to the Government's construction of a *criminal statute*").  The majority emphasized this point at the conclusion of the majority opinion, noting that its "holding finds solid support in the well-established principle of interpretation of *criminal statutes* known as the rule of lenity."  *Id*. at 1095 (emphasis added).  That rule provides that any ambiguity in criminal statutes should be resolved in favor of lenity and, as the majority explained, counseled in favor of the defendant's reading of § 618(e).  *Id*. at 1095-96.  But the rule applies only to the interpretation of criminal statutes, or to a statutory provision with both criminal and noncriminal application.  *See Kasten v. Saint Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011).  It thus has no bearing on the interpretation of § 618(f) and whether that provision allows the Government to bring an enforcement action to compel registration where the agency relationship may have ceased.  None of special considerations specific to criminal prosecutions relied upon by the majority are present where the Government exercises its civil enforcement authority.

The importance of the criminal context similarly animated the majority's discussion of the purpose of FARA in *McGoff*.  As described by the majority, "Congress' fundamental purpose . . . was not to punish foreign agents for the activities described in the statute."  *McGoff*, 831 F.2d at 1093-94.  Instead, Congress' goal "was to compel disclosure to permit evaluation of these activities," a goal Congress "further stressed" by adding a civil enforcement mechanism to the statute.  *Id*. at 1094.  Unlike the criminal prosecution at issue in *McGoff*, which sought to "punish" the defendant for engaging in conduct that required registration under the statute, the Government's aim in the instant lawsuit is plainly consistent with the central goal of FARA:  to compel disclosure to allow government officials as well as the public to evaluate Defendant's activities.  That remains true even where that disclosure occurs years after the agency relationship has ceased to exist—disclosing the existence of a previously unidentified agency relationship will still affect how Government and the public view policy decisions influenced by that foreign agent.  Unlike in a criminal prosecution, the Government's reliance on § 618(f) in this case fits squarely within FARA's central aim of promoting public awareness.

2.  <u>FARA's legislative history supports allowing the Government to seek injunctive relief addressing past conduct</u>

Equally without merit is Defendant's contention that FARA's legislative history supports his narrow reading of the statute.  *See* Def.'s Mot. at 11.  Defendant principally focuses on one reference in the majority opinion's analysis of the legislative history in which the majority observes that, had Congress intended to eliminate any statute of limitations for FARA criminal prosecutions, it would have done so in a more obvious fashion than what the historical record shows.  *McGoff*, 831 F.2d at 1090.  But this passage has no bearing on a civil lawsuit under FARA seeking injunctive relief because such suits are not governed by the criminal statute of limitations at issue in *McGoff*.

13

In fact, *McGoff*'s discussion of FARA's legislative history leaves no doubt that Congress intended for the Government's ability to enforce FARA to survive the cessation of an agency relationship.  As noted by the majority, a core concern motivating Congress was that "individuals subject to FARA were attempting to evade the Act's requirements by ceasing their activities and claiming as an affirmative defense that withdrawal from an agency relationship automatically eliminated liability for failure to file." *Id*. at 1087.  Congress amended § 612(a) in 1950 at the request of the Department of Justice by adding that "termination of such [agency] status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal," and it did so specifically to "eliminate[] as an affirmative defense the argument that the agency relationship had ended and so too had the reporting obligation." *Id*. at 1087-88.  The outcome Defendant seeks in this case—to immunize himself from a civil enforcement action by virtue of having terminated his agency relationship—would be directly contrary to the purpose of the 1950 amendments, as recognized in *McGoff*. *See id*. at 1089 n.27 ("Our interpretation vindicates the express purpose articulated by the Department of Justice in seeking to amend sections 612 and 618, which was to . . . foreclose an agent from cutting off liability for failing to comply with FARA's registration requirements by simply terminating the agency . . . .").

3.  <u>Requiring Defendant to register would uphold the purpose of FARA</u>

As a final matter, Defendant claims that his interpretation of *McGoff* is consistent with the purpose of FARA, but this claim merits no greater weight than those above.  Defendant suggests that the broader purpose of FARA is concerned only with the present and "evaluat[ing] an agent's political speech and activities contemporaneously in their proper context," *see* Def.'s Mot. at 12, but such a reading of the statute would collapse the Government's enforcement

authority.  Taken to its logical conclusion, Defendant's interpretation would restrict FARA enforcement actions to only those instances where the Government has knowledge that a person is about to violate or is presently violating the statute.  Targets of those enforcement actions, moreover, would be able to escape registration simply by terminating their agency relationship at any time, including after the Government brings a civil enforcement action.  It is a dubious proposition that Congress intended to give the Government civil enforcement authority, only to have it be subject to such easy evasion.

Defendant is also mistaken that any disclosures he purportedly made to government officials satisfies the purpose of FARA.  *See id*. at 12 ("[I]t is undisputed that Wynn contemporaneously disclosed to U.S. government officials that he was conveying a message from the PRC, allowing the U.S. officials to evaluate his activities in their proper context."). Such a cramped reading of FARA accounts only for disclosure to the listener and overlooks Congress's desire to make the general public aware of the conduct of persons acting as agents on behalf of foreign principals.  *See Meese v. Keene*, 481 U.S. 465, 480 (1987) ("Congress simply required [agents of foreign principals] to make additional disclosures that would better enable *the public* to evaluate the import of the[ir messages]." (emphasis added)); *Craig*, 401 F. Supp. 3d at 54 ("Simply put, the statute ensures that the public is informed of the true source or sponsor behind the information being disseminated for its consideration.").  Congress's focus on public notification is further evidenced by 22 U.S.C. § 616, which requires the Attorney General to maintain a publicly available database consisting of information from registration statements filed with the Department of Justice.  *See* 22 U.S.C. § 616(d).

Defendant's contention about self-disclosure suffers from the additional misimpression that the only information an agent is required to disclose is the fact that an agency relationship

exists.  To the contrary, Congress requires those serving as agents of foreign principals to disclose multiple details about the scope and nature of the agency relationship.  22 U.S.C. § 612(a)(1)-(8).  Congress further requires agents to file supplemental statements at six-month intervals updating certain of these categories of information.  *Id*. § 612(b).  Registered agents, moreover, must file termination statements with the Department of Justice, and those statements must include sufficient information to allow a determination that an agent "has fully discharged all his obligations under the Act."  28 C.F.R. § 5.205(a)-(b).  Given the amount of information an agent of a foreign principal is required to disclose, Defendant's contention that he has satisfied the purpose of FARA by purportedly telling certain government officials that he was acting at the request of the PRC is baseless.

