**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ATTORNEY GENERAL OF THE<br>UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | Civil Action No. 1:22-cv-01372 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN A. WYNN, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S</u>
## <u>MOTION TO DISMISS THE COMPLAINT</u>

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND..................................................................................................................3

    A.    Statutory background.................................................................................................3

    B.    Factual background....................................................................................................4

    C.    Procedural background .............................................................................................7

STANDARD OF REVIEW ..................................................................................................7

ARGUMENT .......................................................................................................................8

    A.    Civil enforcement actions under FARA can be brought after the conclusion of an agency relationship ..............................................................................................8

        1.    *McGoff* does not foreclose civil enforcement actions after an agency relationship has terminated...................................................................................9

        2.    FARA's legislative history supports allowing the Government to seek injunctive relief addressing past conduct .....................................................13

        3.    Requiring Defendant to register would uphold the purpose of FARA ............14

    B.    Requiring Defendant to register under FARA would not violate his Fifth Amendment rights .................................................................................................16

    C.    Requiring Defendant to register under FARA would not violate Defendant's First Amendment rights ................................................................................................21

        1.    Courts have repeatedly held that FARA comports with the First Amendment ..............21

        2.    FARA registration requires only the disclosure of factual, non-controversial information and does not require affirmation of a Government-dictated message or a statement of opinion or ideological belief ................................................24

        3.    FARA's registration requirement survives more exacting scrutiny because the Government has a compelling interest in disclosure and the registration obligation is narrowly tailored to fulfill that interest ........................................28

        4.    Defendant's proposed alternatives to FARA registration are not viable ........30

    D.    By alleging that Defendant acted at the request of the PRC and Sun when he lobbied government officials, the Complaint sufficiently alleges that Defendant engaged in political activities on behalf of foreign principals ............................................31

        1.    The Complaint sufficiently alleges that Defendant formed an agency relationship with Sun and the PRC by acting at their request.....................................................32

        2.    The legislative history and other interpretive documents for FARA do not support Defendant's reading of agency .......................................................36

        3.    Defendant's repeated lobbying of government officials on behalf of the PRC to seek the return of a PRC businessperson constitutes "political activities" under FARA ..............39

4.    In the alternative, the Court should grant the Government leave to amend its Complaint ……............................................................................................................41

E.    The Court should not look beyond the four corners of the Complaint to resolve Defendant's motion ............................................................................................41

**CONCLUSION**...............................................................................................................42

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Albertson v. Subversive Activities Control Bd.*,
   382 U.S. 70 (1965) ................................................................................ 20

*Anderson v. Holder*,
   647 F.3d 1165 (D.C. Cir. 2011) ............................................................ 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................. 39

*Attorney Gen. v. Irish N. Aid Comm.*,
   668 F.2d 159 (2d Cir. 1982) ....................................................... 34, 35, 36, 37

*Attorney Gen. v. Irish People, Inc.*,
   595 F. Supp. 114 (D.D.C. 1984) .......................................................... 35

*Attorney Gen. v. Irish People, Inc.*,
   796 F.2d 520 (D.C. Cir. 1986) ................................................... 35, 36, 37

*Attorney Gen. v. Irish N. Aid Comm.*,
   346 F. Supp. 1384 (S.D.N.Y. 1972) ....................................... 25, 30, 31

*Attorney Gen. v. Irish People, Inc.*,
   684 F.2d 928 (D.C. Cir. 1982) .............................................................. 30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................... 8, 39

*California v. Byers*,
   402 U.S. 424 (1971) ........................................................................ 21, 22

*Cohen v. United States*,
   650 F.3d 717 (D.C. Cir. 2011) ............................................................. 36

*Davis v. FEC*,
   554 U.S. 724 (2008) .............................................................................. 29

*Doe v. United States*,
   487 U.S. 201 (1988) .............................................................................. 18

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................ 7

*FDIC v. First Interstate Bank of Denver, N.A.*,
   937 F. Supp. 1461 (D. Colo. 1996) ................................................. 38, 41

*FEC v. Christian Coalition,*
  965 F. Supp. 66 (D.D.C. 1997) ............................................................................. 18

*Full Value Advisors, LLC v. SEC,*
  633 F.3d 1101 (D.C. Cir. 2011) ............................................................................ 29

*Hoffman v. United States,*
  341 U.S. 479 (1951) .............................................................................................. 18

*Johanns v. Livestock Marketing Ass'n,*
  544 U.S. 550 (2005) .............................................................................................. 26

*Kasten v. Saint Gobain Performance Plastics Corp.,*
  563 U.S. 1 (2011) .................................................................................................. 11

*Leary v. United States,*
  395 U.S. 6 (1969) ............................................................................................ 21, 22

*Marchetti v. United States,*
  390 U.S. 39 (1968) .......................................................................................... 21, 22

*McDonnell v. United States,*
  579 U.S. 550 (2016) ........................................................................................ 36, 37

*Meese v. Keene,*
  481 U.S. 465 (1987) ....................................................................................... *passim*

*Morales v. Daley,*
  116 F. Supp. 2d 801 (S.D. Tex. 2000) .................................................................. 29

*Mount Vernon Mortg. Corp. v. United States,*
  236 F.2d 724 (D.C. Cir. 1956) ............................................................................. 11

*Nat'l Ass'n of Mfrs. v. SEC,*
  800 F.3d 518 (D.C. Cir. 2015) ............................................................................. 27

*Nat'l Ass'n of Mfrs. v. Taylor,*
  582 F.3d 1 (D.C. Cir. 2009) ............................................................................ 29, 30

*Office of Pers. Mgmt. v. Richmond,*
  496 U.S. 414 (1990) .............................................................................................. 40

*Riley v. Nat'l Fed. of the Blind v. N. Carolina,*
  487 U.S. 781 (1988) .............................................................................................. 27

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.,*
  547 U.S. 47 (2006) ................................................................................................ 27

*Setser v. United States,*
  566 U.S. 231 (2012) .............................................................................................. 34

*Sickle v. Torres Advanced Enter. Sols., LLC*,
884 F.3d 338 (D.C. Cir. 2018) ............................................................... 41

*Sparrow v. United Air Lines, Inc.*,
216 F.3d 1111 (D.C. Cir. 2000) ................................................................ 7

*Steel Co. v. Citizens for Better Env't*,
523 U.S. 83 (1998) ................................................................................ 15

*United States v. Arnold*,
740 F.3d 1032 (5th Cir. 2014) ......................................................... 28, 29

*United States v. City of Palm Beach Gardens*,
635 F.2d 337 (5th Cir. 1981) ................................................................. 11

*United States v. Craig*,
401 F. Supp. 3d 49 (D.D.C. 2019) ..................................................... 3, 16

*United States v. Harriss*,
347 U.S. 612 (1954) .............................................................................. 30

*United States v. Hubbell*,
530 U.S. 27 (2000) ................................................................................ 20

*United States v. McGoff*,
831 F.2d 1071 (D.C. Cir. 1987) ....................................................*passim*

*United States v. Peace Info. Ctr.*,
97 F. Supp. 255 (D.D.C. 1951) ....................................... 19, 22, 25, 31

*United States v. Rafiekian*,
991 F.3d 529 (4th Cir. 2021) ................................................................. 34

*United States v. Schmidt*,
816 F.2d 1477 (10th Cir. 1987) ............................................................ 19

*United States v. Sindel*,
53 F.3d 874 (8th Cir. 1995) ............................................................ 28, 29

*United States v. Stirling*,
571 F.2d 708 (2nd Cir. 1978) ............................................................... 21

*United States v. Woods*,
571 U.S. 31 (2013) ................................................................................ 34

*Viereck v. United States*,
318 U.S. 236 (1943) .............................................................................. 25

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .............................................................................. 26

*Wood v. Moss*,
   572 U.S. 744 (2014) ................................................................................. 7

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ................................................................................. 26

*Yates v. United States*,
   574 U.S. 528 (2015).  ............................................................................. 36, 37

## Statutes

22 U.S.C. § 611 ..................................................................................... *passim*

22 U.S.C. § 612 ..................................................................................... *passim*

22 U.S.C. § 616 ..................................................................................... 16, 22

22 U.S.C. § 618 ..................................................................................... *passim*

Lobbying Disclosure Act of 1995,
   Pub. L. No. 104-65, 109 Stat. 691 (1995) ............................................ 22

## Other Authorities

28 C.F.R. § 5.205 ................................................................................... 17

Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355 (2018) ............................ 28

Federal Rule of Civil Procedure 12(b)(6) ............................................... 7

Federal Rule of Civil Procedure 15(a)(2) ............................................... 43

H.R. Rep. No. 89-1470 (1966) .............................................................. 38

*Audit of the Nat. Security Division's Enforcement and Admin. of the Foreign Agents
   Registration Act*, Office of the Inspector General (Sept. 2016), *available at*
   https://oig.justice.gov/reports/2016/a1624.pdf........................................ 39

U.S. Department of Justice, FARA Unit (May 2020), *available at*
   https://www.justice.gov/nsd-fara/page/file/1279836/download ...................... 38, 39

## INTRODUCTION

For at least several months in 2017, Defendant Stephen A. Wynn ("Defendant") helped the People's Republic of China ("PRC") and Sun Lijun ("Sun"), the then-Vice Minister of Public Security for the PRC, try to effectuate the removal of a PRC businessperson from the United States to the PRC.  Defendant was recruited to join this effort by other U.S. citizens who were aware of Defendant's political connections, and the PRC communicated requests for Defendant's assistance either through those same individuals or directly in conversations between Sun and Defendant.  In response to the PRC's requests, Defendant made multiple attempts to lobby high-level officials in the Administration of then-President Donald J. Trump, including the former President.  These efforts involved providing documents to the former President's secretary; meeting on multiple occasions with high-level officials at the National Security Council and the White House, including the Chief of Staff; and speaking directly with the former President about the PRC's request, including once in person at a formal White House dinner and once in a phone call that Defendant made from a yacht off the coast of Italy.  Defendant's actions on behalf of the PRC came at a time when he was preparing to renegotiate the licenses held by his business to operate casinos in Macau.