For similar reasons, Defendant's assertion that his reading of § 612(a)  is consistent with the prospective nature of injunctive relief, *see* Def.'s Mot. at 13, is likewise wrong.  Without knowing more details about the nature of Defendant's relationship with the PRC and Sun, the Government cannot be certain that the Defendant has in fact ceased engaging in registerable conduct.  Having the information the Defendant is required to provide in his registration statement, *see* 22 U.S.C. § 612(b), as well as the information contained in a termination statement, *see* 28 C.F.R. § 5.205(b), would put the Government in the best position to evaluate whether Wynn's relationship with Sun and the PRC truly ended in October 2017.  Nor is it the case that the Government is seeking to enjoin conduct that has already ceased.  Defendant continues to violate FARA by failing to register, and § 618(f) authorizes the Government to seek an injunction requiring him to do so.  Indeed, FARA is not the only context in which the Government is authorized to compel the disclosure of information that pertains to past conduct. *See, e.g., Anderson v. Holder*, 647 F.3d 1165, 1169 (D.C. Cir. 2011) (affirming district court

judgment requiring parolee to register as a sex offender following passage of registration law that post-dated parolee's offense conduct by twelve years); *Christian Coalition*, 965 F. Supp. at 72 (denying motion to dismiss claim brought by the Federal Election Commission pertaining to conduct that had occurred five years prior).  The Government's suit seeking to compel Defendant to register is accordingly consistent with both the purpose of FARA and the use of injunctive relief more broadly.

**B.**     **Requiring Defendant to register under FARA would not violate his Fifth Amendment rights**

Defendant next argues that requiring him to register under FARA would violate the Fifth Amendment because it would force him to "make a sworn public declaration, under penalty of perjury, that he acted as an agent of foreign principals Sun and the PRC" and "[t]hose sworn statements would directly contradict Wynn's prior sworn testimony and representations in his correspondence with DOJ."  Def.'s Mot. at 14-15.  Much like Defendant's flawed reading of *McGoff*, this argument provides no justification for granting his motion.

Wynn has not met his burden of showing that any statement required by the registration form would in fact "directly contradict" any past statements he has made, a failure that dooms any such Fifth Amendment claim.  To invoke the protections afforded by the Fifth Amendment, claimants must demonstrate that they have a "reasonable cause to apprehend danger" of providing information that would "support a conviction" or "furnish a link in the chain of evidence needed to prosecute" them for violating the law.  *Hoffman v. United States*, 341 U.S. 479, 486 (1951).  But Defendant is not excused from registering under FARA simply because "he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard."  *Id*.  Rather, it is Defendant's burden to "factually establish that the risks of incrimination resulting from" completing a FARA registration form "to be 'substantial and

'real,' not merely trifling or imaginary, hazards of incrimination.'" *See United States v. Schmidt*, 816 F.2d 1477, 1481 (10th Cir. 1987) (quoting *Marchetti v. United States*, 390 U.S. 39, 53 (1968)).

Defendant's motion falls well short of meeting this threshold burden.  First, Defendant contends that registering would "directly contradict" statements he made in correspondence with the Government, citing a June 8, 2018 letter from his counsel to the Department of Justice.  *See* Def.'s Mot. at 15 (citing June 8, 2018 Letter from Reid H. Weingarten, Brian M. Heberlig, and Nicholas P. Silverman, to Jay I. Bratt, Heather H. Hunt, and Robert Wallace ("June 2018 Letter"), ECF No. 11-3).  But Defendant fails to identify any statement in the 14-page letter that would be contrary to a representation he would be required to make as part of a FARA registration.  Second, Defendant claims that registering would be "directly contradictory" with prior sworn testimony that he has given.  This assertion is even more specious.  No such testimony is part of the record on Defendant's motion, so there is no way to assess what purported contradiction exists—including whether it extends to the act of registering as a whole or only certain statements called for by the registration form—or to otherwise evaluate the credibility of Defendant's claim.[2]  Defendant has failed to meet his burden of demonstrating that there exists any potential conflict between his past statements and what he would be required to disclose as a FARA registrant.  His Fifth Amendment challenge to the Complaint should accordingly be denied.

---

[2] Perhaps recognizing the challenges with ruling on a Fifth Amendment challenge to FARA in the abstract, a judge in this district has previously held that "the time to assert the privilege would be when the statement is filed."  *United States v. Peace Info. Ctr.*, 97 F. Supp. 255, 263 (D.D.C. 1951).

Even if Defendant had identified one or more statements that he believed would conflict with any FARA registration filing, his Fifth Amendment challenge should nonetheless still fail because the protections afforded by the privilege do not extend to his beliefs about the legal significance of his actions. The right against self-incrimination exists "to resist compelled explicit or implicit disclosures of incriminating *information*" and "to prevent the use of legal compulsion to extract from the accused a sworn *communication of facts* which would incriminate" the accused. *Doe v. United States*, 487 U.S. 201, 212 (1988) (emphasis added). "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate *a factual assertion or disclose information*." *Id.* at 210 (emphasis added); *see also United States v. Hubbell*, 530 U.S. 27, 34 n.8 (2000) ("It is consistent with the history of and the policies underlying the Self-Incrimination Clause to hold that the privilege may be asserted only to resist compelled explicit or implicit disclosures of incriminating *information*." (emphasis added)).

Here, Defendant's Fifth Amendment challenge is not based on any perceived conflict between disclosures in FARA registration materials and factual information with which he has previously provided the Government. Instead, it centers on the fact that Defendant previously expressed an opinion about the legal significance of his conduct. *See* Def.'s Mot. at 14 ("Granting the government's requested relief would compel Wynn to act as a witness against himself and to *state an opinion he does hold* . . . ." (emphasis added)); *id.* at 15 (noting that "Wynn disputed the Department [of Justice]'s *analysis* in his June 8, 2018 letter" (emphasis added) (internal quotation marks omitted)); *id*. at 7 ("[I]n August 2020, Wynn provided an interview and sworn testimony during the criminal investigation of Broidy and others, in which he stated that *he believed* he was acting in the interests of the United States, and not as an agent of Sun or the PRC." (emphasis added)). Defendant's past statements to the Department of

Justice about his opinion of whether he should be required to register cannot now serve as a basis to excuse him from registering under FARA.  Were that true, persons under investigation for FARA violations could be immunized from any civil enforcement action by simply communicating to the Department of Justice a personal opinion that their conduct did not create a registration obligation.  Nor is it the case that, by registering, Defendant would be forced to convey a belief he does not hold.  FARA does not preclude Defendant from continuing to express his belief that he should not have been required to register.  *See Keene*, 481 U.S. at 481 (observing that FARA registrants "may go beyond the disclosures required by statute and add any further information they think germane" to the public's understanding of their activities).  Defendant's disagreement with the Government about the legal significance of his actions cannot give rise to a Fifth Amendment violation.

More broadly, FARA's registration requirement in general does not infringe upon the rights afforded by the Fifth Amendment.  No such conflict exists where the Government mandates that the public to comply with an "essentially regulatory, not criminal" statute, where "self-reporting is indispensable to its fulfillment," and where there are no "substantial hazards of self-incrimination."  *California v. Byers*, 402 U.S. 424, 429–31 (1971) (rejecting Fifth Amendment challenge to California state law requiring drivers of cars involved in accidents to provide their names and addresses on the scene); *see also, e.g.*, *United States v. Stirling*, 571 F.2d 708, 727-28 (2nd Cir. 1978) (dismissing challenge to SEC stock reporting requirement), *cert. denied*, 439 U.S. 824 (1978).  By contrast, laws do implicate the Fifth Amendment where they target "a highly selective group inherently suspect of criminal activities."  *See Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965) (invalidating on Fifth Amendment grounds order of Subversive Activities Control Board requiring registration by members of

Communist-action organizations); *Marchetti*, 390 U.S. at 61 (holding that the Fifth Amendment

privilege afforded a complete defense to prosecutions for noncompliance with federal gambling

tax and registration requirements); *Leary v. United States*, 395 U.S. 6, 15, 27 (1969) (same for

law imposing transfer and occupational tax on marijuana dealers).