Once apprised of this conduct, the U.S. Department of Justice notified Defendant that he may be obligated to register under the Foreign Agents Registration Act ("FARA").  In May 2018, following discussions between Department of Justice officials and counsel for Defendant, the Department informed Defendant that it had determined that his conduct qualified him as a foreign agent under FARA and that he was therefore required to register.  Defendant challenged this conclusion, and, despite further discussions between Department of Justice officials and Defendant's counsel, Defendant still has not registered.  Accordingly, in May 2022, the

Government initiated the instant lawsuit, seeking an order to compel Defendant to comply with his registration obligation under the statute.

Defendant now seeks dismissal of the Government's suit, raising four challenges to the Complaint.  None of these challenges has any merit.  First, relying on a misreading of D.C. Circuit court precedent, Defendant seeks to cabin the Government's authority to bring civil enforcement suits to only the time before an agency relationship is terminated.  This argument misconstrues the precedent on which Defendant relies, which applied only to criminal prosecutions, and would significantly narrow civil enforcement authority under FARA in a manner that would be plainly contrary to the purpose of the statute.  Second, Defendant claims that being required to register would violate his Fifth Amendment right against self-incrimination, but he fails to meet his burden to establish that such a right is implicated in this case based on Defendant's disagreement with the Government about the legal significance of his actions.

Nor does Defendant's third argument—a First Amendment challenge to FARA's registration requirement—serve as a basis for dismissal.  FARA registration imposes no restraint on free expression, and the registration and labeling requirements under the Act are narrowly tailored to satisfy the statute's vital interest to ensure that the public is sufficiently informed about agents of foreign principals and their activities in this country.  Fourth and finally, Defendant's challenge to the sufficiency of the Complaint should be rejected.  The Complaint sufficiently alleges that Defendant acted "at the request" of the PRC and Sun in a manner that is consistent with circuit court precedent, FARA's legislative history, and the Government's interpretive guidance.  Furthermore, the allegations in the Complaint that Defendant lobbied high-level U.S. government officials at the request of a foreign government are more than

sufficient to allege that Defendant engaged in political activities.  For all of these reasons,

Defendant's motion should be denied.

## BACKGROUND

### A.    Statutory background

The Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. §§ 611-621

("FARA" or "the Act"), requires that agents of a foreign principal register with the Attorney

General and make certain disclosures in registration filings concerning their agency relationships

and activities undertaken within the United States on behalf of their respective foreign principals.

22 U.S.C. § 612(a).  Among the chief purposes of FARA is to "prevent covert influence over

U.S. policy by foreign principals."  *United States v. Craig*, 401 F. Supp. 3d 49, 54 (D.D.C.

2019).  "Simply put, the statute ensures that the public is informed of the true source or sponsor

behind the information being disseminated for its consideration."  *Id*.

"The scope of persons subject to FARA is broad," *see United States v. McGoff*, 831 F.2d

1071, 1074 (D.C. Cir. 1987), and the standard for determining when an agency relationship

exists consists of two parts.  First, a person must "act[] as an agent, representative, employee, or

servant" or "in any other capacity at the order, request, or under the direction or control" of a

foreign principal or the intermediary of a foreign principal.  22 U.S.C. § 611(c)(1).  Second, the

person must undertake certain types of activities within the United States on the foreign

principal's behalf, including, most relevant here, political activities.  *Id*. § 611(c)(1)(i).  FARA

defines "political activities" to mean activities that the agent either believes will, or actually

intends to, "in any way" influence U.S. government officials or a section of the U.S. public

regarding U.S. domestic or foreign policies or the political or public interests, policies, or

relations of a foreign government or foreign political party.  *Id*. § 611(o).

3

Persons who qualify as agents of one or more foreign principals under FARA are required to submit a registration statement with the Attorney General within ten days of the start of the relationship. *Id*. § 612(a). FARA prescribes that certain information be included in the registration statement, *id*. § 612(a)(1)-(11), and supplements must be filed at six-month intervals, *id*. § 612(b). Persons who willfully violate the registration requirements or any other provision of the Act are subject to criminal prosecution. *Id*. § 618(a), (e). The Attorney General is also authorized to bring suit seeking appropriate injunctive relief, including "an order requiring compliance with any appropriate provision" of the statute or accompanying regulations. *Id*. § 618(f).

## B.      Factual background

As alleged in the Complaint, Defendant acted as an agent of two foreign principals: Sun, the former Vice Minister for Public Security in the PRC, and the PRC itself. Compl., ECF No. 1, ¶ 1. Specifically, at the request of Sun, and on behalf of the PRC, Defendant conveyed to former President Trump and his Administration ("the Administration") the PRC's request to remove from the country a PRC businessperson who had sought political asylum in the United States. *Id.* ¶ 2. In so doing, from at least June 2017 through at least August 2017, Defendant acted as an agent for foreign principals Sun and the PRC and engaged in political activities on their behalf in the United States. *Id.*

Defendant is a U.S. citizen, real estate developer, and businessperson who has owned multiple casinos and resorts, including three casino properties located in Macau, which is a special administrative region of the PRC. *Id.* ¶ 8. Defendant also served as the Republican National Committee ("RNC") finance chair from January 2017 through January 2018. *Id.* ¶ 17. In that role, Defendant met Elliot Broidy, a former finance chair of the RNC. *Id.* ¶¶ 16-17.

4

In approximately June 2017, Broidy, on behalf of Sun, elicited Defendant's help with conveying the PRC's request to cancel the visa or otherwise remove the PRC businessperson from the United States. *Id.* ¶¶ 16-17.  Broidy provided Defendant with the PRC businessperson's passport photos, an Interpol red notice, and links to various news articles about the PRC businessperson. *Id.* ¶ 19.  Broidy believed that Defendant's RNC experience, combined with Defendant's business dealings in the PRC and friendship with the then-President, would be helpful in getting access to Administration officials. *Id.* ¶ 17.

Defendant spoke by telephone with Sun at least eight times from approximately June 2017 through at least August 2017. *Id.* ¶ 23.  These calls varied in length but lasted approximately thirty minutes on average. *Id.*  Sun requested Defendant's assistance with seeking the removal of the PRC businessperson, having his new visa application denied, and having him placed on the No Fly List. *Id.* ¶¶ 20-21.  Defendant mentioned his business interests in Macau to Sun on multiple calls. *Id.* ¶ 23.

Defendant agreed to raise the matter with the then-President and Administration officials. *Id.* ¶ 20.  During a dinner on or about June 27, 2017 with the former President and other Administration officials in Washington, D.C., Defendant conveyed the PRC's desire to have the PRC businessperson removed from the United States and provided the PRC businessperson's passport photos to the then-President's secretary. *Id.* ¶ 22.  After the dinner, Broidy informed Defendant by text that Sun was "extremely pleased and said that President Xi Jinping appreciates [Defendant's] assistance." *Id.* ¶ 22.

In addition, between approximately June 2017 and August 2017, Defendant contacted multiple Administration officials about the PRC businessperson, including senior officials on the National Security Council ("NSC") and at the White House. *Id.* ¶ 25.  For example, during one

late July 2017 meeting with the White House Chief of Staff and two senior NSC officials, Defendant stated that PRC officials had contacted him and advised him that "they were very interested in having" the PRC businessperson returned to China. *Id.* ¶ 25. In or around August 2017, Defendant on multiple occasions visited the White House in person to have what appeared to be unscheduled meetings with the then-President; some of these discussions, including a meeting on August 25, 2017, concerned the PRC businessperson. *Id.* ¶ 25. Further, on August 19, 2017, Broidy and Defendant called the then-President from Broidy's yacht during a trip off the coast of Italy. *Id.* ¶ 25. During that call, Defendant asked the then-President about the PRC businessperson's status, and the then-President responded that he would look into the matter. *Id.*

Sun continued to contact Defendant through approximately October 2017, at which point Defendant informed Sun that he had made U.S. government officials aware of the request, that Defendant was not able to provide any more assistance, and that Sun should stop contacting him. *Id.* ¶ 27. Defendant wanted to exit the situation gracefully, preserve his business interests in China, and avoid offending anyone. *Id.* The efforts by Defendant and others to have the PRC businessperson removed ultimately were unsuccessful. *Id.* ¶ 26.

Defendant's conduct was motivated by his desire to protect his business interests in the PRC. *Id.* ¶ 28. In an undated text message, Defendant wrote to a person whom Defendant believed to be Sun's assistant:

> [a]t this point, as a private citizen, I believe I have exhausted the advantages of my position. If there is any other aspect of this situation [sic] may occur to you going forward, I would of course be anxious to help. I remain grateful for the privilege of being part of the Macau and PRC business community.