FARA's registration obligation fits comfortably within the parameters established in

*Byers*.  Rather than targeting a group of persons engaged in inherently criminal activity, FARA is

a statute of general applicability, and its purpose is to promote transparency, not to "facilitate

criminal convictions."  *See Byers*, 402 U.S. at 430.  Information gathered from the registration

statements, moreover, is indispensable to fulfilling FARA's purpose of promoting transparency.

The information collected from registration materials and supplementary filings is made publicly

available, *see* 22 U.S.C. § 616(a), (d), which allows the Government and public at large to "be

informed of the identity of such persons and . . . appraise their statements and actions in the light

of their associations and activities," *Keene*, 481 U.S. at 469; *see also Peace Info. Ctr.*, 97 F.

Supp. at 263 (denying Fifth Amendment challenge to FARA because the statute "does not

require the disclosure of any information except on a voluntary basis as a condition of carrying

on certain occupations or certain activities").  Unlike the statutes at issue in *Albertson*, *Marchetti*,

and *Leary*, FARA is not aimed at conduct that is criminalized by other federal or state statutes.

Acting as the agent of a foreign principal is not a crime, so long as the agent complies with the

requisite registration requirements.

For all of these reasons, the Court should reject Defendant's Fifth Amendment challenge

to the Complaint.[3]

---

[3] Even if the Court were to conclude that FARA registration implicates a foreign agent's
Fifth Amendment rights, it would still not necessitate dismissal of a civil enforcement action.
Where a valid Fifth Amendment claim exists, the Government should be given the option of

**C.      Requiring Defendant to register under FARA would not violate Defendant's First Amendment rights**

Just as FARA registration does not violate Defendant's Fifth Amendment rights, so too does it comport with the First Amendment.  FARA registration imposes no restriction on the ability of an agent to speak or otherwise act on behalf of a foreign principal, and it promotes speech by requiring the disclosure of only that information necessary to apprise government officials and the public of the existence and scope of the agency relationship.  To the extent FARA's registration requirement triggers a higher standard of review, it still passes constitutional muster.  FARA registration requires the disclosure of only that factual information necessary for the public to understand the identities of the agent and foreign principal, the nature of the agency relationship between the two, and what work the agent undertakes on behalf of the foreign principal.  The Government has a compelling interest in ensuring there is public disclosure about the work of foreign agents, and FARA's registration requirement is narrowly tailored to advance this interest.

1.   Courts have repeatedly held that FARA comports with the First Amendment

In the decades since it was passed, FARA has been subject to multiple First Amendment challenges, none of which have succeeded.  In *Block v. Meese*, for example, the D.C. Circuit addressed a First Amendment claim brought by multiple individuals who wished to exhibit a film about nuclear war and two others about acid rain.  *See* 793 F.2d at 1306.  All three films were produced by the National Film Board of Canada ("NFBC"), an entity that served as an instrumentality of the Canadian government and used its New York office to disseminate the films in the United States.  *Id.*  As such, NFBC registered as an agent of a foreign principal, and

---

continuing to pursue a civil enforcement action or providing some form of immunity to the registrant.

certain of its films were deemed by the Department of Justice to constitute "political propaganda" under FARA.[4]  *Id*.  The plaintiffs sued to challenge the requirement under FARA that a registrant notify the Department of Justice within forty-eight hours of transmitting "political propaganda" as well as a statement identifying the places, times, and extent of the transmittal.  *Id*. at 1307.  In addition, the plaintiffs challenged a regulation requiring an agent to report the name of any individual or entity receiving more than 100 copies of material subject to FARA and to identify the theater, viewing dates, and estimated attendance whenever that material was a movie.  *Id*.  According to the plaintiffs, classifying the material as propaganda and requiring public disclosure of their names—as the exhibitors of the movies—infringed on their First Amendment rights.  *Id*. at 1311.

The court dispensed with both claims.  With respect to the reporting requirements, the court observed that the general objective of FARA is to disclose "to the public the nature and extent of agents' dissemination of foreign advocacy."  *Id*. at 1316 (citation omitted).  FARA's reporting obligation fulfills this purpose, the court continued, by disclosing those segments of society "which the foreign agent has been successful in reaching with his principal's message." *Id*.  Underlying the plaintiffs' challenge, the court surmised, was a desire to *prevent* the dissemination of information and a desire that the "already extant public knowledge of their [film] exhibition [not] be any more widespread than necessary."  *Id*. at 1317.  The Government's interest in ensuring public awareness about the reach of a foreign agent's message ultimately outweighed this concern.  *Id*. at 1317-18.

---

[4] Previously, FARA's definition of "political activities" at § 611(o) included reference to "the dissemination of political propaganda," which was defined by § 611(j).  In 1995, Congress amended FARA to remove any reference to "political propaganda" in § 611(o) and to strike § 611(j) altogether.  *See* 109 Stat. 699.

One year later, the Supreme Court in *Meese v. Keene* denied a First Amendment challenge to the "political propaganda" provision of FARA brought by a state legislator and attorney who sought to exhibit the same three Canadian films at issue in *Block*.  481 U.S. at 467. The plaintiff claimed that the statute violated his First Amendment rights by suggesting he was engaged in the dissemination of political propaganda, which he believed to be a pejorative term, and he sought to enjoin FARA's registration and labeling requirements.  *Id*. at 467-68.  In rejecting this claim, the Court reasoned that FARA "places no burden on protected expression" and did not prevent the plaintiff from accessing and exhibiting the Canadian films.  *Id*. at 480. The Court noted that instead of censoring the plaintiff, FARA simply requires persons subject to the Act "to make additional disclosures that would better enable the public to evaluate the import of" the information being disseminated.  *Id*.  Moreover, the Court observed that persons subject to FARA's requirements "may go beyond the disclosures required by statute" and convey any additional message they wish to express.  *Id*. at 481.  As such, FARA "recognizes that the best remedy for misleading or inaccurate speech . . . is fair, truthful, and accurate speech."  *Id*.

Although they do not squarely address FARA's registration requirement, *Keene* and *Block* should nevertheless guide the Court's analysis in this case.  Both cases recognized that, rather than infringing on the First Amendment, FARA promotes free speech by ensuring that the Government and the public have accurate information about agents disseminating information on behalf of foreign principals.  *See also Viereck v. United States*, 318 U.S. 236, 251 (1943) (Black, J., dissenting) ("Resting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false," FARA is intended to ensure that "hearers and readers may not be deceived by the belief that the information comes from a disinterested source.  *Such legislation implements rather than detracts from the prized*

*freedoms guaranteed by the First Amendment*." (emphasis added)).[5]  The Court should similarly

affirm FARA's constitutionality.