*Id.* According to public reporting, in 2016, shortly before the conduct described above occurred, the Macau government restricted the number of gaming tables and machines that Defendant's casino could operate. *Id.* ¶ 29. Also according to public reporting, Defendant was scheduled to

renegotiate his licenses to operate casinos in Macau in 2019, subsequent to the conduct described above.  *Id.*

## C.     Procedural background

The Government filed suit in this case on May 17, 2022 seeking two types of relief:  (1) a declaratory judgment stating that Defendant has an obligation to register for conduct undertaken on behalf of Sun and the PRC, and (2) a permanent injunction requiring Defendant to file a registration statement and any necessary supplements pursuant to § 612(a).  *Id.*, Prayer for Relief.  On July 18, 2022, Defendant filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), raising statutory and constitutional challenges to the Complaint.  *See generally* Def.'s Mem. of Law in Supp. of Mot. to Dismiss the Complaint ("Def.'s Mot."), ECF No. 11-1.  Through this filing, the Government now responds to that motion.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In reviewing such a motion, a court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations and internal quotation marks omitted).  These pleading rules are "not meant to impose a great burden upon a plaintiff."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  While the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  A complaint must simply "contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*,

572 U.S. 744, 757-58 (2014) (citation omitted).

## ARGUMENT

None of the four bases for Defendant's motion warrants dismissal of this case.  First, the

Government is permitted to bring civil enforcement actions after an agency relationship

terminates.  This reading of the statute is consistent with D.C. Circuit court precedent, and to

hold otherwise would severely undercut the Government's civil enforcement power under

FARA.  Second, FARA registration does not implicate Defendant's rights under the Fifth

Amendment.  Defendant fails to identify any past statement that would be contradicted by his

registering, nor can his belief that he is not required to register—a statement of opinion, not

fact—serve as a valid basis for a Fifth Amendment objection.  Third, Defendant's First

Amendment rights are similarly not implicated by FARA registration.  Any burden on expression

imposed by registering is minor, and any such imposition is narrowly tailored to further the goal

of informing the public about the activities of foreign agents in this country.  Fourth, the

Complaint sufficiently alleges that Defendant acted "at the request" of two foreign principals so

as to give rise to an agency relationship for purposes of FARA.  Defendant's conduct as

described in the Complaint—lobbying officials at the highest level of the U.S. Government on

behalf of a foreign power—easily qualifies as political activities.  Having failed to raise any valid

basis for dismissal, Defendant's motion should be denied.

## A.     Civil enforcement actions under FARA can be brought after the conclusion of an agency relationship

Defendant contends that, under FARA, the obligation of an agent of a foreign principal to

register ceases upon termination of the agency relationship.  According to Defendant, because

any agency relationship that may have existed between him and the PRC ended in October 2017,

the Government cannot now bring suit seeking an injunction compelling him to register.  Under

this logic, the only valid civil enforcement action that the Government could bring under FARA

is one in which it files suit and obtains judgment in the five-month window in which Defendant

engaged in registerable activity.

FARA, however, contains no restraints on when the Government can pursue civil

enforcement actions.  The statute expressly states that "termination of [agency] status shall not

relieve such agent from his obligation to file a registration statement for the period during which

he was an agent of a foreign principal."  22 U.S.C. § 612(a).  This provision was specifically

added to the statute to address the concern that those subject to FARA "were attempting to evade

the Act's requirements by ceasing their activities and claiming as an affirmative defense that

withdrawal from an agency relationship automatically eliminated liability for failure to file."

*McGoff*, 831 F.2d at 1087.  And retrospective enforcement actions are consistent with the long-

standing rule that the Government is not time-limited when seeking equitable relief to enforce its

rights.  *See, e.g.*, *United States v. Summerlin*, 310 U.S. 414, 416 (1940); *FEC v. Christian Coal.*,

965 F. Supp. 66, 71 (D.D.C. 1997).

Defendant nevertheless now seeks this Court's blessing to do precisely what Congress

sought to disallow:  evade his statutory obligation to register for the work he undertook on behalf

of Sun and the PRC by declaring that he is no longer acting as a foreign agent.  For the following

reasons, the Court should reject that argument.

1. *McGoff* does not foreclose civil enforcement actions after an agency relationship has
   ended

Defendant relies almost entirely on the D.C. Circuit's decision in *McGoff* interpreting

FARA for purposes of a criminal prosecution, but that case does not compel dismissal of the

instant action.  There, the Government charged the defendant for failing to register as an agent of

the government of South Africa based on conduct that predated the criminal information by more than seven years. *McGoff*, 831 F.2d at 1072. Specifically, the Government alleged that the defendant's failure to register violated 22 U.S.C. § 612(a), which requires persons meeting the definition of agent of a foreign principal to file registration statements, as well as 22 U.S.C. § 618(e), which makes it a continuing criminal offense to fail to register under FARA. *Id.* Based on its reading of the relevant statutory language and legislative history, the majority concluded that the statute of limitations for a continuing offense under § 618(e) begins to run on the last day a person acts as an agent of a foreign principal. *Id.* at 1071.

Defendant relies almost entirely on two pieces of dicta in the majority opinion's analysis. First, the majority commented that "it appears that the statutory obligation to file expires when the agent ceases activities on behalf of the foreign principal," reasoning that "once an individual has ceased his activities, he is no longer an 'agent of a foreign' principal within the meaning of FARA." *Id.* at 1082. Second, in furthering construing FARA's statutory text, the majority stated that "FARA does not evince an antiquarian interest on Congress'[s] part; FARA's focus is on the here and now." *Id.*

Neither of these passing references, however, was outcome-determinative or otherwise central to the holding in *McGoff*. In fact, the majority offered the passages cited by Defendant as one possible reading of § 612(a) before ultimately concluding that the provision is "ambiguous." *Id.* at 1083. In the end, the majority's holding in the case rested not on its interpretation of the text of § 612(a) but its review of the legislative history for that provision. *Id.* at 1089 (concluding that § 612(a) was added "for the specific purpose of causing the statute of limitations to commence on the day the agency relationship terminated"). Given its conclusion

that the text of § 612(a) is ambiguous, the majority did not embrace the phrasing cited by

Defendant as the definitive interpretation.

*McGoff*, furthermore, was focused on the narrow question of when the statute of

limitations for a continuing offense charge under § 618(e) begins to run, not on whether

retrospective civil enforcement actions could be brought.  The majority's central concern with

the Government's interpretation of § 618(e) was that "it would virtually eliminate the statute of

limitations for failure to file under FARA," *id*. at 1093, an outcome the majority described as

being "unusual," "remarkable," "draconian," and a "bold step" for criminal prosecutions, *id*. at

1090.  Civil enforcement actions, however, are authorized by a separate statutory provision.  *See*

22 U.S.C. § 618(f).  And whereas it is "unusual" for criminal prosecutions not to be bound by a

statute of limitations—in matters reserved for only "the most heinous crimes known to our law,"

*McGoff*, 831 F.2d at 1093—that same constraint does not exist for civil enforcement actions, *see*

*Mount Vernon Mortg. Corp. v. United States*, 236 F.2d 724, 725 (D.C. Cir. 1956) (holding that

statutes of limitations do not apply where the United States brings suit "to enforce a public

right"); *accord United States v. City of Palm Beach Gardens*, 635 F.2d 337, 339 (5th Cir. 1981)

("[C]ourts have long held that the United States is not bound by any limitations period unless

congress explicitly directs otherwise.").  The concern about imposing a stopping point on the

Government's ability to bring prosecutions is not present in a civil enforcement proceeding.

Considerations unique to criminal prosecutions undergird the *McGoff* majority's opinion

elsewhere.  The majority, for instance, made multiple references to how its analysis was

influenced by considerations specific to the criminal context.  *See McGoff*, 831 F.2d at 1077 ("*In*

*the criminal context*, courts have traditionally required greater clarity in draftsmanship than in

civil contexts . . . ." (emphasis added)); *id*. ("[T]he law of crimes must be clear.  There is less

room in a statute's regime for flexibility . . . ."); *id*. at 1084 n.22 ("We owe, of course, no deference to the Government's construction of a *criminal statute*").  It further emphasized this point at the conclusion of the majority opinion, noting that its "holding finds solid support in the well-established principle of interpretation of *criminal statutes* known as the rule of lenity."  *Id*. at 1095 (emphasis added).  That rule provides that any ambiguity in criminal statutes should be resolved in favor of lenity and, as the majority explained, counseled in favor of the defendant's reading of § 618(e).  *Id*. at 1095-96.  But the rule applies only to the interpretation of criminal statutes, or to a statutory provision with both criminal and noncriminal application.  *See Kasten v. Saint Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011).  It thus has no bearing on the interpretation of § 618(f) and whether that provision allows the Government to bring an enforcement action to compel registration where the agency relationship may have ceased.  *See McGoff*, 831 F.2d at 1094 n.32 (declining to adopt the dissent's view that the majority ruling precludes the Government's ability to bring civil enforcement actions).  None of special considerations specific to criminal prosecutions relied upon by the majority are present where the Government exercises its civil enforcement authority.

These considerations also animated the majority's discussion of the purpose of FARA in *McGoff*.  As described by the majority, "Congress'[s] fundamental purpose . . . was not to punish foreign agents for the activities described in the statute."  *Id*. at 1093-94.  Instead, Congress's goal "was to compel disclosure to permit evaluation of these activities," a goal Congress "further stressed" by adding a civil enforcement mechanism to the statute.  *Id*. at 1094.  Unlike the criminal prosecution at issue in *McGoff*, which sought to "punish" the defendant for engaging in conduct that required registration under the statute, the Government's aim in the instant lawsuit is plainly consistent with the central goal of FARA:  to compel disclosure to allow government

officials as well as the public to evaluate Defendant's activities.  That remains true even where

that disclosure occurs years after the agency relationship has ceased to exist:  disclosing the

existence of a previously unidentified agency relationship will still affect how government

officials and the public view policy decisions influenced by that foreign agent.  Unlike in a

criminal prosecution, the Government's reliance on § 618(f) in this case fits squarely within

FARA's central aim of promoting public awareness.

2.  <u>FARA's legislative history supports allowing the Government to seek injunctive
relief addressing past conduct</u>

Equally without merit is Defendant's contention that FARA's legislative history supports

his narrow reading of the statute.  *See* Def.'s Mot. at 11.  Defendant principally focuses on one

reference in the majority opinion's analysis of the legislative history in which the majority

observes that, had Congress intended to eliminate any statute of limitations for FARA criminal

prosecutions, it would have done so in a more obvious fashion than what the historical record

shows.  *McGoff*, 831 F.2d at 1090.  But this passage has no bearing on a civil lawsuit under

FARA seeking injunctive relief because such suits are not governed by the criminal statute of

limitations at issue in *McGoff*.