> 2. <u>FARA registration requires only the disclosure of factual, non-controversial information and does not require affirmation of a Government-dictated message or a statement of opinion or ideological belief</u>

Defendant's First Amendment argument is premised on the mistaken belief that

registering under FARA requires him "to speak a particular government-dictated message."

Def.'s Mot. at 17.  According to Defendant, filling out a registration form would force him "to

state an opinion he does not hold" because it requires him to, among other things, identify every

foreign principal for whom he has agreed to act and provide certain details about that agency

relationship.  *Id*. at 14 (citing U.S. Department of Justice Registration Statement, Pursuant to the

Foreign Agents Registration Act of 1938, as amended, ECF. No. 11-4, at 3).  But FARA's

registration requirement makes no demand that Defendant communicate a government-

sponsored message, instead requiring the disclosure of factual information only.  Any burden

imposed by FARA's registration requirement is therefore minimal.

The Supreme Court has long recognized that "the First Amendment does not leave it

open to public authorities to compel a person to utter a message with which he does not agree."

*Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005) (citation and internal brackets

and quotation marks omitted).  Consistent with this principle, the Court invalidated a state law

mandating participation by public school students in a daily recitation of the pledge of allegiance

---

[5] *Block* and *Keene* are not alone in recognizing FARA's constitutionality.  Two district courts have similarly affirmed that FARA comports with the First Amendment.  *Attorney Gen. v. Irish N. Aid Comm.*, 346 F. Supp. 1384, 1390 (S.D.N.Y. 1972) ("*INAC I*") (denying First Amendment challenge to FARA's requirement that registrants make books and records available for inspection); *Peace Info. Ctr.*, 97 F. Supp. at 263 (rejecting First Amendment challenge to indictment for failing to register under FARA).

and flag salute, concluding that no government official "can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  In a separate case, the Court held that it would be unconstitutional to force a person "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" by being required to use license plates as a "mobile billboard for the State's ideological message." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (internal quotation marks omitted) (invalidating state law requiring display of the state motto on non-commercial license plates).

FARA registration, which seeks only basic information about "the nature of [foreign agents'] business and their political activities," *Keene*, 481 U.S. at 469, presents none of these same concerns.  Like any registrant, Defendant is required to complete a six-page form asking for factual information about the parties to the agency relationship, including names, addresses, citizenship, and corporate structure.  *See* ECF No. 11-4 at 1-3.  The form also seeks information about the relationship between the agent and foreign principal, including what activities the agent has engaged in, any financial arrangements between the two, and whether the agent has disseminated any materials on behalf of a foreign principal.  *Id.* at 3-7.  These requirements, moreover, apply "equally to agents of friendly, neutral, and unfriendly governments." *Keene*, 481 U.S. at 469-70.  Registration under FARA thus stands in stark contrast to laws compelling persons to disseminate a particular message in the government's preferred language.  *See, e.g.*, *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (holding that law requiring publicly traded companies to disclose publicly that their products were not "conflict free" violated the First Amendment, based in part on the fact that the government's message "was hardly factual and non-ideological" (internal quotation marks omitted)).  Nothing about FARA

approaches a requirement that compels a registrant to affirm a government-sponsored view or serve as a billboard for a state-sponsored message.

Indeed, multiple courts have drawn a distinction between laws that compel disclosure of factual information and those that compel statements of opinion.  Although both types of compulsion are subject to scrutiny under the First Amendment, the former do not "dictate the content of the speech" and thus impose considerably less burdens on free speech than do laws that involve the government "telling people what they must say."  *See Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 61-62 (2006) (holding that law requiring the Department of Defense to deny federal funding to colleges and universities that prohibited military officials from accessing their campuses for recruiting purposes did not violate the First Amendment); *Riley v. Nat'l Fed. of the Blind v. N. Carolina*, 487 U.S. 781, 800 (1988) (noting that, "as a general rule," the government may itself disseminate information obtained from persons who file legally-required disclosure forms because it would involve communicating "the desired information to the public without burdening a speaker").  This reasoning applies with particular force where, as with FARA, the government regulation at issue requires the disclosure of information as part of a registration requirement or another type of important government function.  *See, e.g.*, *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (holding that sex offender registry statute did not violate the First Amendment because it involved the government "conduct[ing] an essential operation of the government, just as it does when it requires individuals to disclose information for tax collection" (internal brackets and quotation marks omitted)); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (holding that requirement for individuals to submit information about cash transactions in excess of $10,000 to

the Internal Revenue Service did not require the plaintiff to "disseminate publicly a message with which he disagrees").[6]

Defendant's suggestion that registering somehow forces him to convey the Government's viewpoint is unfounded.  According to Defendant, the FARA registration form requires him to "affirm[] under oath that [he] acted as a foreign agent on behalf of foreign principals Sun and the PRC."  Def.'s Mot. at 21 (characterizing the registration form as "a statement of opinion and ideological belief with which [Defendant] emphatically disagrees").  Not so.  As the Court recognized in *Keene*, FARA does not prevent Defendant in any way from expressing his disagreement about the Government's conclusion regarding his agency status or otherwise voice his opinion.  *See Keene*, 480 U.S. at 481 (noting that disseminators of information subject to FARA's requirements "may go beyond the disclosures required by statute and add any further information they think germane to the public's" understanding of their agency relationship).  The form serves as a vehicle for Defendant to satisfy his legal obligation to disclose certain information to the Department of Justice, but it in no way requires Defendant to publicly state his agreement with the law.  Defendant remains free to express his disagreement with FARA and its requirements, but he still must comply with the statute.[7]

_____

[6] As First Amendment scholar Eugene Volokh has observed,

> the constitutionality of such pure factual compulsions is particularly important because we are all routinely required to state various facts to the government.  We have to tell federal and state income tax authorities how much money we make.  We may have to register for the draft.  We may have to answer census forms.  We may have to report to the police certain crimes we witness.

Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 380 (2018).

[7] Courts have reached this same conclusion in a number of cases involving First Amendment challenges to registration requirements.  *See, e.g.*, *Arnold*, 740 F.3d at 1032 (holding that the Sex Offender Registration and Notification Act did not constitute compelled speech); *Sindel*, 53 F.3d at 877-78 (same regarding disclosures on income tax forms); *Morales v. Daley*,

Given this, FARA's registration requirement does not warrant a heightened standard of review.  *See Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) (applying rational basis to compulsion of investment information divulged by a company to the SEC in the course of applying for confidential treatment).  Defendant's First Amendment challenge should accordingly be denied without applying any further scrutiny.

3. <u>FARA's registration requirement survives more exacting scrutiny because the Government has a compelling interest in disclosure and the registration obligation is narrowly tailored to fulfill that interest</u>

Even if the Court concludes that a higher standard of review applies in this case, Defendant's First Amendment challenge should fail.[8]  Courts have repeatedly recognized that the statute has a vital purpose of notifying the public about the nature and extent of the work an agent performs on behalf of a foreign principal.  FARA's registration requirement—which does nothing to prevent an agent from speaking but only seeks information about the agency relationship—is a narrowly tailored means of accomplishing that compelling interest.