In fact, *McGoff*'s discussion of FARA's legislative history leaves no doubt that Congress

intended for the Government's ability to enforce FARA to survive the cessation of an agency

relationship.  As noted by the majority, a core concern motivating Congress was that "individuals

subject to FARA were attempting to evade the Act's requirements by ceasing their activities and

claiming as an affirmative defense that withdrawal from an agency relationship automatically

eliminated liability for failure to file." *Id*. at 1087.  Congress amended § 612(a) in 1950 at the

request of the Department of Justice by adding that "termination of such [agency] status shall not

relieve such agent from his obligation to file a registration statement for the period during which

he was an agent of a foreign principal," and it did so specifically to "eliminate[] as an affirmative

defense the argument that the agency relationship had ended and so too had the reporting

obligation." *Id*. at 1087-88.  The outcome Defendant seeks in this case—to immunize himself

from a civil enforcement action by virtue of having terminated his agency relationship—would

be directly contrary to the purpose of the 1950 amendments, as recognized in *McGoff*.  *See id*. at

1089 n.27 ("Our interpretation vindicates the express purpose [of § 612] which was to . . .

foreclose an agent from cutting off liability for failing to comply with FARA's registration

requirements by simply terminating the agency . . . .").

      3.   <u>Requiring Defendant to register would uphold the purpose of FARA</u>

As a final matter, Defendant's claim that his interpretation of *McGoff* is consistent with

the purpose of FARA is likewise unavailing.  Defendant suggests that the broader purpose of

FARA is concerned only with the present and "evaluat[ing] an agent's political speech and

activities contemporaneously in their proper context."  *See* Def.'s Mot. at 12.  Such a constrained

reading of the statute would collapse the Government's enforcement authority:  FARA

enforcement actions could be brought only where a person is about to violate or is presently

violating the statute, and such persons would be able to escape registration by terminating their

agency relationship at any time, including after the Government files suit.  It is a dubious

proposition that Congress intended to give the Government civil enforcement authority, only to

have it be subject to such easy evasion.

Defendant is also mistaken that any disclosures he purportedly made to government

officials satisfies the purpose of FARA.  *See id*. ("Wynn contemporaneously disclosed to U.S.

government officials that he was conveying a message from the PRC, allowing the U.S. officials

to evaluate his activities in their proper context.").  Such a cramped reading of FARA accounts

14

only for disclosure to the listener and overlooks Congress's desire to make the broader public aware of the conduct of persons acting as agents on behalf of foreign principals.  *See Meese v. Keene*, 481 U.S. 465, 480 (1987) ("Congress simply required [agents of foreign principals] to make additional disclosures that would better enable *the public* to evaluate the import of the[ir messages]." (emphasis added)); *Craig*, 401 F. Supp. 3d at 54 ("Simply put, the statute ensures that the public is informed of the true source or sponsor behind the information being disseminated for its consideration.").  Congress's focus on public notification is further evidenced by 22 U.S.C. § 616, which requires the Attorney General to maintain a publicly available database consisting of information from registration statements filed with the Department of Justice.  *See* 22 U.S.C. § 616(d).

Defendant's reliance on his purported self-disclosure also falls short of providing the full panoply of information required under the statute.  Persons serving as agents of foreign principals must disclose multiple details about the scope and nature of the agency relationship beyond the mere existence of a qualifying relationship, 22 U.S.C. § 612(a)(1)-(11), as well as supplemental statements at six-month intervals updating certain of these categories of information, *id*. § 612(b).  Registered agents, moreover, must file termination statements with the Department of Justice, and those statements must include sufficient information to allow a determination that an agent "has fully discharged all his obligations under the Act."  28 C.F.R. § 5.205(a)-(b).  Defendant's selective representations to certain government officials about his relationship with the PRC cannot substitute for the statutorily required disclosures.  The suggestion that the constitute an alternative way to fulfill the purpose of FARA is unfounded.

For similar reasons, Defendant also overreaches when asserting that his reading of § 612(a) is consistent with the prospective nature of injunctive relief.  *See* Def.'s Mot. at 13.

Without knowing more details about the nature of Defendant's relationship with the PRC and Sun, the Government cannot be certain that Defendant has in fact ceased engaging in registerable conduct.  Having the information Defendant is required to provide in his registration statement, *see* 22 U.S.C. § 612(b), as well as the information contained in a termination statement, *see* 28 C.F.R. § 5.205(b), would put the Government in the best position to evaluate whether Wynn's relationship with Sun and the PRC truly ended in October 2017.  Even if it did, FARA still permit the Government to bring suit, for the reasons discussed above.  Notably, the statute is not alone in authorizing the Government to compel the disclosure of information that pertains to past conduct.  *See, e.g.*, *Anderson v. Holder*, 647 F.3d 1165, 1169 (D.C. Cir. 2011) (affirming district court judgment requiring parolee to register as a sex offender following passage of registration law that post-dated parolee's offense conduct by twelve years); *Christian Coalition*, 965 F. Supp. at 72 (denying motion to dismiss claim brought by the Federal Election Commission pertaining to conduct that had occurred five years prior).  The Government's suit seeking to compel Defendant to register is accordingly consistent with both the purpose of FARA and the use of injunctive relief more broadly.

## B.   Requiring Defendant to register under FARA would not violate his Fifth Amendment rights

Defendant next argues that requiring him to register under FARA would violate the Fifth Amendment because it would force him to "make a sworn public declaration, under penalty of perjury, that he acted as an agent of foreign principals Sun and the PRC" and "[t]hose sworn statements would directly contradict Wynn's prior sworn testimony and representations in his correspondence with DOJ."  Def.'s Mot. at 14-15.  As with Defendant's flawed reading of *McGoff*, this argument provides no justification for granting his motion.

16

Wynn has not met his burden of showing that any statement required by the registration form would in fact "directly contradict" any past statements he has made, and this failure dooms his Fifth Amendment claim.  To invoke the protections afforded by the Fifth Amendment, claimants must demonstrate that they have a "reasonable cause to apprehend danger" of providing information that would "support a conviction" or "furnish a link in the chain of evidence needed to prosecute" them for violating the law.  *Hoffman v. United States*, 341 U.S. 479, 486 (1951).  But Defendant is not excused from registering under FARA simply because "he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard."  *Id*.  Rather, it is Defendant's burden to "factually establish that the risks of incrimination resulting from" completing a FARA registration form "to be 'substantial and 'real,' not merely trifling or imaginary, hazards of incrimination.'"  *See United States v. Schmidt*, 816 F.2d 1477, 1481 (10th Cir. 1987) (quoting *Marchetti v. United States*, 390 U.S. 39, 53 (1968)).

Defendant's motion falls well short of meeting this threshold burden.  Although Defendant contends that registering would "directly contradict" statements he made in correspondence with the Government, citing a June 8, 2018 letter from his counsel to the Department of Justice, *see* Def.'s Mot. at 15 (citing June 8, 2018 Letter from Reid H. Weingarten, Brian M. Heberlig, and Nicholas P. Silverman, to Jay I. Bratt, Heather H. Hunt, and Robert Wallace ("June 2018 Letter"), ECF No. 11-3), he fails to identify any statement in the 14-page letter that would be contrary to a representation he would be required to make as part of a FARA registration.  Even more specious is Defendant's assertion that registering would contradict prior sworn testimony that he has given.  *See* Def.'s Mot. at 16.  No such testimony is part of the record on Defendant's motion, so there is no way to assess what purported

contradiction exists—including whether it extends to the act of registering as a whole or only to certain statements called for by the registration form—or to otherwise evaluate the credibility of Defendant's claim.  Defendant has failed to meet his burden of demonstrating that there exists any potential conflict between his past statements and what he would be required to disclose as a FARA registrant.  His Fifth Amendment challenge to the Complaint should accordingly be denied.

Even if Defendant had identified one or more statements that he believed would conflict with any FARA registration filing, his Fifth Amendment challenge should still fail because the protections afforded by the privilege do not extend to his beliefs about the legal significance of his actions.  The right against self-incrimination exists "to resist compelled explicit or implicit disclosures of incriminating *information*" and "to prevent the use of legal compulsion to extract from the accused a sworn *communication of facts* which would incriminate" the accused.  *Doe v. United States*, 487 U.S. 201, 212 (1988) (emphasis added).  "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate *a factual assertion or disclose information*."  *Id*. at 210 (emphasis added); *see also United States v. Hubbell*, 530 U.S. 27, 34 n.8 (2000) ("It is consistent with the history of and the policies underlying the Self-Incrimination Clause to hold that the privilege may be asserted only to resist compelled explicit or implicit disclosures of incriminating *information*." (emphasis added)).

Here, Defendant's Fifth Amendment challenge is not based on any perceived conflict between disclosures in FARA registration materials and factual information previously provided to the Government.  Instead, it centers on the fact that Defendant previously expressed an opinion about the legal significance of his conduct.  *See* Def.'s Mot. at 14 ("Granting the government's requested relief would compel Wynn to act as a witness against himself and to

*state an opinion he does hold . . . .*" (emphasis added)); *id.* at 15 (noting that "Wynn disputed the Department [of Justice]'s *analysis* in his June 8, 2018 letter" (emphasis added) (internal quotation marks omitted)); *id.* at 7 ("[I]n August 2020, Wynn provided an interview and sworn testimony during the criminal investigation of Broidy and others, in which he stated that *he believed* he was acting in the interests of the United States, and not as an agent of Sun or the PRC." (emphasis added)).  But Defendant's past statements about his opinion of whether he should be required to register is not the type of factual information covered by the Fifth Amendment and thus cannot serve as grounds for invoking the privilege.  Were that true, persons under investigation for FARA violations could be immunized from any civil enforcement action by simply opining to the Government that their conduct did not create a registration obligation. Nor is it the case that, by registering, Defendant would be forced to convey a belief he does not hold.  FARA registration in no way inhibits Defendant from continuing to express his belief that he should not have been required to register.  *See Keene*, 481 U.S. at 481 (observing that FARA registrants "may go beyond the disclosures required by statute and add any further information they think germane" to the public's understanding of their activities).  Defendant's disagreement with the Government about the legal significance of his actions does give rise to a Fifth Amendment violation.