The purpose of FARA has always been linked to public disclosure.  As the Court in *Keene* explained, in order to "protect the national defense, internal security, and foreign relations of the United States," FARA requires "public disclosure by persons engaging in propaganda activities and other activities for or on behalf of" foreign principals.  *Keene*, 481 U.S. at 469

---

116 F. Supp. 2d 801, 815 (S.D. Tex. 2000) (same regarding requirement to complete short and long form census).

[8] If FARA survives strict scrutiny, then it also prevails under exacting scrutiny, *i.e.*, that "there must be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed, and the governmental interest must survive exacting scrutiny.  That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."  *Davis v. FEC*, 554 U.S. 724, 744 (2008) (citations and internal quotation marks omitted); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009) (finding that the disclosure statute survived even strict scrutiny).

(citation omitted).  Such disclosure allows "the Government and the people of the United States [to] be informed of the identity of such persons and [] appraise their statements and actions in the light of their associations and activities."  *Id.*; *accord Block*, 793 F.2d at 1316 (recognizing that the purpose of FARA is to disclose "to the public the nature and extent of agents' dissemination of foreign advocacy").  Given this, the Government's authority to enact and enforce FARA is derived from its responsibility "to conduct its foreign relations and to provide for the national defense."  *INAC I*, 346 F. Supp. at 1390 (describing the Government's purpose in enacting FARA as "strong").[9]  There can be no doubt that the Government's interest in compelling the disclosure of information about persons acting within the United States on behalf foreign interests is compelling.

FARA's registration requirement is targeted to satisfy the Government's compelling interest in public disclosure.  As the court noted in *Block*, FARA enables the Government to collect sufficient information to educate the public about foreign agents as well as the nature and scope of their activities.  *Block*, 793 F.2d at 1316 ("[I]t is obvious that the objective [of the statute] cannot be substantially achieved" if the Government fails to make public information about the reach of a foreign agent's propaganda activities.).  Furthermore, no less intrusive means exists to obtain information about the work agents undertake on behalf of their foreign principals.  Absent Defendant registering and submitting the necessary paperwork, there is no way to ensure that the public is fully informed about the extent of his efforts on behalf of the

---

[9] FARA does not stand alone in its transparency aims.  Multiple other courts have recognized that disclosure laws serve the compelling government purpose of informing the public at large.  *See United States v. Harriss*, 347 U.S. 612, 626 (1954) (finding that the government has a "vital national interest" in providing the public with information regarding lobbying efforts to influence public officials); *Nat'l Ass'n of Mfrs.*, 582 F.3d at 16 (holding that Congress' interest in public awareness of the lobbying efforts to influence the public decision-making process is sufficiently compelling to withstand strict scrutiny).

PRC and Sun.  Nor does FARA registration burden Defendant's protected expression—it "neither prohibits nor censors" his ability to speak.  *Keene*, 481 U.S. at 478.  And FARA compels only that information necessary to understand the nature and duration of a relationship between an agent and a foreign principal.

Given the important Government interests advanced by FARA, and the fact that it does not burden free speech, it is not surprising that FARA has repeatedly been upheld in the face of First Amendment challenges.  *See Keene*, 481 U.S. 465; *Block*, 793 F.2d at 1315; *INAC I*, 346 F. Supp. at 1391 (holding that compelling agent's disclosure of books and records does not infringe on the First Amendment); *Peace Info. Ctr.*, 97 F. Supp. at 262 (holding that FARA "neither limits nor interferes with freedom of speech" because "[i]t does not regulate expression of ideas" or "preclude the making of any utterances," but "merely requires persons carrying on certain activities to identify themselves by filing a registration statement.").[10]  As one judge has remarked, the fact that no provision of FARA has been deemed unconstitutional in the more than 80 years of its existence strongly indicates that "it is well settled that FARA is constitutional." *Attorney Gen. v. Irish People, Inc.*, 684 F.2d 928, 935 (D.C. Cir. 1982) (Wilkey, J.).

In support of his contention that FARA registration would burden his speech, Defendant again asserts that the purpose of FARA has been fulfilled because he purportedly informed certain government officials that he was conveying a message on behalf of the PRC.  This claim is as baseless in this context as it is in other sections of his motion.  First, the content of Defendant's self-disclosure is unclear.  There is no record of what Defendant may have

---

[10] Given that multiple courts have held FARA to be constitutional—including provisions of the statute requiring the disclosure of information—Defendant's contention that "it remains an open question in the D.C. Circuit whether FARA unconstitutionally compels speech," Def.'s Mot. at 24, does not affect the First Amendment analysis.

communicated to government officials, including whether he identified both the PRC and Sun as foreign principals and whether he was receiving any monetary benefit or thing of value in exchange for his assistance.  Aside from the few pieces of documentary information about the PRC businessperson that Defendant provided to the then-President's secretary, *see* Compl. ¶ 22, it is also unknown whether Defendant transmitted any documents or other informational materials to government officials that may have fallen within FARA's labeling requirement (and whether any such materials were labeled as required by the Act).  Second, the scope of Defendant's purported disclosures is not evident from the record.  The Complaint identifies certain instances when Defendant is believed to have contacted government officials about the PRC businessperson, but it is not known if these were the only occasions on which Defendant lobbied government officials and whether he disclosed his relationship with the PRC on every occasion.  Third, even if Defendant had disclosed to every government official whom he lobbied that he was assisting the PRC and Sun, that still would not satisfy FARA's core purpose of informing *the public* that Defendant was acting as an agent of a foreign principal.[11]  *See Keene*, 481 U.S. at 469.  Defendant's self-disclosures cannot serve as a proper substitute for FARA's registration requirement.[12]

---

[11] In this regard, Defendant's objection to FARA registration—despite the fact that he allegedly disclosed his relationship with the PRC as part of his lobbying campaign—mirrors that of the plaintiffs in *Block* who wished to limit the broad dissemination of the fact that the films they were showing were deemed political propaganda.  As the court observed in that case, the plaintiffs' desire that what was "already extant public knowledge" not be shared "any more widespread than necessary" did not give rise to a cognizable First Amendment claim.  *Block*, 793 F.2d at 1317.  So too here, Defendant should not be permitted to evade FARA's registration requirement just because he wishes to contain the spread of information about his PRC-related activities to the general public.  Any different outcome would be "less a vindication than a frustration of [F]irst [A]mendment values."  *Id*.

[12] Defendant's contention that the Government has alternative ways to convey information about Defendant's conduct—that it "is free to speak for itself, which it has already

**D.**     **By alleging that Defendant acted at the request of the PRC and Sun when he lobbied government officials, the Complaint sufficiently alleges that Defendant engaged in political activities on behalf of foreign principals**

For his final challenge to the Complaint, Defendant claims that the Government failed to sufficiently plead that he had an agency relationship with Sun and the PRC or that he engaged in political activities on their behalf.  Defendant's arguments in support of this claim are either contrary to well-settled precedent, belied by the allegations in the Complaint, or both.  Accordingly, they should be rejected by the Court.