More broadly, FARA's registration requirement in general does not infringe upon the rights afforded by the Fifth Amendment.  No such conflict exists where the Government mandates that the public to comply with an "essentially regulatory, not criminal" statute, where "self-reporting is indispensable to its fulfillment," and where there are no "substantial hazards of self-incrimination."  *California v. Byers*, 402 U.S. 424, 429-31 (1971) (rejecting Fifth Amendment challenge to California state law requiring drivers of cars involved in accidents to

provide their names and addresses on the scene); *see also, e.g.*, *United States v. Stirling*, 571

F.2d 708, 727-28 (2nd Cir. 1978) (dismissing challenge to SEC stock reporting requirement),

*cert. denied*, 439 U.S. 824 (1978).  By contrast, laws do implicate the Fifth Amendment where

they target "a highly selective group inherently suspect of criminal activities."  *See Albertson v.*

*Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965) (invalidating on Fifth Amendment

grounds order of Subversive Activities Control Board requiring registration by members of

Communist-action organizations); *Marchetti*, 390 U.S. at 61 (holding that the Fifth Amendment

privilege afforded a complete defense to prosecutions for noncompliance with federal gambling

tax and registration requirements); *Leary v. United States*, 395 U.S. 6, 15, 27 (1969) (same for

law imposing transfer and occupational tax on marijuana dealers).

     FARA's registration obligation fits comfortably within the parameters established in

*Byers*.  Rather than targeting a group of persons engaged in inherently criminal activity, FARA is

a statute of general applicability, and its purpose is to promote transparency, not to "facilitate

criminal convictions."  *See Byers*, 402 U.S. at 430.  Information gathered from the registration

statements, moreover, is indispensable to fulfilling FARA's purpose of promoting transparency.

The information collected from registration materials and supplementary filings is made publicly

available, *see* 22 U.S.C. § 616(a), (d), which allows the Government and public at large to "be

informed of the identity of such persons and . . . appraise their statements and actions in the light

of their associations and activities," *Keene*, 481 U.S. at 469; *see also Peace Info. Ctr.*, 97 F.

Supp. at 263 (denying Fifth Amendment challenge to FARA because the statute "does not

require the disclosure of any information except on a voluntary basis as a condition of carrying

on certain occupations or certain activities").  Unlike the statutes at issue in *Albertson*, *Marchetti*,

and *Leary*, FARA is not aimed at conduct that is criminalized by other federal or state statutes.

Acting as the agent of a foreign principal is not a crime, so long as the agent complies with the requisite registration requirements.

For all of these reasons, the Court should reject Defendant's Fifth Amendment challenge to the Complaint.[1]

## C.      Requiring Defendant to register under FARA would not violate Defendant's First Amendment rights

Just as FARA registration does not violate Defendant's Fifth Amendment rights, so too does it comport with the First Amendment.  FARA registration imposes no restriction on the ability of an agent to speak or otherwise act on behalf of a foreign principal, and it is designed to extract limited factual information from persons who act as foreign agents, as opposed to requiring such persons to disseminate government-sponsored statements of ideology.  But even under a more demanding standard of review, FARA registration still passes constitutional muster because the Government has a compelling interest in ensuring there is public disclosure about the work of foreign agents, and FARA's registration requirement is narrowly tailored to advance this interest.

### 1.   Courts have repeatedly held that FARA comports with the First Amendment

In the decades since it was passed, FARA has been subject to multiple First Amendment challenges, none of which has succeeded.  In *Block v. Meese*, for example, the D.C. Circuit addressed a First Amendment claim brought by multiple individuals who wished to exhibit a film

---

[1] Even if the Court were to conclude that FARA registration implicates a foreign agent's Fifth Amendment rights, it would still not necessitate dismissal of a civil enforcement action. Where a valid Fifth Amendment claim exists, the Government should be given the option of continuing to pursue a civil enforcement action or providing some form of immunity to the registrant with respect to the past statements.

about nuclear war and two others about acid rain.  *See* 793 F.2d at 1306.  All three films were produced by the National Film Board of Canada ("NFBC"), an entity that served as an instrumentality of the Canadian government and used its New York office to disseminate the films in the United States.  *Id.*  As such, NFBC registered as an agent of a foreign principal, and certain of its films were deemed by the Department of Justice to constitute "political propaganda" under FARA.[2]  *Id.*  The plaintiffs sued to challenge the requirement under FARA that a registrant notify the Department of Justice within forty-eight hours of transmitting "political propaganda" as well as a statement identifying the places, times, and extent of the transmittal.  *Id.* at 1307.  In addition, the plaintiffs challenged a regulation requiring an agent to report the name of any individual or entity receiving more than 100 copies of material subject to FARA and to identify the theater, viewing dates, and estimated attendance whenever that material was a movie.  *Id.*  According to the plaintiffs, classifying the material as propaganda and requiring public disclosure of their names—as the exhibitors of the movies—infringed on their First Amendment rights.  *Id.* at 1311.

The court dispensed with both claims.  With respect to the reporting requirements, the court observed that the general objective of FARA is to disclose "to the public the nature and extent of agents' dissemination of foreign advocacy."  *Id.* at 1316 (citation omitted).  FARA's reporting obligation fulfills this purpose, the court continued, by disclosing those segments of society "which the foreign agent has been successful in reaching with his principal's message."  *Id.*  Underlying the plaintiffs' challenge, the court surmised, was a desire to *prevent* the

---

[2] Previously, FARA's definition of "political activities" at § 611(o) included reference to "the dissemination of political propaganda," which was defined by § 611(j).  In 1995, Congress amended FARA to remove any reference to "political propaganda" in § 611(o) and to strike § 611(j) altogether.  *See* Lobbying Disclosure Act of 1995, Pub. L. No. 104-65, § 9, 109 Stat. 691, 699 (1995).

dissemination of information and a desire that the "already extant public knowledge of their [film] exhibition [not] be any more widespread than necessary." *Id*. at 1317.  The Government's interest in ensuring public awareness about the reach of a foreign agent's message ultimately outweighed this concern. *Id*. at 1317-18.

One year later, the Supreme Court in *Meese v. Keene* denied a First Amendment challenge to the "political propaganda" provision of FARA brought by a state legislator and attorney who sought to exhibit the same three Canadian films at issue in *Block*.  481 U.S. at 467.  The plaintiff claimed that the statute violated his First Amendment rights by suggesting he was engaged in the dissemination of political propaganda, which he believed to be a pejorative term, and he sought to enjoin FARA's registration and labeling requirements. *Id*. at 467-68.  In rejecting this claim, the Court reasoned that FARA "places no burden on protected expression" and did not prevent the plaintiff from accessing and exhibiting the Canadian films. *Id*. at 480.  The Court noted that instead of censoring the plaintiff, FARA simply requires persons subject to the Act "to make additional disclosures that would better enable the public to evaluate the import of" the information being disseminated. *Id*.  Moreover, the Court observed that persons subject to FARA's requirements "may go beyond the disclosures required by statute" and convey any additional message they wish to express. *Id*. at 481.  As such, FARA "recognizes that the best remedy for misleading or inaccurate speech . . . is fair, truthful, and accurate speech." *Id*.

Although they do not squarely address FARA's registration requirement, *Keene* and *Block* should nevertheless guide the Court's analysis in this case.  Both cases recognized that any burdens that FARA imposes on free speech are minimal and that FARA promotes free speech by ensuring that the Government and the public have accurate information about agents disseminating information on behalf of foreign principals. *See also Vireck v. United States*, 318

U.S. 236, 251 (1943) (Black, J., dissenting) ("Resting on the fundamental constitutional principle

that our people, adequately informed, may be trusted to distinguish between the true and the

false," FARA is intended to ensure that "hearers and readers may not be deceived by the belief

that the information comes from a disinterested source. *Such legislation implements rather than*

*detracts from the prized freedoms guaranteed by the First Amendment.*" (emphasis added)).  This

Court should similarly affirm the constitutionality of FARA's registration requirement.

2.  <u>FARA registration requires only the disclosure of factual, non-controversial
    information and does not require affirmation of a government-dictated message or a
    statement of opinion or ideological belief</u>

Defendant's First Amendment challenge is premised on the mistaken belief that

registering under FARA requires him "to speak a particular government-dictated message."

Def.'s Mot. at 17.  According to Defendant, filling out a registration form would force him "to

state an opinion he does not hold" because it requires him to, among other things, identify every

foreign principal for whom he has agreed to act and provide certain details about that agency

relationship.  *Id*. at 14 (citing U.S. Department of Justice Registration Statement, Pursuant to the

Foreign Agents Registration Act of 1938, as amended, ECF. No. 11-4, at 3).  But because

FARA's registration requirement makes no demand that Defendant communicate a government-

sponsored message, any burden imposed it imposes is at most minimal.

The Supreme Court has long recognized that "the First Amendment does not leave it

open to public authorities to compel a person to utter a message with which he does not agree."

*Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005) (citation and internal brackets

and quotation marks omitted).  Consistent with this principle, the Court invalidated a state law

mandating participation by public school students in a daily recitation of the pledge of allegiance

and flag salute, concluding that no government official "can prescribe what shall be orthodox in

politics, nationalism, religion, or other matters of opinion . . . ."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  In a separate case, the Court held that it would be unconstitutional to force a person "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" by being required to serve as a "mobile billboard for the State's ideological message."  *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (internal quotation marks omitted) (invalidating state law requiring display of the state motto on non-commercial license plates).