1.   The Complaint sufficiently alleges that Defendant formed an agency relationship with Sun and the PRC by acting at their request

Defendant disputes the Complaint's allegation that he formed an agency relationship with the PRC and Sun for purposes of FARA when he acted at their request.  According to Defendant, a "request," standing alone, is insufficient—there must also be an allegation that a foreign principal ordered, directed, or controlled the agent.  Def.'s Mot. at 30.

This argument, however, is contrary to both the plain language of the statute and well-settled law interpreting the relevant statutory text.  FARA makes clear that a person becomes an

---

done," *see* Def.'s Mot. at 28—is not a credible solution.  To the extent the Government has "spoken" about Defendant at all, it is only through the filing of this lawsuit and issuing an accompanying press release.  The Government has no independent authority outside of FARA to make the public aware when individuals like Defendant are acting as agents of foreign principals.

Defendant's second proposed alternative—that the Government "allow individuals to disclose solely the external facts of past events or discussions and leave readers to draw their own conclusions," *id*—is likewise not viable.  Leaving it to the discretion of foreign agents to select when and what information they disclose would almost certainly result in underreporting by those who wished to hide the fact of their agency relationship and overreporting more cautious individuals whose relationships with foreign principals otherwise would not trigger a registration obligation under FARA.  To ensure that the information the public receives about foreign agents is consistent and reliable, there needs to be a centralized mechanism for collecting the information to be disclosed.  That is precisely the role played by the registration requirement Defendant now seeks to evade.

agent of a foreign principal by acting "at the order, request, or under the direction or control" of the foreign principal. 22 U.S.C. § 611(c)(1). Congress's use of the word "or" in this provision constitutes a clear signal that the items in the list should be read separately. *See United States v. Woods*, 571 U.S. 31, 45 (2013) (noting that the "ordinary use [of the word 'or'] is almost always disjunctive, that is, the words it connects are to be given separate meanings" (citation and internal quotation marks omitted)). Defendant's proposed reading would do precisely the opposite—it would effectively eliminate the word "request" as a stand-alone item in the list and give effect only to the remaining three. Defendant's cramped reading of FARA would thus violate the fundamental interpretive rule of statutory construction to "give effect to every clause and word." *See Setser v. United States*, 566 U.S. 231, 239 (2012) (citation and internal ellipsis omitted).

Every court that has been called upon to interpret § 611(c)(1), moreover, has agreed with the Government's reading. As recognized by this precedent, "agency" for purposes of FARA is different from other definitions, including that found in the Restatement (Second) of Agency, which focuses on the "control" exercised by the foreign principal over the agent. *Attorney Gen. v. Irish N. Aid Comm.*, 668 F.2d 159, 161 (2d Cir. 1982) ("*INAC II*"); *see also United States v. Rafiekian*, 991 F.3d 529, 539 (4th Cir. 2021) (describing FARA's definition of agency as "sweeping" and containing "far-reaching verbiage"). Under FARA, the concern "is not whether the agent can impose liability upon his principal but whether the relationship warrants registration by the agent to carry out the informative purposes of the Act." *INAC II*, 668 F.2d at 161. To be sure, the Second Circuit in *INAC II* cautioned that "agency" should not be read "in its most precatory sense" and that the exact contours of the definition fall "somewhere between a command and a plea." *Id*. But the court also went on to identify two guideposts for ascertaining

34

when acting in response to a request forms an agency relationship.  First, the court focused on whether those requested to act "were identified with specificity by the principal."  *Id*.  The court noted the contrast between a plea made to members of a large religious, racial, or ethnic group with a request made to a particular individual or sufficiently limited group of identifiable individuals.  *Id*.  Second, the court found that there should be consideration of "the specificity of the action requested," distinguishing "a general plea for political or financial support" from "a more specific instruction."  *Id*. at 161-62.  "Once a foreign principal establishes a particular course of conduct to be followed, those who respond to its 'request' for complying action may properly be found to be agents under the Act."  *Id*. at 162.

A judge from this district adopted the Second Circuit's reading of § 611(c)(1) two years later.  *See Attorney Gen. v. Irish People, Inc.*, 595 F. Supp. 114, 117 (D.D.C. 1984) ("*Irish People I*") (concluding, based on *INAC II*, that "[t]he requirements of the statute are stated in the disjunctive").  Although the district court's opinion was reversed on unrelated grounds, the D.C. Circuit affirmed that § 611(c)(1) should be read in the disjunctive.  *See Atty Gen. v. Irish People, Inc.*, 796 F.2d 520, 523 (D.C. Cir. 1986) ("*Irish People II*") (reviewing district court record and concluding that there was no evidence that the alleged agent ever worked at INAC's "order *or request*" and that there was no evidence of a "*request*, order, command, *or* directive" (emphasis added)).

The D.C. Circuit, moreover, identified an additional statutory basis for distinguishing "request" from "direction" and "control," one not discussed by the Second Circuit in *INAC II*.  Reviewing the district court's determination that an agency relationship existed between a small weekly newspaper called Irish People and the Irish Republican Army ("IRA"), the D.C. Circuit questioned the finding that INAC had served as an intermediary between the two organizations.

35

*Id*. at 233.  Although the district court concluded that INAC functioned as an intermediary

because it had registered under FARA as an agent of the IRA, the circuit court disagreed, noting

that "intermediary" and "agent" have definitions that are only partially overlapping under the

statute.  *Id*. at 233-34.  Specifically, the court noted that the definition of "agent" is broader

because it covers those who act "at the order, request, or under the direction or control of a

foreign principal."  *Id*. at 233.  The definition of "intermediary," by contrast, covers persons

whose activities are directed or controlled by a foreign principal—but not those who act at the

"order" or "request" of such a person—thereby making it a narrower definition.  *Id*. (holding

that, because INAC's agency status was based on its acting at the "request" of the IRA, it did not

meet the definition of intermediary under FARA).  Through its examination of the statutory text,

the D.C. Circuit dismissed the reading of § 611(c)(1) now put forward by Defendant here:  that

"request" cannot exist independent of direction or control.[13]

---

[13] In support of his theory of statutory interpretation, Defendant relies on two cases that, unlike *INAC II* and *Irish People II*, do not concern FARA.  *See* Def.'s Mot. at 31-32.  Neither of these cases compels a different outcome in this case.  In *McDonnell v. United States*, the Court construed the federal statute criminalizing bribery of public officials, specifically the definition of "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy."  579 U.S. 550, 566 (2016) (quoting 18 U.S.C. § 201(a)(3)).  The Court rejected a broader reading of the words "meeting" and "question," finding that they should pertain to a formal exercise of government power given the other four words in the definitional list.  *Id*. at 568-69 (applying the interpretive cannon of *noscitur a sociis*).  The Court also explained that "question" and "matter" as used in the statute should be given a meaning "similar in nature" to the other words but not one that is the same.  *Id*. at 569.  Here, by contrast, Defendant seeks to render "request" synonymous with order, direction, and control.  Such a result would be inconsistent with the holding in *McDonnell* as well as the presumption that "statutory language is not superfluous."  *Id*. (citation omitted).