FARA registration, which seeks only basic information about "the nature of [foreign agents'] business and their political activities," *Keene*, 481 U.S. at 469, presents none of these same concerns.  Like any registrant, Defendant is required to complete a six-page form asking for factual information about the parties to the agency relationship, including names, addresses, citizenship, and corporate structure.  *See* ECF No. 11-4 at 1-3.  The form also seeks information about the relationship between the agent and foreign principal, including what activities the agent has engaged in, any financial arrangements between the two, and whether the agent has disseminated any materials on behalf of a foreign principal.  *Id.* at 3-7.  These requirements apply "equally to agents of friendly, neutral, and unfriendly governments."  *Keene*, 481 U.S. at 469-70.  Registration under FARA thus stands in stark contrast to laws compelling persons to disseminate a particular message in the government's preferred language.  *See, e.g.*, *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (holding that law requiring publicly traded companies to disclose publicly that their products were not "conflict free" violated the First Amendment, based in part on the fact that the government's message "was hardly factual and non-ideological" (internal quotation marks omitted)).  Nothing about FARA approaches a

requirement that a registrant affirm a government-sponsored view or convey a state-sponsored message.

Indeed, multiple courts have drawn a distinction between laws that compel disclosure of factual information and those that compel statements of opinion. Although both types of compulsion are subject to scrutiny under the First Amendment, the former do not "dictate the content of the speech" and thus impose considerably less burdens on free speech than do laws that involve the government "telling people what they must say." *See Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 61-62 (2006) (holding that law requiring the Department of Defense to deny federal funding to colleges and universities that prohibited military officials from accessing their campuses for recruiting purposes did not violate the First Amendment); *Riley v. Nat'l Fed. of the Blind v. N. Carolina*, 487 U.S. 781, 800 (1988) (noting that, "as a general rule," the government may itself disseminate information obtained from persons who file legally-required disclosure forms because it would involve communicating "the desired information to the public without burdening a speaker"). This reasoning applies with particular force where, as with FARA, the government regulation at issue requires the disclosure of information as part of a registration requirement or another type of important government function. *See, e.g.*, *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (holding that sex offender registry statute did not violate the First Amendment because it involved the government "conduct[ing] an essential operation of the government, just as it does when it requires individuals to disclose information for tax collection" (internal brackets and quotation marks omitted)); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (holding that requirement for individuals to submit information about cash transactions in excess of $10,000 to

the Internal Revenue Service did not require the plaintiff to "disseminate publicly a message with which he disagrees").[3]

Defendant characterizes FARA registration as constituting "a statement of opinion and ideological belief with which [Defendant] emphatically disagrees," Def.'s Mot. at 21, but this is not so. As the Court recognized in *Keene*, FARA does not prevent Defendant in any way from expressing his disagreement about the Government's conclusion regarding his agency status or otherwise voice his opinion. 480 U.S. at 481 (noting that disseminators of information subject to FARA's requirements "may go beyond the disclosures required by statute and add any further information they think germane to the public's" understanding of their agency relationship). The FARA registration form serves as a vehicle for Defendant to satisfy his legal obligation to disclose certain information to the Department of Justice, but it in no way requires Defendant to publicly state his agreement with the law—Defendant remains free to express his disagreement with FARA and its requirements, so long as he discloses the requisite factual information and otherwise complies with the statute.

Given this, FARA's registration requirement does not warrant a heightened standard of review. *See Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) (applying rational basis to compulsion of investment information divulged by a company to the SEC in the

---

[3] As First Amendment scholar Eugene Volokh has observed,

> the constitutionality of such pure factual compulsions is particularly important because we are all routinely required to state various facts to the government. We have to tell federal and state income tax authorities how much money we make. We may have to register for the draft. We may have to answer census forms. We may have to report to the police certain crimes we witness.

Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 380 (2018).

course of applying for confidential treatment). Defendant's First Amendment challenge should accordingly be denied without applying any further scrutiny.

   3.  FARA's registration requirement survives more exacting scrutiny because the
       Government has a compelling interest in disclosure and the registration obligation is
       narrowly tailored to fulfill that interest

Even if the Court concludes that a higher standard of review applies in this case, Defendant's First Amendment challenge should fail.[4] Courts have repeatedly recognized that the statute has a vital purpose of notifying the public about the nature and extent of the work an agent performs on behalf of a foreign principal. FARA's registration requirement—which does nothing to prevent an agent from speaking and only seeks information about the agency relationship—is a narrowly tailored means of accomplishing that compelling interest.

The purpose of FARA has always been linked to public disclosure. As the Court in *Keene* explained, in order to "protect the national defense, internal security, and foreign relations of the United States," FARA requires "public disclosure by persons engaging in propaganda activities and other activities for or on behalf of" foreign principals. *Keene*, 481 U.S. at 469 (citation omitted). Such disclosure allows "the Government and the people of the United States [to] be informed of the identity of such persons and [] appraise their statements and actions in the light of their associations and activities." *Id.*; *accord Block*, 793 F.2d at 1316 (recognizing that the purpose of FARA is to disclose "to the public the nature and extent of agents' dissemination

---

[4] For similar reasons described herein, FARA's registration requirement also survives exacting scrutiny. Under that standard, "there must be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed, and the governmental interest must survive exacting scrutiny. That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis v. FEC*, 554 U.S. 724, 744 (2008) (citations and internal quotation marks omitted); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009) (finding that the disclosure statute survived even strict scrutiny).

of foreign advocacy").  Courts have consistently held that disclosure laws such as FARA serve a

compelling government purpose by keeping the public informed.  *See United States v. Harriss*,

347 U.S. 612, 626 (1954) (finding that the government has a "vital national interest" in providing

the public with information regarding lobbying efforts to influence public officials); *Nat'l Ass'n

of Mfrs.*, 582 F.3d at 16 (holding that Congress's interest in public awareness of the lobbying

efforts to influence the public decision-making process is sufficiently compelling to withstand

strict scrutiny).  There can be no doubt that the Government's interest is compelling where it

seeks to inform the public about persons acting within the United States on behalf foreign

interests.  *See Attorney Gen. v. Irish N. Aid Comm.*, 346 F. Supp. 1384, 1390 (S.D.N.Y. 1972),

*affirmed without opinion*, 465 F.2d 1405 (2d Cir.), *cert. denied*, 409 U.S. 1080 (1972) ("*INAC

I*"), 346 F. Supp. at 1390 (describing the Government's purpose in enacting FARA as "strong").

FARA's registration requirement is targeted to satisfy this compelling interest in public

disclosure.  As the court noted in *Block*, FARA enables the Government to collect sufficient

information to educate the public about foreign agents as well as the nature and scope of their

activities.  *Block*, 793 F.2d at 1316 ("[I]t is obvious that the objective [of the statute] cannot be

substantially achieved" if the Government fails to make public information about the reach of a

foreign agent's propaganda activities.).  Furthermore, no less intrusive means exists to obtain

information about the work agents undertake on behalf of their foreign principals.  Absent

Defendant registering and submitting the necessary paperwork, there is no way to ensure that the

public is fully informed about the extent of his efforts on behalf of the PRC and Sun.  Nor does

FARA registration burden Defendant's protected expression—it "neither prohibits nor censors"

his ability to speak.  *Keene*, 481 U.S. at 478.  And FARA compels only that information

necessary to understand the nature and duration of a relationship between an agent and a foreign principal.

Given the important Government interests advanced by FARA, and the fact that it does not burden free speech, it is not surprising that FARA has repeatedly been upheld in the face of First Amendment challenges. *See Keene*, 481 U.S. 465; *Block*, 793 F.2d at 1315; *INAC I*, 346 F. Supp. at 1391 (holding that compelling agent's disclosure of books and records does not infringe on the First Amendment); *Peace Info. Ctr.*, 97 F. Supp. at 262 (holding that FARA "neither limits nor interferes with freedom of speech" because "[i]t does not regulate expression of ideas" or "preclude the making of any utterances," but "merely requires persons carrying on certain activities to identify themselves by filing a registration statement."). As one judge has remarked, the fact that no provision of FARA has been deemed unconstitutional in the more than 80 years of its existence strongly indicates that "it is well settled that FARA is constitutional." *Attorney Gen. v. Irish People, Inc.*, 684 F.2d 928, 935 (D.C. Cir. 1982) (Wilkey, J.).

### 4. Defendant's proposed alternatives to FARA registration are not viable

Defendant claims that his purported self-disclosures to certain government officials provides an alternative method of meeting FARA's goals, but this claim is as baseless with respect to his First Amendment argument as it is to his Fifth Amendment challenge. As an initial matter, the content of Defendant's self-disclosure is unclear. There is no record of what Defendant may have communicated to government officials, including whether he identified both the PRC and Sun as foreign principals and whether he was receiving any monetary benefit or thing of value in exchange for his assistance. Aside from the few pieces of documentary information about the PRC businessperson that Defendant provided to the then-President's secretary, *see* Compl. ¶ 22, it is also unknown whether Defendant transmitted any documents or

other informational materials to government officials that may have fallen within FARA's

labeling requirement (and whether any such materials were labeled in accordance with the Act).

In addition, the scope of Defendant's purported disclosures is not evident from the record.  The

Complaint identifies certain instances when Defendant is believed to have contacted government

officials about the PRC businessperson, but it is not known if these were the only occasions on

which Defendant lobbied government officials and whether he disclosed his relationship with the

PRC on every occasion.  Finally, even if Defendant had disclosed to every government official

whom he lobbied that he was assisting the PRC and Sun, that still would not satisfy FARA's core

purpose of informing *the public* that Defendant was acting as an agent of a foreign principal.  *See*

*Keene*, 481 U.S. at 469.  Defendant's purported self-disclosures are no substitute for FARA's

registration requirement.