Likewise, *Yates v. United States* does not support Defendant's interpretation of § 611(c)(1).  There, too, the Court invoked the cannon of *noscitur a sociis* to ensure that every word in a statutory provision outlawing the destruction of documents was interpreted to be "similar in nature" to one another.  574 U.S. 528, 545 (2015).  Defendant's efforts to attempt to stretch the holdings in *McDonnell* and *Yates* to eliminate the word "request" from § 611(c)(1) is without merit.

The allegations in the Complaint concerning Defendant's relationship with Sun and the PRC are more than sufficient to meet the standard for agency set forth in *INAC II* and *Irish People II*.  As alleged therein, Elliot Broidy contacted Defendant on behalf of Sun to help lobby for the return of the PRC businessperson.  Compl. ¶ 17.  Broidy chose Defendant for this outreach because at the time Defendant was serving as the RNC finance chair, and Broidy believed that Defendant's political connections and friendship with the former President would be helpful in getting access to Administration officials.  *Id.*  In addition, Broidy provided Defendant with materials about the PRC businessperson to share with the then-President and others in the Administration.  *Id.* ¶ 18.  Broidy continued to convey requests for assistance from the PRC and Sun.  *Id.* ¶ 21.  At the same time, Defendant participated in a series of telephone calls with Sun, during which Sun discussed the PRC national and stated that he would appreciate Defendant's help with having the PRC national removed.  *Id.* ¶ 23.  Defendant acted in response to this request for help by contacting White House officials and the then-President, informing them that his foreign principals wanted the PRC national returned to China as soon as possible.  *Id.* ¶ 25.  These allegations make clear that the PRC's requests for assistance were not general pleas to the broader public.  Rather, they were requests for Defendant to engage in a specific type of conduct, aimed directly at Defendant due to his political and business connections.  Therefore, they more than meet the Government's burden to plead that Defendant was engaged in an agency relationship under FARA.

2. The legislative history and other interpretive documents for FARA do not support Defendant's reading of agency

In an effort to bolster his erroneous reading of § 611(c)(1), Defendant also invokes FARA's legislative history and interpretive documents and statements from the Department of Justice.  These arguments are equally unavailing.

*First*, the lack of reference to "request" in the legislative history to FARA's 1966 amendments does not mean that the term is afforded no meaning in the statute itself. Assuming reference to legislative history is even necessary in this case given the lack of ambiguity in § 611(c)(1), Defendant's argument would lead to the absurd result of effectively removing a term from statutory text based on the absence of discussion about that term in congressional reports. *See Cohen v. United States*, 650 F.3d 717, 730 (D.C. Cir. 2011) ("Of course, it is the enacted text rather than the unenacted legislative history that prevails." (citation and internal quotation marks omitted)). But even on its own terms, the House Report cited by Defendant weighs against interpreting "request" as requiring some element of direction or control. *See* H.R. Rep. No. 89-1470, at 5 (1966) (noting that "the proposed amendment would continue the provision of existing law that an agency relationship be found to exist where a person has merely agreed to become an agent without entering upon his functions, or where the agent acts other than pursuant to contractual arrangements, or merely holds himself out as an agent of a foreign principal"). FARA's legislative history simply does not support Defendant's reading of the statutory text.

*Second*, the 2020 interpretive guidance issued by the Department of Justice about § 611(c)(1)'s use of "request" supports the Government's construction of that phrase in this case, not Defendant's. *See* "The Scope of Agency Under FARA," U.S. Department of Justice, FARA Unit (May 2020), *available at* https://www.justice.gov/nsd-fara/page/file/1279836/download. Contrary to Defendant's view, the guidance adopts *INAC II*'s interpretation of "request" and makes clear that it means something separate and apart from the other terms listed in § 611(c). *Id*. at 3 ("[A] mere 'request' cannot be equated with an 'order,' or require a legally enforceable obligation, as that would violate a presumption of construction that statutory language is not superfluous." (citation and internal quotation marks omitted)). To be sure, as Defendant points

out, the guidance states that the term "request" connotes "some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's interest." *Id*. But that standard is met here, given the allegation in the Complaint that Defendant was motivated by his desire to protect his business interests in the PRC, noting that he brought up his business dealings in multiple conversations with Sun and expressed gratitude for being able to remain part of the Macau and PRC business community. Compl., ¶¶ 23(e), 28. Thus, to the extent "request" requires the principal having some type of leverage over the agent, the Complaint plainly alleges that such a power dynamic existed between Defendant and his foreign principals.

*Third*, Defendant's reference to statements by individual Department of Justice employees describing their understanding of FARA cannot dictate the proper construction of "request" under § 611(c)(1) in this case. Defendant cites to Congressional testimony from former Assistant Attorney General Phillip B. Heymann in 1980, focusing on an excerpt in which the former official states that registration is required where a person "engages in the activities specified in the statute and [] does so at the order of a foreign principal, or under the direction or control of a foreign principal." Def.'s Mot. at 34 (quoting *Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Foreign Governments of the Senate Comm. on the Judiciary*, 96th Cong. 683, 701 (1980) ("Heymann Statement")). But the Assistant Attorney General goes on to make clear that, in the view of the Department of Justice, "the relationship between the agent and the foreign principal must be one that substantially obligates the agent to the foreign principal." Heymann Statement at 701. As noted above, the Complaint includes such an allegation in this case, asserting that Defendant acted out of concern about his business interests in the PRC. *See* Compl. ¶ 28. And to the extent Assistant

Attorney General Heymann's testimony reflected a different gloss on the statute than more recent guidance discussed above, it has been superseded by the latter.

Defendant's reference to statements made by individual Department of Justice employees during the course of an investigation by the Office of the Inspector General ("OIG"), *see* Def.'s Mot. at 35-36, merits no serious consideration.  Unlike the interpretive guidance and Heymann testimony, these statements do not constitute prepared formal guidance intended for the public or Congress, and Defendant's suggestion to the contrary is baseless.  *See, e.g.*, *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419 (1990) (observing that "equitable estoppel will not lie against the Government as it lies against private litigants").  This is especially true given that the statements in the OIG report are paraphrased and unattributed.  *See Audit of the Nat. Security Division's Enforcement and Admin. of the Foreign Agents Registration Act*, Office of the Inspector General (Sept. 2016), at 9, 11, *available at* https://oig.justice.gov/reports/2016/a1624.pdf.

3. <u>Defendant's repeated lobbying of government officials on behalf of the PRC to seek the return of a PRC businessperson constitutes "political activities" under FARA</u>

Defendant also asserts that the Complaint fails to plead sufficiently that Defendant engaged in political activities on behalf of the PRC and Sun.  *See* Def.'s Mot. at 38-42. Specifically, Defendant claims that the Complaint falls short of establishing (1) that Defendant's agreement with the PRC and Sun was to deliver a message, not to influence government officials, and (2) that Defendant believed his actions would or intended for his actions to influence those same officials.  *Id.*  Defendant's assertion as to both contentions is meritless.