      Similarly, Defendant's contention that the Government has alternative ways to convey

information about Defendant's conduct—that it "is free to speak for itself, which it has already

done," *see* Def.'s Mot. at 28—warrants no serious consideration.  To the extent the Government

has "spoken" about Defendant at all, it is only through the filing of this lawsuit and issuing an

accompanying press release.  The Government has no independent authority outside of FARA to

make the public aware when individuals like Defendant are acting as agents of foreign

principals.  Defendant offers no valid basis for seeking to be excused from that requirement.

**D.      By alleging that Defendant acted at the request of the PRC and Sun when he lobbied government officials, the Complaint sufficiently alleges that Defendant engaged in political activities on behalf of foreign principals**

      For his final challenge to the Complaint, Defendant claims that the Government failed to

sufficiently plead that he had an agency relationship with Sun and the PRC or that he engaged in

political activities on their behalf.  Defendant's arguments in support of this claim are either

contrary to well-settled precedent, belied by the allegations in the Complaint, or both. Accordingly, they should be rejected by the Court.

   1.   The Complaint sufficiently alleges that Defendant formed an agency relationship with Sun and the PRC by acting at their request

Defendant disputes the Complaint's allegation that he formed a registerable agency relationship with the PRC and Sun when he acted at their request.  According to Defendant, a "request," standing alone, is insufficient to trigger FARA's obligations—there must also be an allegation that a foreign principal ordered, directed, or controlled the agent.  Def.'s Mot. at 30.

This argument, however, is contrary to both the plain language of the statute and well-settled law interpreting the relevant statutory text.  FARA makes clear that a person becomes an agent of a foreign principal by acting "at the order, request, or under the direction or control" of the foreign principal.  22 U.S.C. § 611(c)(1).  Congress's use of the word "or" in this provision constitutes a clear signal that the items in the list should be read separately.  *See United States v. Woods*, 571 U.S. 31, 45 (2013) (noting that the "ordinary use [of the word 'or'] is almost always disjunctive, that is, the words it connects are to be given separate meanings" (citation and internal quotation marks omitted)).  Defendant's proposed reading does precisely the opposite— it effectively eliminates the word "request" as a stand-alone item in the list and gives effect only to the remaining three.  In so doing, Defendant's interpretation violates the fundamental interpretive rule of statutory construction to "give effect to every clause and word."  *See Setser v. United States*, 566 U.S. 231, 239 (2012) (citation and internal ellipsis omitted).

Every court that has been called upon to interpret § 611(c)(1), moreover, has agreed with the Government's reading.  As recognized by this precedent, "agency" for purposes of FARA is different from other definitions, including that found in the Restatement (Second) of Agency, which focuses on the "control" exercised by the foreign principal over the agent.  *Attorney Gen.*

32

*v. Irish N. Aid Comm.*, 668 F.2d 159, 161 (2d Cir. 1982) (per curium) ("*INAC II*"); *see also United States v. Rafiekian*, 991 F.3d 529, 539 (4th Cir. 2021) (describing FARA's definition of agency as "sweeping" and containing "far-reaching verbiage").  Under FARA, the concern "is not whether the agent can impose liability upon his principal but whether the relationship warrants registration by the agent to carry out the informative purposes of the Act."  *INAC II*, 668 F.2d at 161.  To be sure, the Second Circuit in *INAC II* cautioned that "agency" should not be read "in its most precatory sense" and that the exact contours of the definition fall "somewhere between a command and a plea."  *Id*.  But the court went on to identify two guideposts for ascertaining when acting in response to a request forms an agency relationship.  First, the court focused on whether those requested to act "were identified with specificity by the principal."  *Id*.  The court noted the contrast between a plea made to members of a large religious, racial, or ethnic group with a request made to a particular individual or sufficiently limited group of identifiable individuals.  *Id*.  Second, the court found that there should be consideration of "the specificity of the action requested," distinguishing "a general plea for political or financial support" from "a more specific instruction."  *Id*. at 161-62.  "Once a foreign principal establishes a particular course of conduct to be followed, those who respond to its 'request' for complying action may properly be found to be agents under the Act."  *Id*. at 162.

A judge from this district adopted the Second Circuit's reading of § 611(c)(1) two years later.  *See Attorney Gen. v. Irish People, Inc.*, 595 F. Supp. 114, 117 (D.D.C. 1984), *aff'd in part, rev'd in part on other grounds*, 796 F.2d 520 (D.C. Cir. 1986) ("*Irish People I*") (concluding, based on *INAC II*, that "[t]he requirements of the statute are stated in the disjunctive").  Although the district court's opinion was reversed on unrelated grounds, the D.C. Circuit affirmed that § 611(c)(1) should be read in the disjunctive.  *See Atty Gen. v. Irish People, Inc.*, 796 F.2d 520,

523 (D.C. Cir. 1986) ("*Irish People II*") (reviewing district court record and concluding that

there was no evidence that the alleged agent ever worked at INAC's "order *or request*" and that

there was no evidence of a "*request*, order, command, *or* directive" (emphasis added)).

The D.C. Circuit, moreover, identified an additional statutory basis for distinguishing

"request" from "direction" and "control," one not discussed by the Second Circuit in *INAC II*.

Reviewing the district court's determination that an agency relationship existed between a small

weekly newspaper called Irish People and the Irish Republican Army ("IRA"), the D.C. Circuit

questioned the finding that INAC had served as an intermediary between the two organizations.

*Id*. at 233.  Although the district court had concluded that INAC functioned as an intermediary

because it had registered under FARA as an agent of the IRA, the circuit court disagreed, noting

that "intermediary" and "agent" have definitions that are only partially overlapping under the

statute.  *Id*. at 233-34.  Specifically, the court noted that the definition of "agent" is broader

because it covers those who act "at the order, request, or under the direction or control of a

foreign principal."  *Id*. at 233.  The definition of "intermediary," by contrast, covers persons

whose activities are directed or controlled by a foreign principal—but not those who act at the

"order" or "request" of such a person—thereby making it a narrower definition.  *Id*. (holding

that, because INAC's agency status was based on its acting at the "request" of the IRA, it did not

meet the definition of intermediary under FARA).  Through its examination of the statutory text,

the D.C. Circuit rjeected the reading of § 611(c)(1) now put forward by Defendant here:  that

"request" cannot exist independent of direction or control.

Neither *McDonnell v. United States*, 579 U.S. 550 (2016), nor *Yates v. United States*, 574

U.S. 528 (2015), two cases cited by Defendant that do not concern FARA, undermine the above

analysis.  In both cases, the Court applied the interpretive cannon of *noscitur a sociis* to ensure

that each word listed as part of a statutory definition was given a meaning "similar in nature" to the other words in the list. *See McDonnell*, 579 U.S. at 569; *Yates* 574, U.S. at 545. But "similar in nature" is not the same as "identical to," and at no point in either case did the Court adopt a reading of a statutory provision that would make a key term synonymous with another, as Defendant seeks to do here with "request." In fact, the Court wanted to avoid exactly this outcome. *See McDonnell*, 579 U.S. at 569 (applying the presumption "that statutory language is not superfluous" (citation omitted)). These cases thus weigh against adopting Defendant's reading of § 611(c).

The allegations in the Complaint concerning Defendant's relationship with Sun and the PRC are more than sufficient to meet the standard for agency set forth in *INAC II* and *Irish People II*. As alleged therein, Elliot Broidy contacted Defendant on behalf of Sun to help lobby for the return of the PRC businessperson. Compl. ¶ 17. Broidy chose Defendant for this outreach because at the time Defendant was serving as the RNC finance chair, and Broidy believed that Defendant's political connections and friendship with the former President would be helpful in getting access to Administration officials. *Id*. In addition, Broidy provided Defendant with materials about the PRC businessperson to share with the then-President and others in the Administration. *Id*. ¶ 18. Broidy continued to convey requests for assistance from the PRC and Sun. *Id*. ¶ 21. At the same time, Defendant participated in a series of telephone calls with Sun, during which Sun discussed the PRC national and stated that he would appreciate Defendant's help with having the PRC national removed. *Id*. ¶ 23. Defendant acted in response to this request for help by contacting White House officials and the then-President, informing them that his foreign principals wanted the PRC national returned to China as soon as possible. *Id*. ¶ 25. These allegations make clear that the PRC's requests for assistance were not general

pleas to the broader public.  Rather, they were requests for Defendant to engage in a specific type

of conduct, aimed directly at Defendant due to his political and business connections.  Therefore,

they more than meet the Government's burden to plead that Defendant was engaged in an agency

relationship under FARA.

   2.   The legislative history and other interpretive documents for FARA do not support
        Defendant's reading of agency

   In an effort to bolster his erroneous reading of § 611(c)(1), Defendant also invokes

FARA's legislative history and interpretive documents and statements from the Department of

Justice.  These arguments are equally unavailing.

   *First*, the lack of reference to "request" in the legislative history to FARA's 1966

amendments does not mean that the term is afforded no meaning in the statute itself.  Assuming

reference to legislative history is even necessary in this case given the lack of ambiguity in

§ 611(c)(1), Defendant's argument would lead to the absurd result of effectively removing a term

from statutory text based on the absence of discussion about that term in congressional reports.

*See Cohen v. United States*, 650 F.3d 717, 730 (D.C. Cir. 2011) ("Of course, it is the enacted text

rather than the unenacted legislative history that prevails." (citation and internal quotation marks

omitted)).  But even on its own terms, the House Report cited by Defendant weighs against

interpreting "request" as requiring some element of direction or control.  *See* H.R. Rep. No. 89-

1470, at 5 (1966) (noting that "the proposed amendment would continue the provision of existing

law that an agency relationship be found to exist where a person has merely agreed to become an

agent without entering upon his functions, or where the agent acts other than pursuant to

contractual arrangements, or merely holds himself out as an agent of a foreign principal").