Under FARA, "political activities" include "any activity" that the foreign agent "believes will, or . . . intends to, in any way influence" any government agency or official, or any segment of the public "with reference to formulating, adopting, or changing the domestic or foreign

policies of the United States or with reference to the political or public interests, policies, or

relations of a government of a foreign country or a foreign political party." 22 U.S.C. § 611(o).

The Government's burden to establish in the Complaint that Defendant engaged in such

activities on behalf of the PRC and Sun is not onerous.  It need only plead facts that "allow[] the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678.  In addition, the Court must accept all factual allegations as true, "even if

doubtful in fact," *Twombly*, 550 U.S. at 555, and it must further grant the Government "the

benefit of all inferences that can reasonably be derived from the facts alleged," *Sickle v. Torres

Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018) (internal brackets omitted).[14]

    The Complaint makes clear that Defendant was part of a broader effort to effectuate the

return of a PRC businessperson who was criminally charged in the PRC and had sought asylum

in the United States.  Compl. ¶ 16.  Defendant was recruited to assist in the effort due to his

political and business connections.  *Id*. ¶ 17.  The Complaint alleges that, as part of this

recruitment effort, Defendant was told that the PRC businessperson was a criminal whom the

PRC wanted to arrest.  *Id*. ¶ 18.  Defendant, moreover, was told that the businessperson's visa

was due to expire soon and that the PRC wanted help in seeking the return of the businessperson

to China.  *Id*.  Defendant was given information about the businessperson, including his passport

photos and an Interpol red notice, to use in his discussions with high-ranking government

---

[14] Defendant cites *Brody v. Bruner*, No. 19-cv-01091, 2021 WL 4264055, at *2 (D. Colo. Sept. 20, 2021) to suggest that the Court should not infer that Defendant engaged in lobbying on the PRC's behalf, *see* Def.'s Mot. at 41, but this case does nothing to alter the standard set forth herein.  *Brody* relied on *FDIC v. First Interstate Bank of Denver, N.A.*, which noted that, in cases alleging civil conspiracy, courts will not infer the necessary agreement.  937 F. Supp. 1461, 1473 (D. Colo. 1996).  But that case was applying Colorado state law, not construing the pleading standard under the Federal Rules of Civil Procedure.  *See id.* (citing the Colorado state Supreme Court).  Even still, the court went on to note that conspiracies are "seldom provable by direct evidence" and that "the requisite agreement may be found by viewing the circumstances."  *Id.*

officials.  *Id*. ¶¶ 17-19.  In addition, the Complaint alleges that, during calls with Defendant, Sun stressed the importance of the businessperson's visa not being renewed and that "he would appreciate [] Defendant's help."  *Id*. ¶ 23.d.  Collectively, these allegations do more than suggest that the PRC merely wanted Defendant's assistance "in bringing the PRC's proposal to the attention of Administration officials," as Defendant contends.  *See* Def.'s Mot. at 39.  They plausibly give rise to the conclusion that the PRC and Sun wanted the businessperson returned, specifically wanted Defendant's assistance in doing so, and armed him with information they thought would help make it happen.

Nor can Defendant credibly argue that the Complaint fails to plausibly allege that Defendant simply delivered a message to the PRC without any desire to influence U.S. policymakers.  Among other allegations, the Complaint asserts that Broidy inquired about the status of the PRC businessperson's visa and whether he had been put on the No Fly List.  Compl. ¶ 22.  In response, Defendant stated that officials at the "highest level" of the Department of State and Department of Defense were "working on this."  *Id*.  The Complaint further alleges that, in an August 2017 call with the former President, Defendant asked specifically about the PRC businessperson's status, to which the former President responded by stating that he would look into the matter.  *Id*. ¶ 25.  These allegations highlight how Defendant wanted to ensure that the officials with whom he had met were not just aware of the message from the PRC but were taking action in response to it as well.  In addition, the Complaint quotes from a written message from Defendant to the PRC in which Defendant reports that he had been assured "that all parties in the White House were fully sensitive to the timing of this issue and the relevant USA procedural law involved."  *Id*. ¶ 28.  Defendant's reference to making White House officials "sensitive" to the PRC's request similarly suggests that Defendant sought to do more than to

make White House officials aware of the PRC's desire to have the businessperson removed—he wanted to influence how they thought about and perceived the issue.

If anything, Defendant's attack on the sufficiency of the factual allegations in the Complaint demonstrates the need for this case to proceed past the pleading stage and into discovery. Defendant faults the Government for not knowing more about what Defendant intended or believed about his actions and claims that he served only as a "mere messenger" who "revealed the source of the message to his audience in real time." *See* Def.'s Mot. at 42. The Government, however, is limited in its ability to obtain this information in the investigative stage. FARA gives the Government no power to issue subpoenas or to otherwise compel the production of documents or witnesses. *See generally*, 22 U.S.C. § 618. The Government must accordingly rely on what information it is able to obtain voluntarily from witnesses or through other means. Here, the only information provided by Defendant to the Government was a factual narrative prepared and communicated by Defendant's attorneys. *See* June 2018 Letter at 1 n.1, 3-5. From this limited information, the Government has not yet been able to ascertain the details of what Defendant communicated to the government officials with whom he spoke, how he characterized his relationship with the PRC and Sun, and whether Defendant disclosed this relationship to some but not all of the government officials with whom he met.[15] The Court

---

[15] Defendant relies on unsupported factual allegations elsewhere in his motion. *See, e.g.*, Def.'s Mot. at 19-20 (claiming that Defendant "transmitted a message to U.S. government officials with full transparency about where the message came from" and that "[n]o audience member was deceived" and "all material facts have since been disclosed to the public"); *id.* at 27 (asserting that Defendant "received no compensation and spent no money" from the PRC or Sun, transmitted a message "with full transparency about where the message came from," and disclosed "all material facts"). To the extent these factual allegations by Defendant are material to the Court's resolution of the claims raised in his motion, the Government is entitled to discovery before the Court rules on them.

should not dismiss the Complaint where the Government has not yet had the opportunity to gather this factual information, including through sworn statements by the Defendant.

    4.  <u>In the alternative, the Court should grant the Government leave to amend its Complaint</u>

The Government believes it has sufficiently plead a cause of action under FARA for the reasons stated above.  Should the Court disagree, however, the Government seeks leave to amend the Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied.


Dated: August 15, 2022               Respectfully submitted,

                                MATTHEW G. OLSEN
                                Assistant Attorney General
                                National Security Division
                                U.S. Department of Justice

                                JENNIFER KENNEDY GELLIE
                                Chief, FARA Unit
                                National Security Division
                                U.S. Department of Justice

                                <u>/s/ *Nathan M. Swinton*</u>
                                NATHAN M. SWINTON
                                EMMA ELLENRIEDER
                                Trial Attorneys
                                U.S. Department of Justice
                                National Security Division
                                Counterintelligence and Export Control Section
                                950 Pennsylvania Ave NW, Room 7700D
                                Washington, D.C. 20530
                                Telephone: (202) 353-0267
                                Email: Nathan.Swinton@usdoj.gov
                                          Emma.Ellenrieder@usdoj.gov