FARA's legislative history simply does not support Defendant's reading of the statutory text.

*Second*, the 2020 interpretive guidance issued by the Department of Justice about § 611(c)(1)'s use of "request" supports the Government's construction of that phrase in this case, not Defendant's.  *See* "The Scope of Agency Under FARA," U.S. Department of Justice, FARA Unit (May 2020), *available at* https://www.justice.gov/nsd-fara/page/file/1279836/download. Contrary to Defendant's view, the guidance adopts *INAC II*'s interpretation of "request" and makes clear that it means something separate and apart from the other terms listed in § 611(c). *Id*. at 3 ("[A] mere 'request' cannot be equated with an 'order,' or require a legally enforceable obligation, as that would violate a presumption of construction that statutory language is not superfluous." (citation and internal quotation marks omitted)).  To be sure, as Defendant points out, the guidance states that the term "request" connotes "some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's interest."  *Id*.  But that standard is met here, given the allegation in the Complaint that Defendant was motivated by his desire to protect his business interests in the PRC, noting that he brought up his business dealings in multiple conversations with Sun and expressed gratitude for being able to remain part of the Macau and PRC business community.  Compl., ¶¶ 23(e), 28.  To the extent "request" requires the principal having some type of leverage over the agent, the Complaint plainly alleges that such a power dynamic existed between Defendant and his foreign principals.

*Third*, Defendant's reference to statements by individual Department of Justice employees describing their understanding of FARA cannot dictate the proper construction of "request" under § 611(c)(1) in this case.  Defendant cites to Congressional testimony from former Assistant Attorney General Phillip B. Heymann in 1980, focusing on an excerpt in which the former official states that registration is required where a person "engages in the activities

specified in the statute and [] does so at the order of a foreign principal, or under the direction or

control of a foreign principal."  Def.'s Mot. at 34 (quoting *Inquiry Into the Matter of Billy Carter*

*and Libya:  Hearings Before the Subcomm. to Investigate the Activities of Foreign Governments*

*of the Senate Comm. on the Judiciary*, 96th Cong. 683, 701 (1980) ("Heymann Statement")).

But the Assistant Attorney General goes on to make clear that, in the view of the Department of

Justice, "the relationship between the agent and the foreign principal must be one that

substantially obligates the agent to the foreign principal."  Heymann Statement at 701.  As noted

above, the Complaint includes such an allegation in this case, asserting that Defendant acted out

of concern about his business interests in the PRC.  *See* Compl. ¶ 28. And to the extent Assistant

Attorney General Heymann's testimony reflected a different gloss on the statute than more

recent guidance discussed above, it has been superseded by the latter.

Defendant's reference to statements made by individual Department of Justice employees

during the course of an investigation by the Office of the Inspector General ("OIG"), *see* Def.'s

Mot. at 35-36, merits no serious consideration.  Unlike the interpretive guidance and Heymann

testimony, these statements do not constitute prepared formal guidance intended for the public or

Congress, and Defendant's suggestion to the contrary is baseless.  *See, e.g.*, *Office of Pers.*

*Mgmt. v. Richmond*, 496 U.S. 414, 419 (1990) (observing that "equitable estoppel will not lie

against the Government as it lies against private litigants").  This is especially true given that the

statements in the OIG report are paraphrased and unattributed.  *See Audit of the Nat. Security*

*Division's Enforcement and Admin. of the Foreign Agents Registration Act*, Office of the

Inspector General (Sept. 2016), at 9, 11, *available at*

https://oig.justice.gov/reports/2016/a1624.pdf.

3.  Defendant's repeated lobbying of government officials on behalf of the PRC to seek the return of a PRC businessperson constitutes "political activities" under FARA

Defendant also asserts that the Complaint fails to plead sufficiently that Defendant engaged in political activities on behalf of the PRC and Sun.  *See* Def.'s Mot. at 38-42. Specifically, Defendant claims that the Complaint falls short of establishing (1) that Defendant's agreement with the PRC and Sun was to deliver a message, not to influence government officials, and (2) that Defendant believed his actions would or intended for his actions to influence those same officials.  *Id*.  Defendant's assertion as to both contentions is meritless.

Under FARA, "political activities" include "any activity" that the foreign agent "believes will, or . . . intends to, in any way influence" any government agency or official, or any segment of the public "with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party."  22 U.S.C. § 611(o). The Government's burden to establish in the Complaint that Defendant engaged in such activities on behalf of the PRC and Sun is not onerous.  It need only plead facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In addition, the Court must accept all factual allegations as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, and it must further grant the Government "the benefit of all inferences that can reasonably be derived from the facts alleged," *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018) (internal brackets omitted).

The Complaint makes clear that Defendant was part of a broader effort to effectuate the return of a PRC businessperson who was criminally charged in the PRC and had sought asylum in the United States.  Compl. ¶ 16.  Defendant was recruited to assist in the effort due to his

political and business connections. *Id.* ¶ 17. The Complaint alleges that, as part of this recruitment effort, Defendant was told that the PRC businessperson was a criminal whom the PRC wanted to arrest. *Id.* ¶ 18. Defendant, moreover, was told that the businessperson's visa was due to expire soon and that the PRC wanted help in seeking the return of the businessperson to China. *Id.* Defendant was given information about the businessperson, including his passport photos and an Interpol red notice, to use in his discussions with high-ranking government officials. *Id.* ¶¶ 17-19. In addition, the Complaint alleges that, during calls with Defendant, Sun stressed the importance of the businessperson's visa not being renewed and that "he would appreciate [] Defendant's help." *Id.* ¶ 23.d. Collectively, these allegations do more than suggest that the PRC merely wanted Defendant's assistance "in bringing the PRC's proposal to the attention of Administration officials," as Defendant contends. *See* Def.'s Mot. at 39. They plausibly give rise to the conclusion that the PRC and Sun wanted the businessperson returned, specifically wanted Defendant's assistance in doing so, and armed him with information they thought would help make it happen.

Nor can Defendant credibly argue that the Complaint fails to plausibly allege that Defendant simply delivered a message to the PRC without any desire to influence U.S. policymakers. Among other allegations, the Complaint asserts that Broidy inquired about the status of the PRC businessperson's visa and whether he had been put on the No Fly List. Compl. ¶ 22. In response, Defendant stated that officials at the "highest level" of the Department of State and Department of Defense were "working on this." *Id.* The Complaint further alleges that, in an August 2017 call with the former President, Defendant asked specifically about the PRC businessperson's status, to which the former President responded by stating that he would look into the matter. *Id.* ¶ 25. These allegations highlight how Defendant wanted to ensure that

40

the officials with whom he had met were not just aware of the message from the PRC but were taking action in response to it as well.  In addition, the Complaint quotes from a written message from Defendant to the PRC in which Defendant reports that he had been assured "that all parties in the White House were fully sensitive to the timing of this issue and the relevant USA procedural law involved."  *Id*. ¶ 28.  Defendant's reference to making White House officials "sensitive" to the PRC's request similarly suggests that Defendant sought to do more than to make White House officials aware of the PRC's desire to have the businessperson removed—he wanted to influence how they thought about and perceived the issue.

4. <u>In the alternative, the Court should grant the Government leave to amend its Complaint</u>

The Government believes it has sufficiently plead a cause of action under FARA for the reasons stated above.  Should the Court disagree, however, the Government seeks leave to amend the Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).

**E.    The Court should not look beyond the four corners of the Complaint to resolve Defendant's motion**

In contravention of well-settled law that the record on a Rule 12(b)(6) motion to dismiss is limited to a complaint and only those documents that are attached or are integral to the pleading, *see Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004), Defendant impermissibly relies on unsupported factual allegations at various points in his motion, *see, e.g.*, Def.'s Mot. at 7 (asserting that "in August 2020, Wynn provided an interview and sworn testimony during the criminal investigation of Broidy and others, in which he stated that he believed he was acting in the interests of the United States and not as an agent of Sun or the PRC"); 19-20 (claiming that "[n]o audience member was deceived" by Defendant's purported self-disclosures and that "all material facts have since been disclosed to the public"); *id*. at 27 (asserting that Defendant

disclosed "all material facts").  To the extent these factual allegations by Defendant are material to the Court's resolution of the claims raised in his motion, the Government is entitled to discovery before the Court rules in Defendant's favor.

This point is especially true given that FARA affords the Government no power to issue subpoenas or to otherwise compel the production of documents or witnesses.  *See generally*, 22 U.S.C. § 618.  The Government must accordingly rely on what information it is able to obtain voluntarily from witnesses.  Here, the only information provided by Defendant to the Government was a factual narrative prepared and communicated by Defendant's attorneys.  *See* June 2018 Letter at 1 n.1, 3-5.  From this limited information, the Government has not yet been able to ascertain the details of what Defendant communicated to the government officials with whom he spoke, how he characterized his relationship with the PRC and Sun, and whether Defendant disclosed this relationship to some but not all of the government officials with whom he met.  The Court should not dismiss the Complaint where the Government has not yet had the opportunity to gather this factual information and where such information is material to the issues raised in Defendant's motion.

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied.


Dated: August 17, 2022                    Respectfully submitted,

                                          MATTHEW G. OLSEN
                                          Assistant Attorney General
                                          National Security Division
                                          U.S. Department of Justice

                                          JENNIFER KENNEDY GELLIE
                                          Chief, FARA Unit

National Security Division
U.S. Department of Justice

/s/ *Nathan M. Swinton*
NATHAN M. SWINTON
EMMA ELLENRIEDER
Trial Attorneys
U.S. Department of Justice
National Security Division
Counterintelligence and Export Control Section
950 Pennsylvania Ave NW, Room 7700D
Washington, D.C. 20530
Telephone: (202) 353-0267
Email: Nathan.Swinton@usdoj.gov
        Emma.Ellenrieder@usdoj.gov